Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Kamel Boukadoum and*
*Co-Lead Counsel for the Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

KAMEL BOUKADOUM, FRED BERGMAN, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

ACELYRIN, INC., SHAO-LEE LIN, MARDI C. DIER, BRUCE C. COZADD, DAN BECKER, ALAN B. COLOWICK, HENRY O. GOSEBRUCH, PATRICK MACHADO, BETH SEIDENBERG, and DAWN SVORONOS,

Defendants.

No. 2:23-cv-09672-FMO-MAA

**FIRST AMENDED CLASS ACTION COMPLAINT**

Courtroom: 6D
Judge: Hon. Fernando M. Olguin

# TABLE OF CONTENTS


Page

I. VIOLATIONS OF THE EXCHANGE ACT ..... 2

A. The Nature of the Exchange Action ..... 2

B. Jurisdiction and Venue for the Exchange Act Claims ..... 8

C. The Exchange Act Parties ..... 8

D. The Exchange Act Substantive Allegations ..... 10

1. Acelyrin's Lead Product Candidate, Izokibep ..... 10

2. Acelyrin's Development of Izokibep for the Treatment of HS is Critical to the Company's Success. ..... 11

3. Acelyrin Issues its IPO, Misleading Investors About its Izokibep Clinical Trials and the Drug's Prospects for the Treatment of HS. ..... 17

4. Unbeknownst to Investors But Not Acelyrin, Patient Discontinuations Undermined Acelyrin's Izokibep Clinical Trials for HS. ..... 19

5. By Omitting the Methodologies, Acelryin Materially Misrepresented the Impact of Patient Dropouts in the HS Trials. ..... 20

6. Acelyrin Knew Ongoing Dropouts Would Tank Part B's Statistical Significance. ..... 22

a. The Majority of Part B Patients Completed or Were Approaching the End of the Trial Before the IPO. ..... 22

b. Acelyrin Learned About Part B Patient Discontinuations as They Occurred. ..... 23

E. Materially False and Misleading Statements for the Exchange Act Claims. ..... 24

F. The Truth Emerges ..... 42

G. Post-Class Period Developments Confirm Serious Issues with Part B Trial....................44

1. Months After the Drop, Acelyrin Continues to Evade Questions About the High Rate of Discontinuations in Part B....................44

2. Acelyrin's SEC Filings Finally Disclose the Risk of Discontinuations in Part B....................48

3. Acelyrin Attempts to Shift Blame to its CRO for the Poor Part B Results....................50

H. Scienter Allegations for the Exchange Act Claims....................52

I. Class Action Allegations for the Exchange Act Claims....................55

J. Claims under Sections 10(b) and 20(a) of the Exchange Act....................57

COUNT I (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)....................57

COUNT II (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS)....................60

II. VIOLATIONS OF THE SECURITIES ACT....................62

A. The Nature of the Securities Action....................62

B. Jurisdiction and Venue for the Securities Act Claims....................65

C. The Securities Act Parties....................65

D. The Securities Act Substantive Allegations....................67

1. Acelyrin's Lead Product Candidate, Izokibep....................67

2. Acelyrin's Development of Izokibep for the Treatment of HS is Critical to the Company's Success....................69

3. Acelyrin Issues its IPO, Misleading Investors About its Izokibep Clinical Trials and the Drug's Prospects for the Treatment of HS. .......... 75

4. Unbeknownst to Investors, Patient Discontinuations Undermined Acelyrin's Izokibep Clinical Trials for HS. .......... 76

5. By Omitting the Methodologies, the Offering Documents Materially Misrepresented the Impact of Patient Dropouts in the HS Trials. .......... 78

6. Ongoing Dropouts Predating the IPO Tanked Part B's Statistical Significance. .......... 80

a. The Majority of Part B Patients Completed or were Approaching the End of the Trial Before the IPO. .......... 80

b. Acelyrin Learned About Part B Patient Discontinuations as They Occurred. .......... 81

E. Materially False and Misleading Statements for the Securities Act Claims .......... 82

F. The Registration Statement Failed to Comply with SEC Rules and Regulations and Applicable Accounting Principles .......... 89

G. Events and Disclosures Following the Offering. .......... 92

H. Class Action Allegations for the Securities Act Claims .......... 103

I. Securities Act Counts .......... 104

COUNT I FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST THE SECURITIES ACT DEFENDANTS .......... 104

COUNT II FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST THE SECURITIES ACT DEFENDANTS .......... 106

PRAYER FOR RELIEF .......... 107

DEMAND FOR TRIAL BY JURY .......................................................... 108

Court-appointed Co-Lead Plaintiffs Kamel Boukadoum and Fred Bergman ("Lead Plaintiffs") by and through their undersigned counsel, bring this action on behalf of themselves and (1) purchasers of Acelyrin, Inc. securities between May 4, 2023, and September 11, 2023; and (2) purchasers of Acelyrin, Inc. securities pursuant and/or traceable to Acelyrin, Inc.'s May 4, 2023 initial public offering. These groups are collectively referred to as the "Class." Excluded from the Class are Defendants, their families, and their affiliates. Lead Plaintiffs assert two sets of claims in this Complaint under alternative theories of liability.

***First***, Lead Plaintiffs assert fraud claims under pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. These claims are asserted against Acelyrin, Inc. and its founder and chief executive officer, Shao-Lee Lin—all of whom made, issued, or disseminated materially false and misleading statements that caused the price of Acelyrin securities to be artificially inflated during the Class Period ("Count I"). Each of these Defendants engaged in an act, practice, course of business, and/or scheme that defrauded or deceived investors ("Count II"). And Defendant Lin was a control person with respect to such material misstatements and omissions. These claims are predicated on every false and misleading statement identified in Section I.E, *infra*, and are brought on behalf of all persons or entities who purchased Acelyrin securities during the Class Period.

***Second***, Lead Plaintiffs assert strict liability claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), which arise from the Lead Plaintiffs' contention that the Offering Documents for Acelyrin, Inc.'s May 4, 2023 initial public offering were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein. These claims are asserted against (i) Acelyrin, the issuer of the securities; and (ii) defendants

Shao-Lee Lin, Mardi C. Dier, Bruce C. Cozadd, Dan Becker, Alan B. Colowick, Henry O. Gosebruch, Patrick Machado, Beth Siedenberg, and Dawn Svoronos, who each signed the Offering Documents and were control person with respect to such misstatements. These claims are predicated solely on the statements made in the Offering Documents discussed in Section II.E. These claims do not sound in fraud. For purposes of these claims, Lead Plaintiffs do not allege that the Company or the Individual Defendants committed intentional or reckless misconduct or that the Company or the Individual Defendants acted with scienter of fraudulent intent, which are not elements of the Securities Act claims. These claims are brought on behalf of those who purchased or otherwise acquired Acelyrin common stock pursuant and/or traceable to the Offering Documents issued in connection with the Company's Offering, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of its undersigned counsel, including from the following sources: (i) Acelyrin's public documents, conference calls, announcements and filings with the SEC made by Acelyrin; (ii) research reports from securities and financial analysts; (iii) Company wire and press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Acelyrin securities; (vii) consultation with experts; and (viii) additional materials and data concerning the Company and industry as identified herein.

# I. VIOLATIONS OF THE EXCHANGE ACT

## A. The Nature of the Exchange Action

1. This is a federal securities class action complaint brought on behalf of purchasers of Acelyrin, Inc. securities between May 4, 2023, and September 11, 2023

(the "Exchange Act Claims Class Period"). Lead Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

2. Acelyrin is a clinical-stage biopharmaceutical company focused on developing transformative medicines for immunological diseases. The Company's lead product candidate, izokibep, is a novel antibody designed to treat hidradenitis suppurativa (HS), a chronic and debilitating inflammatory skin condition, along with other immunological disorders such as psoriatic arthritis, axial spondyloarthritis, and uveitis.

3. Izokibep's success was crucial to Acelyrin, as it was the Company's most advanced program and represented a significant potential market opportunity. The positive results from earlier clinical trials of izokibep were a key selling point in Acelyrin's May 2023 initial public offering (IPO), which raised over $500 million in proceeds. As a clinical-stage company, Acelyrin was dependent on the IPO proceeds to fund its ongoing operations and clinical development programs.

4. Acelyrin's May 4, 2023 Registration Statement (the "Registration Statement") that incorporated by reference the Company's May 3, 2023 second amended Form S-1 (the "May 3, 2023 Prospectus") (together, the "Offering Documents"), contained false and misleading statements and omissions about the clinical trials and prospects of izokibep. For example, Defendants touted izokibep as "provid[ing] the opportunity to offer clinically meaningful, differentiated benefits for patients" and achieving unprecedented "high orders of HiSCR" (Hidradenitis Suppurativa Clinical Response) in Part A of the Phase 2b/3 open-label trial. However, Lead Plaintiffs allege these statements were materially false and misleading and omitted material facts because Defendants failed to disclose: (1) that the Part A trial used a study analysis method (LOCF) that would not be indicative of the future success of HS trials using more rigorous methods; (2) that the Part A trial's efficacy results predating the IPO did not include the patients that discontinued,

thereby artificially driving up the Part A HiSCR rates; (3) that Part B would use a different, more rigorous study analysis method (NRI) in the Part B results that must account for patient discontinuations; and (4) that the high discontinuation rates from the ongoing Part B trial had already compromised the integrity and results of that trial by the time of the IPO.

5. The Offering Documents also purported to warn of potential risks that "participants may drop out or fail to return for post-treatment follow-up at a higher rate than anticipated" and that Acelyrin "may experience participant withdrawals or discontinuations" that "may compromise the quality of our data." But these risk warnings were themselves false and misleading because, at the time of the IPO, the undisclosed adverse events had already occurred—Acelyrin was already experiencing problematic discontinuation rates in the ongoing Part B izokibep trial for HS that jeopardized the integrity of the results—and yet the Offering Documents did not disclose these material events.

6. With respect to the Exchange Act claims, Lead Plaintiffs allege that throughout the Class Period, Defendants made materially false and misleading statements and omissions regarding the clinical trials and efficacy of izokibep. Specifically, Lead Plaintiffs allege that Defendants failed to disclose that the methodologies used in Parts A and B of the HS trials obscured the impact of high discontinuation rates in Part B of the Phase 2b/3 clinical trial of izokibep, seriously compromising the integrity and results of the trial. As a result, Lead Plaintiffs allege that Defendants' statements about izokibep's clinical and commercial prospects during the Class Period were materially false and misleading.

7. At the time of making the alleged misrepresentations and omission during the Class Period, Acelyrin and its founder and CEO Shao-Lee Lin (the Exchange Act Defendants) knew of, or were deliberately reckless, to the falsity their statements and omissions and should have disclosed that the Part A results were artificially inflated because they omitted the trial dropouts, as well as the high

discontinuation rates in the Part B trial before the IPO based on the Company's access to near real-time clinical trial data and the timing of patient enrollments and drop-outs. Part B of Acelyrin's Phase 2b/3 trial of izokibep in HS patients was already well underway at the time of the IPO in May 2023. Based on the customary pace of patient enrollment and the timeline of the trial, a significant portion of the patients had already been enrolled and treated by the time of the IPO. As a result, the Executive Defendants had access to data on patient discontinuations and adverse events in near real-time as the trial progressed.

8. In addition, the fact that the Exchange Act Defendants were able to provide detailed disclosures about the earlier Part A open-label portion of the trials, including specific discontinuation rates and reasons, is further evidence that the Executive Defendants were closely monitoring trial data and knew of the falsity of their statements or acted with deliberate recklessness. Indeed, Acelyrin later admitted that the problematic discontinuations in Part B of the Phase 2b/3 trial occurred "as early as week 4," further confirming that the issue arose well before the IPO.

9. Lead Plaintiffs allege that Acelyrin's risk disclosures in the IPO offering documents were false and misleading because they discussed patient discontinuations as a hypothetical risk that might occur in the future, when in fact the adverse events had already been observed in the ongoing trial.

10. As further evidence contributing to a strong inference of scienter, the Exchange Act Defendants also had a motive to omit the discontinuation rates observed in clinical trials to successfully complete the IPO and maintain the Company's artificially inflated stock price. Such discontinuations, or "dropouts," are a critical issue in clinical trials because patients who are not available for analysis at the end of a trial negatively affecting the likelihood of arriving at statistically significant results and can introduce bias into the trial because dropouts may not be randomly distributed. By failing to disclose this material information and instead

presenting the risk of discontinuations as a hypothetical possibility, Defendants misled investors about the true state of the clinical program.

11. The truth began to emerge on September 11, 2023, when Acelyrin announced disappointing top-line results from Part B of the Phase 2b/3 trial of izokibep in HS patients. The company disclosed that the trial failed to meet its primary endpoint, largely due to unexpectedly high discontinuation rates among trial participants.

12. On this news, Acelyrin's stock price fell $17.19 per share, or 61.61%, over the following two trading sessions, causing significant losses and damages to investors.

13. Securities analysts expressed shock at the high discontinuation rates and the company's lack of explanation suggests that Acelyrin had not been forthcoming about the true state of the clinical trials.

14. For example, in a report dated September 12, 2023, analysts at Jefferies stated, "it's difficult to glean much from the data given how poorly the trial was run [due to] one of the highest … d/c [discontinuation] rates we've seen in HS." The same report noted that "the most problematic part of the SLRN HS data is that the only dose that looks competitive vs next-gen IL-17's = the 160mg QW dose (if you give SLRN the benefit of the doubt) … unfortunately that dose also showed a ~25% D/C [discontinuation] rate—which isn't commercially viable."

15. The same report stated that "the reason for the non-treatment related d/c's [discontinuations] in izo's Part B trial is still being assessed," and that "historical studies showed most of the IL-17 agents had <10% total d/c [discontinuations] rates." The report suggested that "different trial designs or conduct could potentially play a role" in the high discontinuation rates observed in Acelyrin's trial.

16. Furthermore, after Acelyrin announced the disappointing results and high discontinuation rates in the Phase 2b/3 trial, Acelyrin issued a press release on

November 27, 2023 stating that it had identified "certain confounding factors" in the trial, including "responder discontinuations without adverse events." Acelyrin announced that it would be implementing "quality control measures above and beyond standard protocol" for its ongoing trials and that it would be conducting an "independent audit" of the trials conducted by its contract research organization (CRO), Fortrea.

17. In response, Fortrea issued its own press release disputing Acelyrin's characterization of the situation. Fortrea stated that it "objects to the implications that Fortrea's study conduct impacted the trial outcomes" and that it "stands behind its conduct of the HS clinical trial in accordance with the protocol and applicable regulatory requirements." Fortrea also defended its reputation, stating that it has "successfully conducted thousands of clinical trials for more than 30 years, all while upholding the highest standards of integrity for all our customers."

18. By blaming Fortrea and announcing enhanced quality control measures and audits, Acelyrin essentially admitted that there were problems with the conduct of the clinical trials that had not been adequately disclosed to investors. Furthermore, the fact that Fortrea felt compelled to defend its reputation and dispute Acelyrin's characterization of the situation suggests that Acelyrin may have been attempting to shift blame away from itself and onto the CRO.

19. Securities analysts' reports detailing the fundamental flaws in the clinical trials further contribute to a strong inference of Defendants' scienter. In a November 28, 2023 report, analysts at Morgan Stanley noted that "the discontinuations are happening early … as early as week four in dose treatment groups." The report also highlighted Acelyrin's statements about implementing "quality control measures above and beyond standard protocol" and conducting an independent audit of the trials conducted by Fortrea.

20. Similarly, in a November 29, 2023 report, Piper Sandler noted that Acelyrin had blamed Fortrea for "certain confounding factors" in the trials, but that

Fortrea had disputed these allegations and defended its conduct and reputation. The report suggested that the dispute between Acelyrin and Fortrea raised further questions about the conduct of the trials and the reliability of the data.

21. Overall, Lead Plaintiffs allege that Defendants' misrepresentations and omissions artificially inflated the price of Acelyrin securities during the Exchange Act Class Period and seek to recover damages on behalf of aggrieved class members under the Exchange Act.

**B. Jurisdiction and Venue for the Exchange Act Claims**

22. The Exchange Act claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). Jurisdiction is conferred by 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23. Venue for the Exchange Act claims asserted herein is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Acelyrin is headquartered in this District, Defendants are found or transact business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

24. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

**C. The Exchange Act Parties**

25. As set forth in their previously filed Certifications incorporated by reference herein [ECF Nos. 26-3; 30-3], Lead Plaintiffs Kamel Boukadoum and Fred Bergman acquired Acelyrin securities at artificially inflated prices during the Exchange Act Class Period and suffered damages because of the federal securities

law violations and false and/or misleading statements and/or material omissions alleged herein.

26. Defendant Acelyrin is a Delaware corporation with principal executive offices located at 4149 Liberty Canyon Road, Agoura Hills, California 91301. The Company's common stock trades in an efficient market on the NASDAQ under the trading symbol "SLRN". Acelyrin describes itself as "a late-stage clinical biopharma company focused on identifying, acquiring, and accelerating the development and commercialization of transformative medicines," particularly with a focus on "the treatment of diseases with pathology related to excess activation of the immune system." (See May 3, 2023 Prospectus at 4.)

27. Defendant Shao-Lee Lin ("CEO Lin" or "Lin") has served as Acelyrin's Founder, Chief Executive Officer, and a Director of the Company at all relevant times.

28. Lin possessed the power and authority to control the contents of Acelyrin's SEC filings, press releases, and other market communications. Lin was provided with copies of Acelyrin's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of her position with Acelyrin, and her access to material information available to her but not to the public, Lin knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. Lin is liable for the false statements and omissions pleaded herein.

29. Acelyrin and Lin are sometimes referred to herein collectively as the "Exchange Act Defendants."

### D. The Exchange Act Substantive Allegations

#### 1. Acelyrin's Lead Product Candidate, Izokibep

30. Acelyrin, founded in 2020, is a late-stage clinical biopharma company that focuses on identifying, acquiring, and accelerating the development and commercialization of transformative medicines for difficult-to-treat autoimmune disorders that historically have eluded full disease resolution. As a result, potential remedies purporting to improve on the limited treatment options available present "multi-billion-dollar opportunities in the aggregate" in untapped markets and revenues. (See May 3, 2023 Prospectus at 128.)

31. But as a new company, Acelyrin has a limited portfolio of drug candidates being developed for commercialization, including drug agents izokibep, lonigutamab, and SLRN-517. While the latter two are in early stages of development in Phase 1 (and were obtained through a recent acquisition), Acelyrin developed izokibep from the ground up, and it is the Company's most advanced, "lead program" product candidate in the later stages of Phase 2 development for hidradenitis suppurativa (HS), psoriatic arthritis (PsA), and uveitis.[1] *Id.* at 128-29.

32. As such, izokibep is considered the "poster child for Acelyrin's strategic approach, which is to identify, acquire, and accelerate the development and commercialization of transformative medicines." (See TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023).

---

[1] Before seeking FDA approval, drugs typically go through three phases of development: Phase 1 clinical trials are conducted in a small number of volunteers or patients to assess the early tolerability and safety profile, and the pattern of drug absorption, distribution, and metabolism; Phase 2 clinical trials are conducted in a limited patient population afflicted with a specific disease in order to assess appropriate dosages and dose regimens, expand evidence of the safety profile, and evaluate preliminary efficacy; and Phase 3 larger scale, multicenter, well-controlled clinical trials are conducted on patients with a specific disease to generate enough data to statistically evaluate the efficacy and safety of the product for approval, as required by the FDA, to establish the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug.

33. Acelyrin's offering documents tout izokibep's special characteristics. They state that "[t]he [d]esign of Izokibep is [h]ighly [d]ifferentiated from [m]onoclonal [a]ntibodies." (See May 3, 2023 Prospectus at 133.) This "small protein therapeutic [is] designed to bind the homodimeric IL-17A molecule with high potency" and "[i]n contrast to conventional monoclonal antibodies, izokibep is much smaller – approximately one-tenth the size of a traditional monoclonal antibody – containing two IL-17A binding domains and an albumin binding domain that results in improved pharmacokinetic (PK) properties." *Id.* "By virtue of its structure and size, we believe izokibep has several key features different from traditional monoclonal antibodies," including "high potency" compared to the current "FDA-approved anti-IL-17A agents secukinumab (marketed by Novartis AG) and ixekizumab (marketed by Eli Lilly and Company)," an "albumin-binding domain increases the plasma half-life of izokibep and enhances its ability to target sites of inflammation," a "small size" to reach "difficult to penetrate tissues," and, "as demonstrated in comparative analyses assessing binding affinity, izokibep molecules are also more potent than the currently marketed monoclonal antibodies targeting IL-17A, secukinumab and ixekizumab" so "[w]e believe izokibep can deliver in a single subcutaneous injection exposure levels that the marketed anti-IL-17A monoclonal antibodies require IV infusion to deliver." *Id.* at 133-35.

34. Given this vast potential, Acelyrin describes izokibep as a "'diamond[] in the rough,' where, based on molecule characteristics, [the Company's] collective experience and expertise, and the evolving scientific and medical understanding, [Acelyrin] can establish a clinical development plan that tests [its] hypotheses as to what those benefits could mean for patients." *Id.* at 107, 128.

**2. Acelyrin's Development of Izokibep for the Treatment of HS is Critical to the Company's Success.**

35. One of the main pipelines for izokibep is for the treatment of moderate-to-severe HS, a chronic autoimmune condition where the hallmark of disease is skin

abscesses, nodules, fistulae, and scar tissue. Moderate to severe HS is characterized by the presence of HS lesions in more than two distinct anatomic areas (groin, gluteal cleft, under the breasts, across the upper back and neck), with one of these areas having Hurley Stage II or III, which includes tunnelling or scarring in the skin pockets. *Id.* at 136, 141.

36. Efficacy of treatments in HS is measured by improvements in Hidradenitis Suppurativa Clinical Response (HiSCR), the clinically validated scoring system that is used to assess disease activity. To illustrate, HiSCR50 represents a 50% improvement in abscesses and inflammatory nodules without worsening in either of these individually or worsening in tunnelling; high order responses, such as 75% improvement (HiSCR75), 90% improvement (HiSCR90), and 100% improvement (HiSCR100, which means there are no abscesses or inflammatory nodules and no new fistulae/tunnels), represent even greater clinical responses in the reduction of inflammatory nodules and abscesses as well as fistulae/tunnels. *Id.* at 136.

37. Notably, this debilitating condition currently has no FDA approved treatment that can fully resolve these skin lesions, leaving many to suffer without cure. The only FDA-approved treatment, AbbVie's Humira adalimumab, has only half reached the scale of 50% resolution and none reach 100%. (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023).

38. Prior to the IPO, Acelyrin presented izokibep as an untapped agent that, if approved by the FDA for treatment of HS, would cover an "unmet need" with "several multi-billion-dollar indications." (Acelyrin Presentation, Mar. 2, 2023). Indeed, market interest in these trial results was at a fever pitch, noting izokibep's potential "blockbuster" indications. (Piper Sandler, "Acelyrin Addressing Investors' Burning Questions & Our HS TableMania," Aug. 13, 2023.) As one May 30, 2023 report noted: "Rough diamonds may be mistaken for worthless pebbles, but a courageous and exceptional management team like Acelyrin can cut and polish them

into precious gems," with lead product "[i]zokibep … [an] example[] of this," with "best in-class, multi-billion-dollar potential. We expect this team to generate outsized returns for investors." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023).

39. In May 2022, Acelyrin began its izokibep Phase 2 clinical trials for HS, which the Company divided into Parts A and B. (clincicaltrials.gov)

40. Part A of the Phase 2 clinical trials was "designed to inform [Acelyrin's] own internal decision-making about the future of the izokibep development program in HS," and "[the Company's] internal hurdle for continuing to advance development in HS was to see high orders of HiSCR responses" in Part A, while the more clinically rigorous Part B would test these results against placebo-controlled groups (or "arms"). (See May 3, 2023 Prospectus at 140-41.)

41. Part A involved 30 participants over 12 weeks and was designed to be an exploratory open-label, single-arm investigation, meaning every patient receiving treatment received the same dose, and all knew they were receiving izokibep (versus a placebo). Patients received an injection of 160 mg of izokibep per week for a total of 12 weeks. Part A measured the portion of subjects achieving 50%, 75%, 90%, and 100% symptom resolution on the HiSCR scale.

42. Part B—which tracked 175 patients over a 16-week period—was a randomized, double-blinded, placebo-controlled, four-arm study. Of the 175 randomized patients, 57 received the 160 mg dose per week (QW dosing), 59 received the 160 mg dose every other week (Q2W dosing), and 29 and 30, respectively, were in placebo groups at the corresponding dosing frequencies. The primary endpoint for this analysis was HiSCR75. (Acelyrin Presentation, Aug. 1, 2023).

43. Although unknown to the public at the time, Acelyrin had "agreed" with the FDA to use a non-responder imputation (NRI) "analysis" method to assess the Part B results. (Acelyrin Results Call, Sept. 11, 2023.) The mode of analysis assumes

that any patients who discontinue the study are considered non-responders regardless of the reason for discontinuing or if the patient had indeed responded. In other words, patients discontinuing during the trial are treated as non-responders, regardless of the status they had prior to dropout. As the agreed-to method with the FDA, if Part B missed, Acelyrin would be unable to use the results of this trial for registrational purposes—and instead need to perform additional testing that could confirm Acelyrin's hypothesis about izokibep's efficacy in treatment HS.

44. Discontinuations, or "dropouts," are a critical issue in clinical trials, particularly when they lead to patients being lost to follow up (LTFU). That is because patients who are not available for analysis at the end of a trial represent a problem for the sponsor and for regulatory agencies. According to one article on the subject, for instance, "the greatest contemporary threat [to randomized clinical trials] is considered to be to patients discontinuing or withdrawing from the trial, that is, withdrawing from the protocol-specified assessments needed to evaluate efficacy and safety."[2] According to the FDA, "withdrawn subjects are more likely to have experienced adverse events or a failure of efficacy, and the exclusion of their data has an increased probability of introducing bias and negatively impacting the scientific validity of the research."[3] Similarly, the European Medicines Agency has stated that "missing data are a potential source of bias when analyzing clinical trials. Interpretation of the results of a trial is always problematic when the proportion of missing values is substantial."[4] Put simply, patient dropouts decrease the sample size, thereby negatively affecting the likelihood of arriving at statistically significant

[2] https://www.ahajournals.org/doi/full/10.1161/circheartfailure.115.002842

[3] Guidance for Sponsors, Clinical Investigators, and IRBs Data Retention When Subjects Withdraw from FDA-Regulated Clinical Trials. U.S. Food and Drug Administration Oct 2008

[4] Guideline on Missing Data in Confirmatory Clinical Trials. European Medicines Agency Jul 2010

results and can introduce bias into the trial because dropouts may not be randomly distributed. And significantly, high dropout rates can undermine the results of a clinical research effort, representing the death knell for FDA approval – and thus any future commercial prospects.

45. In January 2023, Acelyrin revealed its Part A trial results. After 12 weeks of treatment, Acelyrin announced that izokibep demonstrated "high orders of HiSCR" showing 71% of participants achieving HiSCR50, 57% achieving HiSCR75, 38% achieving HiSCR90 and 33% achieving HiSCR100. (See May 3, 2023 Prospectus at 141.)

46. These results played a key role in Acelyrin's campaign to raise the hype surrounding the upcoming IPO. Acelyrin, for instance, touted the Part A findings in its road show presentations and its Offering Documents, stating, "As presented at the 2023 American Academy of Dermatology (AAD) annual meeting, izokibep demonstrated high orders of HiSCR in Part A of our Phase 2b/3 trial in HS … report[ing] data as observed at 12 weeks with 71% of participants achieving HiSCR50, 57% achieving HiSCR75, 38% achieving HiSCR90 and 33% achieving HiSCR100" with "[b]oth Hurley Stage II and III participants [] present in the populations achieving the highest orders of response (HiSCR90 and HiSCR100)." *Id.*

47. Securities analysts regarded the Part A results as highly promising. For example, analysts at Piper Sandler spoke to a Key Opinion Leader (KOL) in the HS field who reported that "it was the best responses I have ever seen in any drug I have ever used both commercially and in clinical trials." (Piper Sandler, HS KOL Interview, July 23, 2023.)

48. But Acelyrin also revealed that Part A experienced a high number of patient discontinuations. Nine out of thirty participants dropped out during the study—nearly *30%* of the patient population. (See May 3, 2023 Prospectus at 8.)

49. Acelyrin provided three reasons for the discontinuations: two patients experienced gastrointestinal symptoms events, three experienced injection-site reactions (ISRs), and four patients moving away from study sites due to the COVID-19 pandemic. *Id.*

50. Acelyrin minimized concerns about safety impacting these discontinuations, assuaging the market that the ISRs were mild, and the gastrointestinal issues were preexisting, such that those patients should have been excluded from the study altogether. *Id.* at 153.

51. Critically, however, at that time Acelryin did not reveal the method it used to calculate Part A's game-changing results. Acelyrin's Part A results rely on a method known as last observation carried forward (LOCF). Unlike the NRI method, the LOCF method assumes discontinued patients would have exhibited the same results at the end of the trial as they had on their last observation. When presenting the Part A results to investors, Acelyrin, however, did not use the term LOCF, instead describing the data "as observed." *Id.* at 8, 132, 141.

52. Purporting to learn from the Part A results, Acelyrin worked to resolve these high discontinuation rates in the more rigorous Part B trial by, for instance, issuing incoming Part B patients a frequently asked questions page or an "FAQ" to educate them on ISRs and other adverse reactions to the izokibep injections. (Piper Sandler, "Acelyrin Part 2: Takeaways from Our SLRN Fireside Chat," July 23, 2023.) At the time Acelyrin disclosed its Part A trial results in March 2023, the Part B trial was already well underway, with the lion's share of sites active for treatment by the latter half of 2022. Like the Part A results, however, Part B's ongoing trial also witnessed high dropout rates. Critically, however, Acelyrin did not disclose the agreed-to method of analysis for Part B was NRI.

53. Acelyrin was under pressure to complete its Part B results given that competitor MoonLake Therapies was also racing to be the first next-gen HS inhibitor. Like Acelyrin, the efficacy of MoonLake's own compound (sonelokimab) was based

on the hypothesis that smaller molecules can more deeply penetrate tissues and see better results. (Morgan Stanley, "Evaluating Key Considerations Ahead of PhII Part B Data for Izokibep in HS," Sept. 5, 2023.)

54. MoonLake was set to release its own Phase 2 data in June 2023. *Id.* Given this upcoming showdown, analysts eagerly awaited Acelyrin's "[k]ey immunology pipeline readout [from the Part B HS trial] … given it marks the first pipeline readout for SLRN following the company's IPO and given the focus placed on therapies for HS by a recent data set from competitor MoonLake Therapeutics." *Id.* Indeed, analysts "expect the benchmark for the [Acelyrin] Part B data to be formed by the recent sonelokimab data from MoonLake," noting "[w]hile the initial izokibep data is impressive, given the small *n* [sample size] of the Part A data we believe that the upcoming Part B data readout represents the key data set for determining izokibep's competitive strength & positioning" for the burgeoning HS market. *Id.* Investors thus closely watched MoonLake's contemporaneously developed agent alongside izokibep's results.

**3. Acelyrin Issues its IPO, Misleading Investors About its Izokibep Clinical Trials and the Drug's Prospects for the Treatment of HS.**

55. On April 13, 2023, Acelyrin filed the Registration Statement on Form S-1 with the SEC in connection with its IPO, which, after several amendments, was declared effective by the SEC on May 4, 2023. Between February and April 2023, the Company and the SEC exchanged draft registration statements and correspondence about the registration statement's disclosures, with the SEC directing Acelyrin to remove any and all reference to the safety and efficacy of the Company's product candidates given that such "conclusions that are within the sole authority of the FDA and are assessed throughout the entire development process" and to "…describe the relevant preclinical and clinical trials and objective results of such trials…" (See Mar. 13, 2023 Ltr. from SEC to Acelyrin; Apr. 6, 2023 Ltr. from SEC to Acelyrin.)

56. On May 4, 2023, pursuant to the Registration Statement, Acelyrin's common stock began publicly trading on the NASDAQ under the trading symbol "SLRN".

57. On May 5, 2023, Acelyrin filed the Prospectus on Form 424B4 with the SEC in connection with the IPO (the "May 5, 2023 Prospectus"), which incorporated and formed part of the Registration Statement.

58. Pursuant to the Offering Documents, Acelyrin issued 30 million shares of its common stock to the public at the Offering price of $18.00 per share for proceeds to the Company of $502.2 million after applicable underwriting discounts and commissions.

59. The Offering Documents touted the success of izokibep's purported efficacy in treating HS during Part A of the Phase 2b/3 clinical trials and assuaged any fears about Part A's one-third discontinuation rate.

60. According to the Offering Documents, the confirmatory Part B clinical trial was "ongoing" with top line results expected in the second half of 2023. (See May 5, 2023 Prospectus at 5, 137.)

61. The Offering Documents made several general disclosures about the risk of potential trial participant discontinuations and dropouts, including at higher rates than anticipated, and the negative impact of such discontinuations on drug approval, the trial data quality, and research and development costs.

62. The Offering Documents also made limited, specific disclosures relevant to the discontinuation risk, specifically the nine discontinuations in the Part A trial for injection site reactions, physical relocation and lost to follow up, and adverse events.

63. However, nowhere in the Offering Documents do they discuss or mention any discontinuations in the ongoing Part B trial.

64. Nor do the Offering Documents inform investors about the methodology used to calculate either the Part A or Part B results.

**4. Unbeknownst to Investors But Not Acelyrin, Patient Discontinuations Undermined Acelyrin's Izokibep Clinical Trials for HS.**

65. While Acelyrin bolstered investors' confidence in izokibep as a revolutionary treatment for HS, high levels of patient discontinuations compromised the trials' integrity, and as alleged *infra*, the Company knowingly, or at a minimum acted with deliberate recklessness, in misleading investors by withholding (1) the trials' different methodologies, effectively obscuring the impact of patient discontinuation in Part A; and (2) the rate of these discontinuations seen in Part B at the time of the IPO and beyond until Acelyrin finally released its top line Part B results in September 2023.

66. Plaintiffs retained pharmaceutical expert Todd Clark to assess Defendants' statements regarding the Part A and B HS trial data and results. Mr. Clark has a Master of Science degree in drug development and regulation from Johns Hopkins University and an MBA from the Kellogg School of Business at Northwestern University. He is a pharmaceutical expert with approximately thirty years of experience consulting for branded and generic drug companies, as well as biotech firms, investment banks, and health technology services to advise them on, among other things, drug development and clinical trial design. He served in an executive role at the largest pharmaceutical marketing communications firm in the world prior to 1998, at which time he founded the consulting company he runs today. In his consulting role, Mr. Clark has consulted with many of the top pharmaceutical companies in the world, has published extensively on industry topics, including clinical trial issues, and is frequently quoted in trade journals and by academics, and he has testified in numerous cases as an expert on pharmaceutical matters.

67. Mr. Clark's expert analysis shows that, by the time of the May 4, 2023 IPO, (1) Acelyrin's failure to disclose the difference in Part A and Part B methodologies materially mispresented the impact of patient discontinuation in both trials and (2) based on publicly available information about the progress of Part B,

Acelryin would have received enough data on discontinuations in Part B to know that this issue continued to plague the Phase 2b/3 trial for HS—and enough to know the ability of the highly anticipated Part B to meet its primary endpoint was endangered by this issue.

**5. By Omitting the Methodologies, Acelryin Materially Misrepresented the Impact of Patient Dropouts in the HS Trials.**

68. For Part A, Acelyrin's omission of the LOCF method strategically misled investors about the import of the data, thus "gaming expectations" of the Part B results.

69. As discussed, Acelyrin touted Part A's efficacy results, but did not disclose that it came to those results using the LOCF method. Using that method, Acelyrin could obfuscate the impact of the high number of patient discontinuations in the Part A results—in fact, by definition, those dropouts *were not part of the final Part A analysis*.

70. In discussing Part A results, however, the prospectus and pre-IPO press releases say, "we have reported data as observed at 12 weeks." In Mr. Clark's view, this is decidedly *not* the same as saying "using a last-observation-carried-forward method to account for discontinuations" which is how it should have been described if Acelyrin was being transparent. According to Mr. Clark's experience, even for a trained eye, it is very easy to gloss over "data as observed," especially when this phrase is presented without any context as to the fact that it's being used to account for discontinuations. Simply, used alone, "as observed" does not imply a connection to discontinuation rates. Thus, in Mr. Clark's view, given the absence of other detailed sources of information available to investors at the time (e.g., the trial protocol, journal articles, etc.) the way that Acelyrin framed Part A results prior to the IPO would be very difficult for even a trained outsider to identify.

71. This omission would be material to a reasonable investor. For one, while LOCF is used in clinical trials, it is problematic in that it introduces bias into the

trial—an issue of particular concern for studies with high dropout rates like Part A. As one expert expounds in *Fallacies of Last Observation Carried Forward*: "The only condition where LOCF is unbiased is when the missing data occurs completely by chance and the data used as the basis for the LOCF imputation has exactly the same distribution as does the unknown missing data" but "[s]ince it can never be proven that these distributions are exactly the same, all LOCF analyses are suspect and should be dismissed."[5] In contrast, had the Part A results been calculated under more rigorous models (like the NRI), the Part A results would have been less impressive. In consequence, investors would not view Part A as an indication of the likely success (or not) of the upcoming Part B results.

72. Regarding Part B, Acelyrin's omission of the agreed-to methodology (the NRI) was also material.

73. Because NRI (unlike LOCF) assumes that discontinued patients are non-responders, using the NRI method inevitably results in lower response rates than LOCF if there are any dropouts at all. Thus, if there were *any* dropouts at all in Part B— a near-certain event given the near 30% dropout rate in Part A—then results for that portion of the study would be lower than those reported for Part A.

74. At bottom, Acelryin was setting up expectation for an "apples-to-apples" comparison with results the company had shared from Part A, when, in reality, the NRI-based primary endpoint for Part B would yield "apples-to-oranges" results. As the trial sponsor, Acelyrin knew that Part A and Part B results would be calculated differently, and if Acelyrin had been transparent that Part A results were calculated using LOCF and that Part B outcomes would be calculated using NRI, then observant, trained analysts could have predicted that Part B results would be lower than Part A simply because of the difference in calculations. In Mr. Clark's opinion, however, by failing to specify the methodology used to calculate the results,

[5] John M. Lachin, *Fallacies of Last Observation Carried Forward*, National Journal of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4785044/

those results were not presented with that level of transparency. Had investors known of these critical differences in treating discontinuation rates, that information would have curbed enthusiasm for the Part B results, and of course, the value of the IPO.

75. Most important, Acelyrin touted these "as observed" results without disclosing that the FDA would judge the outcome of Part B using the NRI method.

**6. Acelyrin Knew Ongoing Dropouts Would Tank Part B's Statistical Significance.**

76. In addition to obscuring the impact of discontinuations in the HS trials generally, by the time of the IPO, Acelryin also would have received enough near-real-time data on discontinuations in Part B to know that this issue would seriously compromise the anticipated Part B results.

**a. The Majority of Part B Patients Completed or Were Approaching the End of the Trial Before the IPO.**

77. Even under conservative estimates, relying on publicly available data from the Part B timeline shows that the majority of patients had either completed the trial or had progressed at least as far past week 12 at the time of the IPO.

78. Among other indicators, 92% of all sites involved in the clinical trial were active by January 13, 2023, which is 16 weeks prior to the IPO date.

79. Moreover, before the Part B trial status was changed to "active, not recruiting," only three out of the 53 sites involved in the trial were removed from the list of recruiting sites, which implies a high rate of site performance.

80. Mr. Clark also noted that while Part A of the trial was conducted exclusively at U.S. sites (meaning that any non-U.S. sites could only be involved in Part B), the first non-U.S. sites were brought online no later than August 5, 2023; of the 27 non-U.S. sites that would eventually be brought online, 85% were initiated on or before November 8, 2022. Based on when non-U.S. sites were initiated (as noted above, all non-U.S. sites were for Part B), it is likely that Part B enrollment began around August 2022.

81. Moreover, Part B reached its "Primary Completion Date" (the on which the last patient is examined or receives the studied intervention) on August 2, 2023—meaning the last patient was first administered izokibep or placebo 16 weeks earlier, on or around April 12, 2023.

82. Finally, Mr. Clark relied on Acelyrin's own statements to investors on May 30, 2023, that Part B enrollment had concluded "early", and "ahead of schedule." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023). Thus, enrollment plainly concluded before the IPO, and most patients were either 16 weeks into treatment or close to it by that time.

**b. Acelyrin Learned About Part B Patient Discontinuations as They Occurred.**

83. Acelyrin tracked these discontinuations in near real-time. While Acelyrin would remain "blinded" to *efficacy* results, it had access to, and did in fact monitor, *discontinuations* in near real-time. As stated, "they [Acelyrin management] have been tracking discontinuation rates across all studies and in the Ph2b Part B … not in real time, but they have an understanding at the end of the day." (Piper Sandler, "Acelyrin Part 2: Takeaways from Our SLRN Fireside Chat," July 23, 2023.) Acelyrin thus would have known the number of discontinuations across the majority of the Part B patient population before the IPO.

84. Taken together, the Part B trial was at an advanced stage of completion on the IPO date and Acelyrin would know that discontinuations would seriously undermine the Part B trial results and the ability to achieve primary endpoint. This is particularly true when we consider that Acelyrin knew that the FDA would assess discontinuations using the NRI method.

85. Mr. Clark also highlighted key facts suggesting that Acelyrin knew these discontinuations would be material and impact the integrity of the trial. Part A had already suffered from a high rate (30%) of discontinuations. Acelyrin knew ISRs were the most significant cause of patient discontinuation in Part A that was directly

related to treatment—and with Part B, two injections of 80 mg each were used to achieve the 160 mg dose, thereby presenting two opportunities for ISR with every administration. Acelyrin's steps to reduce discontinuations through patient education suggests Acelyrin would be on high alert for further discontinuations in Part B. Moreover, even if the educational efforts were successful in reducing ISR-related dropouts, there was no basis to assume they would have any effect on lost-to-follow-up patients, an even larger source of discontinuations in Part A.

86. According to Mr. Clark, the high dropout rate in Part A, the degree of Part B completion, Acelyrin's acknowledged monitoring of dropouts during Part B, Acelyrin's knowledge that NRI was the relevant metric, and the number of trial dropouts Acelyrin observed at the time of the IPO would be material information impacting the integrity of the trial. It was therefore misleading for Acelyrin to tout Part A's efficacy results while the Part B trial continued to suffer from the same, high rate of discontinuation, and further for Acelyrin to omit this discontinuation information while disclosing trial discontinuation generally as a potential risk factor. In particular, the discontinuation rates appearing pre-IPO alone would cause concern because a) it indicated that the Company's efforts to reduce dropout rates from Part A might not be working, b) high dropout rates are often associated with significant adverse events (such as negative safety signals), and c) dropouts can affect the statistical significance/reliability of the trial data. Together, it is plausible to infer that Acelyrin knew that discontinuations continued to be problematic at the time of the IPO in May 2023.

**E. Materially False and Misleading Statements for the Exchange Act Claims.**

87. The Exchange Act Class Period began on May 4, 2023, when Acelyrin's common stock began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions in the Offering Documents.

88. Regarding clinical trials for izokibep, the Offering Documents described this "diamond in the rough" agent as "currently in development for multiple

immunological indications including hidradenitis suppurativa (HS)" and that it "***has been administered to more than 400 participants and in some for up to three years***. ***More than 150 participants received doses up to 160 mg and more than 80 participants received up to 160 mg weekly, some out to six months***."[6] (May 3, 2023 Prospectus at 6, 12, 128, 132.) (Emphasis added.)

89. The statements in ¶ 88 were false and misleading and omitted to disclose material facts when made because Acelyrin's disclosure of the number of doses and patients at the time of the IPO indicates that it had sufficient data to draw and disclose accurate conclusions regarding both Part A and B clinical trials, yet the statement failed to disclose material negative facts that provide critical insight into these numbers and render the prior statements not misleading, specifically: (1) that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (2) that the Part A efficacy results omitted the nearly 30% dropout rate, which, if included, would have rendered those results not statistically significant; and (3) that the high dropout rate in the ongoing Part B trial at the time of the IPO would also rendered those results not statistically significant. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, its public statements were materially false and misleading at all relevant times.

90. The Offering Documents described the Part A trial for HS, which "consisted of open label treatment with izokibep 160 mg administered subcutaneously (SC) weekly (QW)" for thirty participants, and explained how "***Part A of this trial was designed to inform our own internal decision-making about the future of the izokibep development program in HS***" and how "***[o]ur internal hurdle***

[6] Plaintiffs have bolded and italicized the specific portions of the challenged statements in question that they contend are false and misleading.

***for continuing to advance development in HS was to see high orders of HiSCR responses***" in Part A. *Id.* at 8, 140-41. (Emphasis added.)

91. The statements in ¶ 90 were false and misleading and omitted to disclose material facts when made because: (1) the Part A results did not achieve the purported "high orders of HiSCR" described given the disclosed results were in fact presented without accounting for the nearly 30% dropout rate; (2) Acelyrin's "internal hurdle" was the high observed discontinuation in both Part A and B, not the illusory success of Part A's results purportedly showing "high orders" of HiSCR responses; (3) the misleading Part A results published revealed nothing "about the future of the izokibep development program in HS" given it failed to include key metrics of the high rate of patient discontinuations; and (4) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods. Having spoken on this subject matter, Defendants were required to provide this information to render their statements not misleading. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

92. The Offering Documents then touted the success of izokibep's purported efficacy in treating HS during Phase II Part A clinical trials, stating: "As presented at the 2023 American Academy of Dermatology (AAD) annual meeting, ***izokibep demonstrated high orders of HiSCR in Part A*** of our Phase 2b/3 trial in HS … report[ing] data as observed at 12 weeks with 71% of participants achieving HiS CR50, 57% achieving HiSCR75, 38% achieving HiSCR90 and 33% achieving HiSCR100" with "[b]oth Hurley Stage II and III participants were present in the populations achieving the highest orders of response (HiSCR90 and HiSCR100)" (*id.* at 8, 141) and Acelyrin assuaged any fears about Part A's one-third discontinuation rate: "***Thirty participants were enrolled in the trial and nine discontinued for***

***various reasons*** including physical relocation and lost to follow up (four), injection site reactions (three; two mild, one moderate), and serious adverse events (SAEs) relating to gastrointestinal symptoms (two). Of the two SAEs, one was Crohn's disease (potentially related) and the second was pre-existing diverticulitis with diverticular abscess and sepsis (not related)." *Id.* at 8. (Emphasis added.)

93. The statements in ¶ 92 were false and misleading and omitted to disclose material facts when made because: (1) the Part A results did not achieve the purported "high orders of HiSCR" described given the disclosed results were in fact presented without accounting for the nearly 30% dropout rate; (2) noting that nine "discontinued for various reasons" is misleading given those discontinuations were not encompassed in the Part A results; and (3) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods. Having spoken on this subject matter, Defendants were required to provide this information to render their statements not misleading. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

94. Given the success of Part A, the "***double-blind, placebo-controlled Part B of this Phase 2b/3 trial is still actively ongoing and based on the Part A results***" with "expect[ed] enroll[ment]" of "approximately 150 patients." *Id.* "After consultation with the FDA, the trial is expected to enroll participants with moderate-to-severe HS, diagnosed over a year before the expected first dose in the trial, with a total abscess and inflammatory nodule (AN) count of greater than five at screening and prior to enrollment and randomization. Participants will be randomized into four cohorts: two cohorts will receive placebo as either a QW or Q2W dosing. Two other cohorts will receive 160 mg izokibep as either QW or Q2W dosing. The primary endpoint is HiSCR75 at Week 16. Secondary endpoints include the reduction in

participants assessment of skin pain, reduction in flares, and percentage of participants with reduced counts of abscesses and inflammatory nodules. After Week 16, participants that previously received placebo will be dosed with 160 mg izokibep on their previous dosing schedule until the end of the treatment period at Week 32" and "***[o]ur active ongoing trials with izokibep [include a] Phase 2b/3 trial of izokibep in HS … [with] [t]opline data in the Phase 2b/3 trial of izokibep in HS is expected in the second half of 2023***." *Id.* at 6. (Emphasis added.)

95. The statements in ¶ 94 were false and misleading and omitted to disclose material facts when made because: (1) Part B was not "based on Part A's results" given the modeling data was an apples-to-oranges comparison; (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations; and (4) the expected "[t]opline data" results for Part B were already compromised by a high rate of participant discontinuation. Having spoken on this subject matter, Defendants were required to provide this information to render their statements not misleading. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

96. In the Offering Documents' "Management Discussion and Analysis of Financial Condition and Results of Operations" section, Acelyrin disclosed that: "***Our future research and development costs may vary significantly based on factors such as … patient drop-out or discontinuation rates***…" *Id.* at 114. (Emphasis added.)

97. The statements in ¶ 96 were false and misleading when made and omitted to disclose material facts because: (1) Acelyrin's "future research" already

had been compromised by "patient drop-out[s]" and "discontinuation rates" that nullified the Part B results; and (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations. Having spoken on this subject matter, Defendants were required to provide this information to render their statements not misleading. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

98. The Offering Documents provided several "***risk factors***" related to potential discontinuations "***in initiating or completing clinical trials due to unforeseen events or otherwise, that could delay or prevent our ability to receive marketing approval or commercialize our current and any future product candidates, including***" that "***participants may drop out or fail to return for post-treatment follow-up at a higher rate than we anticipate***." *Id.* at 26. (Emphasis added.) The Offering Documents further stated, "[p]articipant enrollment, a significant factor in the timing of clinical trials, is affected by many conditions including the size and nature of the patient population, the number and location of clinical sites we enroll, the proximity of participants to clinical sites, the eligibility and exclusion criteria for the trial, the design of the clinical trial, the inability to obtain and maintain participant consents, [and] ***the risk that enrolled participants will drop out before completion*** ….." (Emphasis added.) *Id.*

99. The statements in ¶ 98 were false and misleading when made and omitted to disclose material facts because the "risk" that "in initiating or completing clinical … that could delay or prevent our ability to receive marketing approval or commercialize our current and any future product candidates" due to "participants …

drop[ping] out or fail[ing] to return for post-treatment follow-up at a higher rate than we anticipate" had already materialized in Part B by the time of the IPO. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

100. The risk factors went on to state that Acelyrin "***ha[s] in the past and may in the future experience participant withdrawals or discontinuations from our trials***" and such "***[w]ithdrawal of participants from our clinical trials may compromise the quality of our data***." *Id.* (Emphasis added.) "***If additional adverse events, SAEs or other side effects are observed in any of our clinical trials that are atypical of***, or more severe than, the known side effects of the respective class of agents that each of our product candidates are a part of, we may have difficulty recruiting participants to our clinical trials, ***participants may drop out of our trials***, or we may be required to abandon those trials or our development efforts of one or more product candidates altogether." *Id.* at 28. (Emphasis added.)

101. The statements in ¶ 100 were false and misleading when made and omitted to disclose material facts because: (1) the "risk" that "[w]ithdrawal of participants from our clinical trials may compromise the quality of our data" had already materialized in Part B by the time of the IPO; (2) noting that nine "discontinued for various reasons" in Part A is misleading given those discontinuations were omitted from the Part A efficacy results; (3) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; and (4) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the

Company's public statements were materially false and misleading at all relevant times.

102. The risk factors again pointed to the HS Part A discontinuations, stating "for example, … ***nine participants withdrew*** from Part A of our ongoing Phase 2b/3 trial in HS for various reasons including injection site reactions, physical relocation and lost to follow up, and SAEs relating to gastrointestinal symptoms." *Id.* (Emphasis added.)

103. The statements in ¶ 102 were false and misleading when made and omitted to disclose material facts because: (1) the "risk" that "“[w]ithdrawal of participants from our clinical trials may compromise the quality of our data" had already materialized in Part B by the time of the IPO; (2) noting that nine "discontinued for various reasons" in Part A is misleading given those discontinuations were omitted from the Part A efficacy results; (3) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; and (4) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

104. The fact that participants from Part B trial had withdrawn by the time of the IPO thereby compromising the quality of the data was information that a reasonable investor would have found material. For example, on May 30, 2023, an analyst report noted that "as of the end of May 2023, [Acelyrin's] management noted that there have been no discontinuations so far in Part B." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.)

105. On June 15, 2023, Acelyrin issued a press release announcing the Company's Q1 2023 financial results and recent highlights, again touting the results from Part A and also teased the "accelerated" progress of Part B's upcoming results: As CEO Lin stated, "[t]he past several months have been transformative for ACELYRIN" as we are "particularly pleased for patients that in the past six months ***we have been able to share izokibep data demonstrating resolution of important manifestations of disease and significant evidence of positive impact on quality of life***" in the "late-breaking presentation at the 2023 American Academy of Dermatology (AAD) Annual Meeting data ***showing that treatment with izokibep led to high orders of HiSCR response at 12 weeks in the open label Part A*** of the Phase 2b/3 trial in HS" and that "[w]e are pleased today to be sharing the ***acceleration of timing for top-line pivotal data for izokibep in [Part B]*** Hidradenitis Suppurativa (HS), now expected in the third quarter of 2023." (Emphasis added.)

106. The statements in ¶ 105 were false and misleading when made and omitted to disclose material facts because: (1) Part A did not provide "data demonstrating resolution of important manifestations of disease and significant evidence of positive impact on quality of life" nor did it "show[] that treatment with izokibep led to high orders of HiSCR response at 12 weeks" given Acelyrin omitted discontinuation from the results population, rendering the data not statistically significant; (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations; and (4) the "acceleration of timing for top-line pivotal data for izokibep" in Part B was compromised by high rates of observed discontinuations.

107. That same day, June 15, 2023, Acelyrin filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2023 (the "Q1 2023 10-Q"), again touting the Part

A results and again minimized the discontinuations seen in Part A: "In Part A of our Phase 2b/3 trial of izokibep in HS, one participant had new onset Crohn's disease that was determined by the principal investigator to be possibly drug related. Upon review and following discontinuation of the participant from the trial, we noted such participant had pre-existing gastrointestinal symptoms and should have been excluded from the trial. A second participant with pre-existing diverticulitis had diverticular abscess and sepsis, both determined by the principal investigator to be unrelated to treatment." In addition, "***nine participants withdrew from Part A of our Phase 2b/3 trial of izokibep in HS for various reasons*** including injection site reactions, physical relocation and lost to follow up, and SAEs relating to gastrointestinal symptoms."

108. Appended to the Q1 2023 10-Q as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Lin and Dier, attesting that "***the information contained in the [Q1 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company***."

109. The statements in ¶¶ 107 and 108 were false and misleading when made and omitted to disclose material facts because: (1) noting that nine "discontinued for various reasons" in Part A is misleading given those discontinuations were not encompassed in the Part A results; (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin already knew that high withdrawal rates undermined Part B's statistical significance. Accordingly, the information contained in the Q1 2023 10-Q did not fairly present, in all material respects, the financial condition and results of operations of the Company.

110. On July 23, 2023, Acelyrin's management team held a "fireside chat" with investors moderated by Piper Sandler. In that chat, Piper Sandler "caught up with SLRN mgmt team who were very enthusiastic about the upcoming Ph2b/3

readout in HS with izokibep in 3Q23" and to "discuss expectations heading into the data, details of trial design, and why ISRs and discontinuation rates are not a concern" in this Part B. (Piper Sandler, "Acelyrin Part 2: Takeaways from Our SLRN Fireside Chat," July 23, 2023.)

111. In that fireside chat, as reported by Piper Sandler, Acelyrin management again began by touting the Part A efficacy and the implications for positive results in Part B. *Id.* As reported, according to management, "the wonderful thing happening in HS … with a measure like HiSCR100, you are essentially demonstrating a full resolution from baseline in AN (abscess and nodule) plus the added criteria of no new draining tunnels" and "[a]ltogether, that is where mgmt sees the treatment in HS headed, and thus is focused on the resolution of disease with izokibep." *Id.* As reported, management was "pleasantly surprised and encouraged to have already passed this [HiSCR100] with the OLE [open label] Part A data." *Id.* "And as expected, from the OLE data, SLRN achieved transformative efficacy in line with the hypothesis they put forth." *Id.* "With that in mind, this data made SLRN go through internal decision-making to continue with the Part B experience and move forward" to achieve the same "promising" results. *Id.* As reported: "In a nutshell mgmt expressed its excitement for the upcoming data where treatment with izokibep showed marked continued improvement to the point of showing ACR50% in the high 70-80% range (by Week 46, ACR50 was 70% (80 mg) and 50% (40 mg)) in the Ph2." *Id.*

112. Notably, as reported, Acelyrin maintained that the ISRs and other discontinuation rates plaguing Part A are not a "concern[]" in Part B due in part to patient education after Part A through an "informational FAQ" distributed to investigators and participants heading in to Part B. *Id.*

113. As reported in the fireside chat, Acelyrin's management stated:

> ***ISRs are not a concern***, where mgmt highlighted this is not abnormal for an injected medicine, they have implemented an FAQ for

> investigators and patients to help set and manage expectations, and events are transient (~1-day) and resolve quickly and mediate over time…Recall from the OLE (Part A), there were 3 discontinuations due to ISRs (2 mild and 1 moderate) but mgmt acknowledged this is something to be anticipated with injectable drugs. If something can potentially drive significant benefit, a mild occurrence is manageable … ***what SLRN learned from Part A OLE, is that into the Part B they created an informational FAQ for investigators and patients so that they may be well-educated*** about what others are seeing and saying in regard to ISR. This can help educate and set correct expectations for patients that these events are normal and go away over time. Specifically, mgmt highlighted that these ISRs typically last on the order of a single day, occur in the first 3-4 injections (start to disappear with 5th injection), are the size of a coin (thus telling us it is a local and not systemic effect), and for those patients that have requested some sort of antihistamine, ice, etc. treatment, ***is it generally well managed***. *Id.* (Emphasis added.)

114. More broadly, as reported, Acelyrin did "not seem concerned about discontinuation rates going forward" in Part B given Acelyrin "track[ed] discontinuation rates across all studies and in the Ph2b Part B." *Id.*

> On the call, ***mgmt noted how they have been tracking discontinuation rates*** across all studies and in the Ph2b Part B (not in real time, but they have an understanding at the end of the day), and feel that they learned key things from Part A that they applied in Part B ***making this less of a concern***. For example, in the context of the OLE, mgmt noted that they partly fell victim to the timing (in line with COVID), where they lost several patients due to moving away for jobs. Moreover, they noticed that there were a few patients enrolled with GI issues that ultimately shouldn't have been enrolled, and thus mgmt increased the stringency of enrollment going forward where they screened patients more adequately for background GI symptoms related to risk of IBS. *Id.* (Emphasis added.)

115. A contemporaneous analysis from a "KOL" (Key Opinion Leader) interviewed by Piper Sandler, also released July 23, 2023, expounded on Acelyrin's patient education steps to reduce dropouts seen in Part A by distributing a patient "FAQ" before starting Part B. (Piper Sandler - Part 1: Our Expert KOL Call, July 23, 2023.) Following the issue of that FAQ, it is reported that Acelyrin stated that "there

were no dropouts in the next >150 patients"—in other words, no dropouts for the next 150 patients in Part B. *Id.*

116. The KOL was assured that this statement meant dropouts for Part B (which enrolled 175 patients) was not a concern even in the face of "the high number of drop-outs in the [open label HS Part A trial] OLE":

> There were ~30% (9/30) patients that dropped out of the izokibep Ph2b/3 OLE related to GI events, ISRs, and driven by the fallout of the COVID-19 pandemic … with discontinuations … due [to] 1) GI-related with a single case of Crohn's disease in a patient with pre-existing symptoms and a worsening of known diverticulitis (they have since heightened their exclusion criteria to test and rule out IBD), 2) ISRs (2 mild, 1 moderate) where there was some disconnect between investigators and patients regarding perceived severity of events where mgmt created an FAQ sheet, and after ***implementation there were no dropouts in the next >150 patients***, and 3) discontinuations from the pandemic fallout where people were moving away from study sites. *Id.* (Emphasis added.)

117. With this, the KOL "highlighted how ISRs are common across many injectable drugs, and seeing how trivial it is to control them shuts down that specific argument" and "dropouts in an [open label Part A] OLE study are always a risk," yet the expert "feels comfortable overall that what was seen is not too outside the norm or cause for concern." *Id.*

118. In another reported meeting with analysts from TD Cowen on July 27, 2023, Acelyrin's management reiterated these optimistic conclusions for Part B and was "excited to share" the results. As reported, "management believes that the likelihood that izo's efficacy will improve in HS with increased duration of therapy is high, so it is confident that the data will impress and lead to its eventual use," which "is true even if half as many patients resolve (relative to Part A) in twice the amount of time (i.e. if ~15% achieve a HiSCR100), as this would still be higher than any dataset that competing programs have reported before." (TD Cowen, "Mgmt Mtg Highlights Izo's Data Lends Confidence," July 27, 2023).

119. And once again, as reported, Acelyrin assured investors that Part B discontinuations (from ISRs or otherwise) "would not be an issue" and would in fact be "below the rate observed" in Part A. *Id.*

> ***We also believe the overall rate of ISRs in Part B should decrease below the rate observed in Part A (40%, n=12/30), as should discontinuations due to ISRs (recall that three occurred in Part A). Management is confident this will not be an issue moving forward based on its proactive efforts to educate investigators on the transient nature of izo's ISRs to ensure they understand what to expect and how to manage it.*** Two of the three ISRs that led to discontinuation were mild, which supports the potential for discontinuations to be mitigated by clear expectation management and a simple ice pack.
>
> Perhaps more importantly, the current Phase IIb/III study is utilizing two 80mg/1mL injections to administer the 160mg dose, which in theory doubles the risk for ISRs to occur. That is the difference between the 40% rate in HS and the mid-20%s rates in PsA. Therefore, ***the rate and severity of ISRs should come down even more*** once the company can deliver the 160mg dose in one single 1.5mL injection like it is in the ongoing confirmatory Phase III trial and for the potential launch. *Id.* (Emphasis added.)

120. On August 1, 2023, Acelyrin gave a presentation lauding the Part A results and the likely positive outcome for the "accelerated Part B RCT top-line data to Q323." (Acelyrin Presentation, Aug. 1, 2023.) Acelyrin again explained how the "rationale" for Part A was to be "***[d]esigned for internal decision-making***" for Part B, and that subjects were seeing "***improvements in the number of draining tunnels … as early as the first month of treatment***" and that "***Part B will continue to inform our understanding of these effects***." *Id.* Again, Acelyrin minimized the "discontinuations" seen in Part A, chalking them up to "***suggest education challenge versus risk/benefit issue***" and "preexisting" patient conditions "***that should have been excluded from trial***." *Id.*

121. The statements in ¶ 120 were false and misleading when made and omitted to disclose material facts because: (1) Acelyrin minimized the

"discontinuations" seen in Part A, chalking them up to "suggest education challenge versus risk/benefit issue" and "preexisting" patient conditions "that should have been excluded from trial" in Part A is misleading given those discontinuations were not encompassed in the Part A results; (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations; (4) Acelryin was aware that high discontinuation rates undermined Part B's statistical significance.

122. On August 13, 2023, as reported by analysts, Acelyrin management again "answered burning questions from" about the hype for Part B results, and once again, management assuaged fears about Part B discontinuations. (Piper Sandler, "Acelyrin Addressing Investors' Burning Questions & Our HS TableMania," August 13, 2023.)

123. As reported, Acelyrin's management "believ[es] the dose they are going forward with (QW 160 mg) has the potential to be transformative on efficacy and still safe" and "further noted that a once-weekly regimen is very human, where a patient could give themselves drug every Sunday at home with an auto-injector, for example." *Id.* As a basis for this enthusiasm, while management remained "blind" to efficacy data, management "has noted they have been tracking the blinded discontinuation rates across all studies including the Ph2b Part B (not in real time, but has an understanding overall at the end of the day)." *Id.*

124. In response to the question "Do you worry about high discontinuation rates given Ph2b open label study and thus jeopardizing success of Ph2b?" management reportedly answered:

> Remembering that mgmt has been blinded to the ***data but tracking discontinuation rates across studies, they learned things from the Part A discontinuation rates which were applied in Part B, making it less of***

> ***a concern***. For example, in the OLE they lost some patients due to job relocation from COVID-19, and they also enrolled patients with GI issues that ultimately should not have been enrolled. ***Thus, by increasing stringency of enrollment going forward, they are less concerned about these rates***. *Id.* (Emphasis added.)

125. Regarding discontinuations for ISRs, and why "should investors not worry about high injection site reactions" "according to [Acelyrin], what they learned from Part A and applied to Part B is to create an informational FAQ for investigators and patients on what ISR means, looks like, and how easily it can be managed … to educate and set correct expectations for patients that these events are normal occurrences and happen less frequently over time." *Id.*

126. Overall, reportedly the "[b]ottom line is that izokibep showed no predictable pattern related to AEs [adverse events] and raised no concerns" about discontinuations for management. *Id.*

127. On August 14, 2023, Acelyrin issued a press release announcing the Company's Q2 2023 financial results and recent highlights, again touting that "***data from Part A of Phase 2b/3 trial of izokibep in Hidradenitis Suppurativa demonstrated improvements in number of draining tunnels in two-thirds of patients as early as week 4***" and that "***the placebo-controlled Part B remains on track for top-line data in the third quarter 2023***. …. ***Enrollment*** of the double-blind, placebo-controlled Part B of the Phase 2b/3 trial evaluating izokibep in HS ***completed ahead of schedule, accelerating anticipated top-line results*** into the third quarter 2023." (Emphasis added.)

128. That same day, August 14, 2023, Acelyrin filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2023 (the "Q2 2023 10-Q"). The Q2 2023 10-Q contained substantively similar statements as referenced in ¶¶ 93-94, *supra*, regarding the design and execution of the Company's izokibep clinical trials, as well as the drug's purported mechanism of action in treating diseases such as HS.

129. Appended to the Q2 2023 10-Q as an exhibit was a signed certification pursuant to SOX by Defendant Lin, attesting that "the information contained in the [Q2 2023 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

130. The statements in ¶¶ 127-129 were false and misleading when made and omitted to disclose material facts because: (1) the Part A results did not achieve the purported "demonstrated improvements in number of draining tunnels in two-thirds of patients as early as week 4" described given the disclosed results were in fact presented without accounting for the nearly 30% dropout rate; (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations; and (4) Part B was not "on track for top-line data" given the known, high rate of discontinuations rendering those results not statistically significant.

131. On the August 14, 2023, "first earnings call" for the Company, Acelyrin's CEO Defendant Lin "d[ove] deeper into the exciting and rapid progress we continue to make with our clinical program[]" for HS treatment. According to CEO Lin, Part A of the HS trial confirmed this hypothesis and would follow through to the upcoming results from Part B, expecting to "***deliver multiple important data readouts through the end of 2024 that include for the HS Phase 2b/3 trial***, which was previously shared, as expected, in Q3 that was accelerated from the end of the year." (Acelyrin Earnings Call, Aug. 24, 2023). In response to the question for the "ultimate goal in terms of efficacy" in Part B, Acelyrin's CEO noted:

> ***We saw in our open label Part A experience that we were reaching and I'll confess what even surprised us at the time, HiSCR100 levels of response in as many as a third of patients as early as we close, granted that was a small dataset and exactly what that point estimate ends up being within the context of a larger Part B is to be determined. But***

> ***from our perspective, and especially given now that we have two datasets that are suggesting the ability to approach the potential for resolution of disease, we're laser-like focused on that concept and that this molecule has the potential to really bring us to something that may be more paradigm-shifting for patients across these indications So we've always talked about being at least as good as, if not better than whatever the bit we consider the best agent out there to be without any new safety liabilities. We think that we've been consistent with that to-date. We are going to hold ourselves to that same standard moving forward. And we think that all eyes really on the potential to continue to talk about resolution of disease for patients….the totality of evidence across HS … enabl[es] us to talk about the concept of the potential for resolution of disease***. *Id.* (Emphasis added.)
>
> Overall, "[w]hat we're seeing within the context of the HS as a field is incredibly exciting. In that, we're ***moving both to higher orders of response whether we're talking about higher – HiSCR75 or HiSCR90s and HiSCR100s …. we can now talk about clear skin instead of 50% improvements or 75% improvements in terms of clearance of your skin lesions*** …. and we believe that's what we're seeing for Hidradenitis Suppurativa.....***the likelihood of seeing that for izokibep in HS is … very real.*** And so we're terribly excited for patients overall and so we're – we're all together moving the practice of medicine in this disease state." *Id.* (Emphasis added.)

132. The statements in ¶ 131 were false and misleading when made and omitted to disclose material facts because: (1) the Part A results did not achieve the purported "HiSCR100 levels of response in as many as a third of patients" described given the disclosed results were in fact presented without accounting for the nearly 30% dropout rate; (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations; (4) Part B was not "on track for top-line data" given the known, high rate of discontinuations rendering those results not statistically significant; and (5) the data for Part A and B did not reach statistical significance when including the

discontinuations, so Acelyrin was not putting forth results "at least as good as, if not better than whatever the bit we consider the best agent out there …. consistent with that to-date" nor did it "hold …. to that same standard moving forward" given Acelyrin knew about the high rate of discontinuations marring the Part B results.

**F. The Truth Emerges**

133. On September 11, 2023, after the markets closed, Acelyrin issued a press release entitled "ACELYRIN, INC. Announces Top-Line Results from Placebo-Controlled Clinical Trial of Izokibep for Moderate-to-Severe Hidradenitis Suppurativa."

134. In that press release, Acelyrin "announced top-line results from Part B of a Phase 2b/3 trial evaluating izokibep for the treatment of moderate-to-severe Hidradenitis Suppurativa (HS)" revealing that "[t]he primary endpoint of HiSCR75 at week 16 did not meet statistical significance."

135. High discontinuation rates, occurring "as early as week four" were a primary reason for this failure:

> The randomized double-blind, placebo-controlled, multi-center trial evaluated the safety and efficacy of izokibep dosed 160 mg weekly (QW) and every two weeks (Q2W), versus placebo, in 175 patients with moderate-to-severe HS (Hurley Stage II and III). The trial was conducted at 50 sites globally and assessed various efficacy endpoints, including the primary endpoint of HiSCR75 (Hidradenitis Suppurativa Clinical Response) at 16 weeks utilizing a non-responder imputation (NRI) analysis method.
>
> ***In the primary NRI analysis of Part B, statistical significance was impacted by patients with HiSCR75-100 discontinuing as early as week 4 unrelated to adverse events***. …. Applying a Last Observation Carried Forward (LOCF) sensitivity analysis of the full dataset highlighted the ***impact of responder discontinuations on the primary analysis and showed statistical significance of HiSCR75 at week 16***….
>
> ***Also, given the number of responders who discontinued in the QW arm – the majority unrelated to an adverse event – a modified-NRI (mNRI) approach showed a high level of statistical significance and highlighted the impact of discontinuations on magnitude and significance of response***. This analysis demonstrates the performance of

> izokibep at this juncture in the study – in isolation from the placebo rate increases observed later in the trial – and provides an exploratory approach to analyzing responder discontinuations. (Emphasis added.)

136. On September 11, 2023, Acelyrin held a call with investors to discuss these "extremely disappointing" results. For the HS Part B top line results, CEO Lin stated "the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in the primary non-responder imputation analysis" which Lin stated was caused by "two" "***surprising***" "factors," the main one being "***discontinuation*** of HiSCR75 to HiSCR100 responders in the Q week arm due to reasons unrelated to adverse events."[7] (Acelyrin Results Call, Sept. 11, 2023) (Emphasis added.)

137. As the CEO explained, these "***discontinuations mattered and affected the outcome of the study***." *Id.* While "[t]he study was over enrolled to account for potential discontinuations, … ***there were both more discontinuations and importantly more responder discontinuations, including even HiSCR75 and HiSCR100 responders than we would expect*. *Ordinarily, discontinuations tend to occur due to lack of response or for safety and tolerability issues. We did not see that in this study***." "***Discontinuation rates for this study were higher than expected,*** and we tried to understand the potential drivers." Yet "[w]e ***have not identified a clear pattern for reasons for dropout***."[8] *Id.* (Emphasis added.)

---

[7] The other was a "marked increase in placebo rates during the course of the study." *Id.* "[O]ur placebo rates that are markedly higher than historical precedent." *Id.* "Statistical significance was further impacted by the unexplained and marked increase in placebo range during the course of the study to unprecedented levels." *Id.* Although admittedly this "had doubled relative to historical precedents," Acelyrin would only say "[w]e really don't have a good explanation for why that should be happening." *Id.* Acelyrin would only provide that "to be honest, this is the first time in my career that I've seen responders discontinuing without adverse event like this, and also placebo responses sort of increasing in rates during the course of the study to these unprecedented high levels." *Id.*

[8] Despite positive safety claims, the highest dropout rates consistently occurred in the highest dose arm (160 mg QW). In its public disclosures, however, the company repeatedly stated that it conducted an extensive analysis to determine root causes for

138. During the question-and-answer segment, analysts struggled "to wrap our head around the data," asking again for CEO Lin to explain "the reasons for the discontinuation specifically for the patients who are not discontinuing due to treatment or a side effect" and "what were the major reasons for discontinuations in the placebo? And how do we think about the high – the discontinuations in the placebo along with that high placebo response that you're seeing?" *Id.*

139. CEO Lin, however, would not provide additional explanation, and only reiterated the Company was "***really not seeing a pattern at all that we can speak to***." *Id.* (Emphasis added.) CEO Lin noted, however, that these discontinuations occurred "***early***." *Id.* (Emphasis added.)

140. CEO Lin discussed trial modifications to avoid these surprising and "unexplained" results: "There are modifications we are considering to address discontinuations … such as sample size, baseline characteristics, time point and subject to further discussion with health authorities, endpoint and statistical approaches in our continued efforts to bring izokibep to patients with HS." *Id.*

141. On this news, Acelyrin's stock price fell $17.19 per share, or 61.61%, on heavy trade volume, over the following two trading sessions, to close at $10.71 per share on September 13, 2023.

## G. Post-Class Period Developments Confirm Serious Issues with Part B Trial.

### 1. Months After the Drop, Acelyrin Continues to Evade Questions About the High Rate of Discontinuations in Part B.

142. These surprising results—and the lack of plausible explanation—left analysts scratching their heads. As one September 12, 2023, report noted "***it's difficult to glean much from the data given how poorly the trial was run [due to]***

---

discontinuation but never mentioned the possibility that there might be tolerability problems with the recommended therapeutic regimen of 160 QW. While there is insufficient data to support a causal link, this possibility should at least be considered.

***one of the highest … d/c [discontinuation] rates we've seen in HS***." (Jeffries, Sept. 12, 2023) (Emphasis added.)

143. As this report went on, given the "painfully disappointing HS data" from "***high dropouts***" the prior, expected "base case scenario of a 25-30% HiSCR75 delta at week 16 … was clearly wrong." *Id.* (Emphasis added.) "The most problematic part of the SLRN HS data is that the only dose that looks competitive vs next-gen IL-17's = the 160mg QW dose (if you give SLRN the benefit of the doubt)" but ***"[u]nfortunately that dose also showed a ~25% D/C [discontinuation] rate (approx double the Q2W dose)—which isn't commercially viable***." *Id.* (Emphasis added.)

144. Regarding the "high rates of study discontinuation reported in the izo 160 mg QW arm," analysts noted that:

> ***The dropouts occurred among responders as early as week 4, which SLRN indicated may have impacted the significance of HiSCR responses***…Izo 160mg QW arm had the highest total d/c rates ~25%, almost double vs the Izo Q2W and pbo arms. The d/c rates due to AE were low 2-5% in the Izo dose groups, suggesting most of the d/c [discontinuations] were not related to safety/tolerability. Interestingly, there were seemingly high discontinuations in Part B in the pbo arm as well (~17%). Additionally, it's unclear how SLRN defines d/c unrelated to AE (vs non-tx related AE's) & what types of pts they censored in their KM curve as we're seeing some discrepancies in #'s reported in the slides…
>
> The reason for the non-treatment related d/c's [discontinuations] in izo's Part B trial is still being assessed. When we caught up with SLRN mgmt, they told us the reason for d/c [discontinuations] were labeled all kinds of different ways, but not labeled as related to AE. SLRN has looked at each of the d/c [discontinuations] cases on a subject level to dig for whether there is a safety/tolerability issue since it's unlikely due to lack of efficacy response. ***SLRN told us they found no pattern to why these d/c chose to drop out of the study***, other than in the weekly QW arm the majority of the dropouts were responders (8/14 responders, 7 of the HiSCR75-100, 2 of HiSCR100) and 11 of the 14 QW dropouts were not treatment-related.
>
> Based on our analysis, historical studies showed most of the IL-17 agents had <10% total d/c [discontinuations] rates, and the majority of the dropouts were safety-related. Despite Humira (adalimumab) showing relatively high d/c [discontinuations] rates ~18% in one Ph2 HS study, it

> had d/c of 2-3% in other trials. ***Given this, we think different trial designs or conduct could potentially play a role.*** Compared to other IL-17 studies, Izo in general had higher total d/c [discontinuations] rates of 12-25% in HS and 14-23% in PsO, but relatively low rate 2-5% in PsA. In HS Ph2/3 part A and Ph2 PsO, more d/c [discontinuations] were related to AE (5-17%) vs 2-5% in HS PartB. *Id.* (Emphasis added.)

145. Moving forward, analysts will "need more clarity on the regulatory path forward is (e.g., ***trial design/stat modification) … [and] until mgmt provides a good explanation about what is causing the non-tx related dropouts***, izo's potential in HS remains a 'show me' story." *Id.* (Emphasis added.) Until then, investors will remain "skeptical of [Acelyrin's] data" given "***how poorly the trial was run***." *Id.* (Emphasis added.)

146. In a series of talks at analyst-hosted conferences following this news, Acelyrin would not provide any new information to explain the "surprising" dropout rates.

147. At a September 13, 2023, conference hosted by Morgan Stanley, Acelyrin's CEO Lin reiterated:

> ***The discontinuations are happening early***. ***They're happening early in the treatment groups, as early as week four in dose treatment groups***….
>
> We asked ourselves the number of discontinuations … that changed during the course of the study or actually sort of ***reached levels that we frankly haven't seen in historical studies*** … And when we dug down to understand what was happening, we found that, especially in the weekly arm, that there were more discontinuations and the majority of those discontinuations were actually responder discontinuations, ***which is very unusual***….
>
> ***We looked across our discontinuations to understand whether or not there was a pattern…. So, it was very confusing to us*** … ***We looked both at what was reported to us as the reason of the discontinuation as well as we looked through the full database of everything we had on – had captured on these patients to ask ourselves, was there a tolerability pattern that we could see? And we have not seen that at this point***. (Morgan Stanley Conference, Sept. 13, 2023) (Emphasis added.)

148. In the question-and-answer portion, investors again pressed for any "hypothesis" to explain these dropouts and the data. In response, CEO Lin would only say it would not "speculate" as to a reason. *Id.*

> We went to the studies—study coordinators to then ask, hey, is there anything that you will have captured on any of these subjects from a discontinuation perspective that are in your database that is not necessarily in the electronic database so that we can continue to hunt for whether or not there's a pattern here. So we'll continue to assess these sorts of things. But at least at this juncture, there really isn't, you know, sort of anything that we can we can understand and we understand that that's unusual. *Id.*

149. Yet months later, Acelyrin's leadership continued to dodge the same questions.

150. For instance, on Acelyrin's November 7, 2023 earnings call, in response to the question "in regards to HS, I was wondering, have you been able to further analyze the result to better understand the placebo response and discontinuation rate observed?" and if this would impact a PsA trial, CEO Lin responded:

> Obviously, given our HS readout that we shared in September, we've been ***extraordinarily hyper-vigilant with regards to putting in any measures such that we understand real time or continue to understand and make sure that we are understanding in real time any discontinuations …*** We don't anticipate any read-through to our PsA and we think that our sort of blinded continued analysis haven't suggested to us any issues in that regard. We have continued further deep dives with regards to the HS dataset … [and] we anticipate having more information with regards to that program by end of year, early next year to share when we have sort of relevantly compiled both our conversations with the health authorities as well as the deep dives that continue to be ongoing.(Acelyrin Earning Call, Nov. 7, 2023) (Emphasis added.)

151. In response to the question "on HS, can you go over precisely what your HS protocol deemed to be drug related or not?" for dropouts, CEO Lin would only say:

> We actually went back through and didn't just take at face value whether or not it was reported to us, whether there was a lot to follow up … We went back through the entire electronic dataset and evaluated for whether or not there was a pattern, including looking for ISRs that weren't necessarily reported as an AE. *Id.*

152. Acelyrin's leadership continued to stonewall investors during a November 16, 2023 healthcare conference. When asked about the HS discontinuations and high placebo response "wave … which none of us had ever seen," CEO Lin continued the script that "we continue to interrogate that data set very carefully" and "we've ruled out all the obvious usual suspects," without identifying results or what those "suspects" were.

153. On November 7, 2023, Acelyrin issued a press release announcing the Company's Q3 2023 financial results and recent highlights while conspicuously omitting mention of the week 16 failures in Part B of the HS clinical trial, stating only, "[w]e believe in izokibep's potential in hidradenitis suppurativa, with ~25% of patients achieving HiSCR100 responses within 12 weeks, which means they rapidly achieved resolution of all abscesses and nodules without new draining tunnels" and "[a]s we previously shared, discussions with the FDA will help inform next steps to advance our registrational program" and "expect to have an update by the end of this year or early next year."

**2. Acelyrin's SEC Filings Finally Disclose the Risk of Discontinuations in Part B.**

154. A few days later, on November 9, 2023, Acelyrin filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2023 (the "Q3 2023 10-Q").

155. The Q3 2023 10-Q contained substantively similar statements as referenced in ¶¶ 93-94, *supra*, regarding the design and execution of the Company's izokibep clinical trials, as well as the drug's purported mechanism of action in treating HS, except now the Company acknowledged the disastrous outcome of the

Part B portion of its Phase 2b/3 trial in HS, "which significantly harmed [its] stock price."

156. In that Q3 10-Q, Acelyrin finally started disclosing the discontinuation issue from Part B.

157. For instance, in the "Management Discussion and Analysis of Financial Condition and Results of Operations" section, Acelyrin disclosed that: "Our future research and development costs may vary significantly based on factors such as … patient drop-out or discontinuation rates…"

158. This time, however, the section elaborated on the discontinuation issues in Part B by stating:

> A change in the outcome of any of these variables with respect to the development of any of our product candidates could significantly change the costs and timing associated with the development of that product candidate. For example, in September 2023, we announced that the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in Part B of the Phase 2b/3 trial of izokibep in HS. The factors we believe contributed to the Part B results, including subject discontinuations unrelated to adverse events and a marked increase in placebo response rates during the course of the trial, could negatively impact the results of ongoing and future clinical trials of izokibep, including the ongoing Phase 3 trial of izokibep in HS, ….In any event, the negative results in Part B of the Phase 2b/3 trial may significantly extend our development timeline and significantly increase our development costs for HS. In this regard, we had previously planned for the inclusion of the Part B results from our Phase 2b/3 trial of izokibep in HS as part of the planned registrational package for HS. Subject to receiving feedback from the FDA regarding next steps for development of izokibep in HS, we may need to conduct and successfully complete both our ongoing Phase 3 trial in HS, as well as an additional Phase 3 trial in HS. (Q3 2023 10-Q at 48.)

159. In the "Risk Factors" section, Acelyrin also for the first time highlighted the discontinuation plaguing Part B of the HS trials:

> The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later-stage clinical trials. For example, despite encouraging results from the open-label Part A of our Phase 2b/3 trial of izokibep in HS, the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in the Part B portion of such trial. This result significantly harmed our stock price and investor perceptions of the prospects for izokibep in HS, and may significantly extend our development timeline for such indication. The factors we believe contributed to the Part B results were primarily subject discontinuations unrelated to adverse events and a marked increase in

> placebo response rates during the course of the trial that led to overall placebo response rates that were markedly higher than historical rates in the HS indication. Our clinical trials are subject to significant risk factors that can have a material and negative impact on outcomes, many of which are beyond our control. Such factors include unexpectedly high placebo response rates and patient responder discontinuations unrelated to adverse events, such as we observed in our Phase 2b/3 trial of izokibep in HS… (Q3 2023 10-Q at 49-50.)
>
> …. participants may drop out or fail to return for post-treatment follow-up, in each case at a higher rate than we anticipate (as we experienced with respect to participant discontinuations in the Part B portion of our Phase 2b/3 trial of izokibep in HS)…" (Q3 2023 10-Q at 49-50.)
>
> …. Such withdrawals may compromise the quality of our data or contribute to negative or inconclusive results from trials, as we experienced in the week 16 Part B results of our Phase 2b/3 trial of izokibep in HS. Any of these conditions may negatively impact our ability to successfully complete such trials and/or include results from such trials in regulatory submissions, which could adversely affect our ability to advance the development of our product candidates in a timely and cost-efficient manner, or at all. For example in light of our week 16 Part B results in our Phase 2b/3 trial of izokibep in HS, subject to FDA feedback, the timeline for any potential related BLA submission for such indication may be significantly extended (or ultimately may not occur)… (Q3 2023 10-Q at 50.)
>
> … our product candidates could fail to receive regulatory approval for many reasons, including the following:… the results of clinical trials may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval, including due … participant discontinuation rates… as those observed in week 16 results of Part B of the Phase 2b/3 trial of izokibep in HS… (Q3 2023 10-Q at 58.)

160. That Acelyrin finally disclosed these risks to the market confirm they are material. Of course, Acelyrin knew about these discontinuations prior to the IPO, yet remained mum until after the IPO concluded.

### 3. Acelyrin Attempts to Shift Blame to its CRO for the Poor Part B Results.

161. After the Exchange Act Class Period, on November 27, 2023, Acelyrin issued a press release blaming its CRO Fortrea—the entity responsible for executing Acelyrin's HS and PsA clinical trials—for the errors uncovered in these trials, and resulting, at least in part, in a statistically insignificant outcome at primary endpoint week 16 in Part B of the Phase 2b/3 HS trial, stating:

> In September 2023, ACELYRIN disclosed top-line results from Part B of its Phase 2b/3 trial evaluating izokibep for the treatment of moderate-to-severe Hidradenitis Suppurativa ("HS trial"). ***Given certain confounding factors observed in the trial, including responder discontinuations without adverse events and a marked increase in placebo rates arising in the latter half of the study, the Company implemented quality control measures above and beyond standard protocol*** for the ongoing open-label extension of the HS trial, the ongoing Phase 3 trial in HS, and the ongoing PsA trial. These trials are being conducted by the same Contract Research Organization (CRO). The CRO does not conduct any trials on behalf of ACELYRIN beyond the izokibep clinical program…
>
> **Next Steps.** ACELYRIN's wide-ranging review of the ongoing izokibep trials, including operational execution by the CRO, is continuing. ACELYRIN will contract with a third-party to conduct an independent audit of the trials being conducted by the CRO for ACELYRIN, including the HS trial and the PsA trial. ACELYRIN will not use this CRO for any new trials that it conducts. Based on the outcome of its ongoing evaluation and the planned audit, the Company will determine the best path forward for the development of izokibep on behalf of patients. This will include a determination of whether to transition its ongoing trials to a new CRO or complete the trials with the current CRO…
>
> "We are disappointed by these developments, especially for the patients who need better treatment options for psoriatic arthritis and hidradenitis suppurativa," said Shao-Lee Lin, MD, PhD, founder and CEO of ACELYRIN. "However, we are a company founded on truth and transparency, and we are grateful that through the tenacity of our internal team we were able to identify these errors. We are committed to delivering the best possible outcome for patients, physicians and shareholders as we continue to pursue development of izokibep as a potentially differentiated treatment for multiple immunologic conditions."

162. In response, the same day, Fortrea filed its own 8-K, "disput[ing] the accuracy of statements that ACELYRIN has made and the characterization of those statements in subsequent media reports." Specifically, "ACELYRIN implied, and media reported that the trial evaluating the product in the treatment of Hidradenitis Suppurativa (HS) was not conducted properly by Fortrea and that this may have impacted the outcome of the trial," but "Fortrea objects to the implications that Fortrea's study conduct impacted the trial outcomes" and "stands behind its conduct of the HS clinical trial in accordance with the protocol and applicable regulatory requirements." "Fortrea has successfully conducted thousands of clinical trials for more than 30 years, all while upholding the highest standards of integrity for all our

customers. We have an unwavering commitment to the safety and well-being of patients and clinical trial participants, to data integrity, and to the ethical conduct of clinical trials."

163. This finger-pointing further confirms serious errors pervaded the Part B results.

### H. Scienter Allegations for the Exchange Act Claims

164. During the Exchange Act Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

165. ***Defendants were aware of or recklessly disregarded the issues with the high number of dropouts that undermined the statistical significance of both Part A and B results.*** As one report noted, "[t]he experience of this management team cannot be understated." "Dr. Shao-Lee Lin, Co-Founder and CEO, has been "a physician, scientist and biopharma executive." (Acelyrin, "Our People," https://www.acelyrin.com/our-people). Dr. Lin "received an undergraduate degree in chemical engineering and biochemistry from Rice University" and "earned her MD and PhD at The Johns Hopkins University School of Medicine as a part of the National Institutes of Health-sponsored medical scientist training program." She also "has served on faculty as a clinical scholar at The Rockefeller University and as adjunct faculty at Cornell, UCLA, Stanford, and Northwestern medical schools." (Acelyrin, "Our People," https://www.acelyrin.com/our-people).

166. Dr. Lin's "directly relevant experience is rare in a biotech CEO and gives [analysts] a great deal of confidence in management's ability to execute." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30,

2023). Indeed, Dr. Lin was previously the CSO and head of research and development at Horizon Therapeutics, where she helped in-license and led the team that developed Tepezza (the only approved therapy in TED)." She also was a corporate officer at AbbVie, leading the development of the expansive neuroscience, immunology, virology, and general pipeline that resulted in several regulatory filings and approvals in under three years. Specifically, "she was responsible for getting Humira to market for HS and uveitis (the only approved agent for both), and therefore has first-hand experience developing drugs that are now standard of care in most of the indications that Acelyrin is looking to disrupt with its optimized candidates. Moreover, she is backed by a great team and has brought several colleagues with her from Horizon." *Id.*

167. With this technical, relevant background, Dr. Lin would have known presenting the results for Part A as "data observed" (rather than LOCF) would paint a misleading picture about Part A's real efficacy and the future for izo's treatment in Part B, which used a NRI model. Indeed, only post-IPO, did Dr. Lin acknowledge that more rigorous NRI-based HiSCR75 was the primary endpoint for Part B of the trial, suggesting Dr. Lin wanted to create the impression of greater efficacy in Part A to bolster excitement for the Part B results without revealing these key differences in the data models that would impact the read through from Part A and B. Moreover, Dr. Lin made representations that Acelyrin was tracking the discontinuation rates in near-real time and her experience would have altered her to the serious, high dropout rates and the likely impact on Part B's statistical significance.

168. ***Defendants' misrepresentations were necessary to go public***. Defendants made many of their misrepresentations and omissions while soliciting funds from investors in their initial public offering, with their misstatements allowing the Company to complete their long-desired IPO and become a publicly traded company.

169. ***Defendants' post-class period admissions confirm obfuscating behavior about the HS trials***. After the "disappointing" Part B results were revealed, Acelyrin evaded the same investor questions about the reasons for the high dropout rates for months—and to date, Acelyrin still has not provided any further explanation for these results. It is plausible that Acelyrin (in reality) knows the reason: the weak Part A results (rendered meaningless by high dropouts) read through to the "disappointing" (but, if the truth were known, expected) Part B results plagued by the same issue. As discussed, Acelyrin obfuscated the "apples-to-oranges" comparison between Part A and B by failing to disclose the difference in modeling a LOCF (in Part A) and NRI (for Part B). Instead of disclosing this, Acelyrin claims to not "see a pattern" in discontinuations for Part B. Moreover, rather than own up to these misleading tactics, Acelyrin later tried to shift blame to its CRO for the "disappointing" results, which the CRO hotly refutes. Indeed, the reason for Acelyrin filing the 8-K regarding the CRO was triggered by a different study the CRO was handling, which involved different teams, protocol, and testing sites. It thus is highly unlikely that the same issues in the identified study would have bled through to the HS trials. Yet Acelryin was quick to make this inferential leap as an attempt to explain away the HS data.

170. ***Defendants knew or acted with deliberate recklessness regarding the high discontinuations in the HS trials given izokibep's commercial success was essential to Acelyrin's core operations***. As a new company with no prior FDA-approved drug, izokibep's success (as the most advanced drug in Acelyrin's limited portfolio) was a key positioning factor to push it to Phase III, the last stage to FDA application and commercial viability. As a result, issues in the HS trial that would jeopardize this stream of needed revenue would be so top-of-mind that it is not plausible that senior Acelyrin management did not know about those problems when making false or misleading statements about the HS Phase II Part A and B trials. Moreover, given competitor HS drugs were in the same trial stages and soon to be

reporting results, this increased the pressure on Acelyrin to disclose its own matching results to remain commercially relevant and viable as a next-gen treatment for HS.

## I. Class Action Allegations for the Exchange Act Claims

171. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Acelyrin securities during the Class Period (the "Exchange Act Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Exchange Act Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

172. The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. Throughout the Exchange Act Class Period, Acelyrin securities were actively traded on the NASDAQ. While the exact number of Exchange Act Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes there are hundreds or thousands of members in the proposed Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by Acelyrin or its transfer agent and may be notified of the pendency of this action by Unites States mail, using the form of notice similar to that customarily used in securities class actions.

173. Plaintiff's claims are typical of the claims of the members of the Exchange Act Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

174. Plaintiff will fairly and adequately protect the interests of the members of the Exchange Act Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Exchange Act Class.

175. Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Exchange Act Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Exchange Act Class Period misrepresented material facts about the business, operations and management of Acelyrin;
- whether the Individual Defendants caused Acelyrin to issue false and misleading financial statements during the Exchange Act Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Acelyrin securities during the Exchange Act Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Exchange Act Class have sustained damages and, if so, what is the proper measure of damages.

176. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

177. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Exchange Act Class Period;
- these omissions and misrepresentations were material;
- Acelyrin securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Exchange Act Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Exchange Act Class purchased, acquired and/or sold Acelyrin securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

178. Based upon the foregoing, Plaintiff and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

179. Alternatively, Plaintiff and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Exchange Act Class Period statements in violation of a duty to disclose such information, as detailed above.

### J. Claims under Sections 10(b) and 20(a) of the Exchange Act

**COUNT I**

**(VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)**

180. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

181. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

182. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Acelyrin securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Acelyrin securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

183. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Acelyrin securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Acelyrin's finances and business prospects.

184. By virtue of their positions at Acelyrin, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the

Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

185. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Acelyrin, the Individual Defendants had knowledge of the details of Acelyrin's internal affairs.

186. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Acelyrin. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Acelyrin's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Acelyrin securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Acelyrin's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Acelyrin securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

187. During the Class Period, Acelyrin securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the

materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Acelyrin securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Acelyrin securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Acelyrin securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

188. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

189. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS)**

190. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191. During the Class Period, the Individual Defendants participated in the operation and management of Acelyrin, and conducted and participated, directly and indirectly, in the conduct of Acelyrin's business affairs. Because of their senior

positions, they knew the adverse non-public information about Acelyrin's misstatement of income and expenses and false financial statements.

192. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Acelyrin's financial condition and results of operations, and to correct promptly any public statements issued by Acelyrin which had become materially false or misleading.

193. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Acelyrin disseminated in the marketplace during the Class Period concerning Acelyrin's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Acelyrin to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Acelyrin within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Acelyrin securities.

194. Each of the Individual Defendants, therefore, acted as a controlling person of Acelyrin. By reason of their senior management positions and/or being directors of Acelyrin, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Acelyrin to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Acelyrin and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

195. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Acelyrin.

## II. VIOLATIONS OF THE SECURITIES ACT

196. This Section and Counts herein expressly do not incorporate any of the allegations in Section I. For purposes of this Section and the claims alleged herein, it is as though Section I is not part of this Complaint. As stated herein, the allegations in this Section arise under strict liability and/or negligence, and none of the allegations herein shall be interpreted as alleging intentional or reckless misconduct or alleging that any of the Defendants acted with scienter or fraudulent intent.

### A. The Nature of the Securities Action

197. This is a federal securities class action brought on behalf of purchasers of Acelyrin, Inc. securities in and/or traceable to the registration statement for the Company's May 4, 2023 IPO (the "Securities Act Class"). Lead Plaintiffs allege violations of Sections 11 and 15 of the Securities Act of 1933.

198. Acelyrin is a clinical-stage biopharmaceutical company focused on developing transformative medicines for immunological diseases. The Company's lead product candidate, izokibep, is a novel antibody designed to treat hidradenitis suppurativa (HS), a chronic and debilitating inflammatory skin condition, along with other immunological disorders such as psoriatic arthritis, axial spondyloarthritis, and uveitis.

199. Izokibep's success was crucial to Acelyrin, as it was the Company's most advanced program and represented a significant potential market opportunity. The positive results from earlier clinical trials of izokibep were a key selling point in Acelyrin's May 4, 2023 initial public offering (IPO), which raised over $500 million in proceeds. As a clinical-stage company, Acelyrin was dependent on the IPO proceeds to fund its ongoing operations and clinical development programs.

200. Unbeknownst to investors, Acelyrin's May 4, 2023 Registration Statement (the "Registration Statement") that incorporated by reference the Company's May 3, 2023 second amended Form S-1 (the "May 3, 2023 Prospectus") (together, the "Offering Documents"), was negligently prepared, and as a result,

contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with governing rules and regulations.

201. Specifically, the Offering Documents overstated the efficacy and prospects of izokibep while failing to adequately disclose risks related to high discontinuation rates observed in earlier and ongoing clinical trials. For example, Defendants touted izokibep as "provid[ing] the opportunity to offer clinically meaningful, differentiated benefits for patients" and achieving unprecedented "high orders of HiSCR" (Hidradenitis Suppurativa Clinical Response) in Part A of the Phase 2b/3 open-label trial. These statements were materially false and misleading because the Offering Documents failed to disclose: (1) that the Part A trial used a study analysis method (LOCF) that would not be indicative of the future success of HS trials using more rigorous methods; (2) that the Part A trial's efficacy results predating the IPO did not include the patients that discontinued, thereby artificially driving up the Part A HiSCR rates; (3) that Part B would use a different, more rigorous study analysis method (NRI) in the Part B results that must account for patient discontinuations; and (4) that the high discontinuation rates from the ongoing Part B trial had already compromised the integrity and results of that trial by the time of the IPO.

202. The Offering Documents also purported to warn of risks that "participants [in clinical trials] may drop out or fail to return for post-treatment follow-up at a higher rate than anticipated" and that Acelyrin "may experience participant withdrawals or discontinuations" that "may compromise the quality of our data." But these risk warnings were themselves false and misleading because, at the time of the IPO, the undisclosed adverse events had already occurred—Acelyrin was already experiencing problematic discontinuation rates in the ongoing Part B izokibep trial for HS that jeopardized the integrity of the results—and yet the Offering Documents did not disclose these material events. By failing to disclose this

material information and instead presenting the risk of discontinuations as a hypothetical possibility, the Offering Documents misled investors about the true state of the clinical programs.

203. Acelyrin and its officers Shao-Lee Lin (Founder and CEO) and Mardi Dier (CFO), as well as its Board Directors—all signatories to the Offering Documents—possessed the material information and power to ensure the Offering Documents accurately disclosed the Part A and Part B trials based on the Company's access to study results, near real-time clinical trial data, and the timing of patient enrollments and drop-outs. In particular, Part B of Acelyrin's Phase 2b/3 trial of izokibep in HS patients was already well underway at the time of the IPO in May 2023. Based on the customary pace of patient enrollment and the timeline of the trial, a significant portion of the patients had already been enrolled and treated by the time of the IPO. As a result, Acelyrin would have had access to data on patient discontinuations and adverse events in near real-time as the trial progressed.

204. On September 11, 2023, Acelyrin announced disappointing top-line results from Part B of the Phase 2b/3 trial of izokibep in HS patients. The Company revealed that the trial failed to meet its primary endpoint or statistical significance, largely due to unexpectedly high discontinuation rates among trial participants.

205. Following this news, reports from securities analysts, and further disclosures from the Company, the value of the Company's shares plummeted to below $18 per share IPO price. Acelyrin's share price has continued to decline, falling as low as $5.90 per share and at the time of this Complaint, trading at $6.65 per share, more than 60% below the initial Offering price of $18.00.

206. As alleged herein, because of Defendants' wrongful acts and omissions, and the precipitous share price decline in Accelyrin's common stock, Lead Plaintiffs and other Securities Act Class members have suffered and continue to suffer significant losses and damages.

### B. Jurisdiction and Venue for the Securities Act Claims

207. The Securities Act claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k). Jurisdiction is conferred by Section 22 of the Securities Act (15 U.S.C. §77v).

208. Venue for the Securities Act claims asserted herein is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 22 of the Securities Act (15 U.S.C. §77v) because Acelyrin is headquartered in this District, Defendants are found or transact business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

209. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets. Securities Act.

### C. The Securities Act Parties

210. As set forth in their previously filed Certifications incorporated by reference herein [ECF Nos. 26-3; 30-3], Lead Plaintiffs Kamel Boukadoum and Fred Bergman purchased Acelyrin shares pursuant and/or traceable to the Registration Statement for the IPO and were damaged thereby.

211. Defendant Acelyrin is a Delaware corporation with principal executive offices located at 4149 Liberty Canyon Road, Agoura Hills, California 91301. Following the IPO, the Class A common stock of the Company trades in an efficient market on the NASDAQ under the trading symbol "SLRN". Acelyrin describes itself as "a late-stage clinical biopharma company focused on identifying, acquiring, and accelerating the development and commercialization of transformative medicines," particularly with a focus on "the treatment of diseases with pathology related to excess activation of the immune system." (See May 3, 2023 Prospectus at 4.)

212. Defendant Shao-Lee Lin ("Lin") has served as Acelyrin's Founder, Chief Executive Officer, and a Director of the Company since July 2020. Lin signed

the Registration Statement as "Founder, Chief Executive Officer and Director (*Principal Executive Officer*)."

213. Defendant Mardi C. Dier ("Dier") served as Acelyrin's Chief Financial Officer and Chief Business Officer from November 2022 through the May 4, 2023 IPO, before resigning in August 2023. Dier signed the Registration Statement as "Chief Financial Officer and Chief Business Officer (*Principal Executive Financial and Accounting Officer*)."

214. Defendant Bruce C. Cozadd ("Cozadd") served as Director and Chair of Acelyrin's Board of Directors since March 2022 and January 2023, respectively. Cozadd signed the Registration Statement as "Director."

215. Defendant Dan Becker ("Becker") served as Director on Acelyrin's Board of Directors since September 2022. Becker signed the Registration Statement as "Director."

216. Defendant Alan B. Colowick ("Colowick") served as Director on Acelyrin's Board of Directors since November 2021. Colowick signed the Registration Statement as "Director."

217. Defendant Henry O. Gosebruch ("Gosebruch") served as Director on Acelyrin's Board of Directors since March 2023. Gosebruch signed the Registration Statement as "Director."

218. Defendant Patrick Machado ("Machado") served as Director on Acelyrin's Board of Directors at since April 2021. Machado signed the Registration Statement as "Director."

219. Defendant Beth Seidenberg ("Seidenberg") served as Director on Acelyrin's Board of Directors since October 2020. Seidenberg signed the Registration Statement as "Director."

220. Defendant Dawn Svoronos ("Svoronos") served as Director on Acelyrin's Board of Directors since December 2022. Svoronos signed the Registration Statement as "Director."

221. Defendants Lin, Dier, Cozadd, Becker, Colowick, Gosebruch, Machado, Seidenberg, and Svoronos are sometimes referred to herein collectively as the "Individual Securities Act Defendants." Each of the Individual Securities Act Defendants signed the Registration Statement for the IPO. Each of the Individual Securities Act Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO for their own financial benefit and the financial benefit of Acelyrin. Prior to the consummation of the IPO, Acelyrin entered into separate indemnification agreements with each of its directors and executive officers and purchased directors' and officers' liability insurance.

222. Acelyrin and the Individual Securities Act Defendants are sometimes referred to herein collectively as the "Securities Act Defendants."

223. Pursuant to the Securities Act, the Securities Act Defendants are strictly liable for the materially untrue and misleading statements in or incorporated in the Offering Documents. By virtue of their positions with the Company, and/or as signers of the Offering Documents, each of the Individual Securities Act Defendants possessed the power and authority to control the contents of Acelyrin's Offering Documents.

## D. The Securities Act Substantive Allegations

### 1. Acelyrin's Lead Product Candidate, Izokibep

224. Acelyrin, founded in 2020, is a late-stage clinical biopharma company that focuses on identifying, acquiring, and accelerating the development and commercialization of transformative medicines for difficult-to-treat autoimmune disorders that historically have eluded full disease resolution. As a result, potential remedies purporting to improve on the limited treatment options available present

"multi-billion-dollar opportunities in the aggregate" in untapped markets and revenues. (See May 3, 2023 Prospectus at 128.)

225. But as a new company, Acelyrin has a limited portfolio of drug candidates being developed for commercialization, including drug agents izokibep, lonigutamab, and SLRN-517. While the latter two are in early stages of development in Phase 1 (and were obtained through a recent acquisition), Acelyrin developed izokibep from the ground up, and it is the Company's most advanced, "lead product candidate" in the later stages of Phase 2 development for hidradenitis suppurativa (HS), psoriatic arthritis (PsA), and uveitis.[9] *Id.* at 128-29.

226. As such, izokibep is considered the "poster child for Acelyrin's strategic approach, which is to identify, acquire, and accelerate the development and commercialization of transformative medicines." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.)

227. Acelyrin's Offering Documents tout izokibep's special characteristics, stating "[t]he [d]esign of Izokibep is [h]ighly [d]ifferentiated from [m]onoclonal [a]ntibodies." (See May 3, 2023 Prospectus at 133.) This "small protein therapeutic [is] designed to bind the homodimeric IL-17A molecule with high potency" and "[i]n contrast to conventional monoclonal antibodies, izokibep is much smaller – approximately one-tenth the size of a traditional monoclonal antibody – containing two IL-17A binding domains and an albumin binding domain that results in improved

[9] Before seeking FDA approval, drugs typically go through three phases of development: Phase 1 clinical trials are conducted in a small number of volunteers or patients to assess the early tolerability and safety profile, and the pattern of drug absorption, distribution, and metabolism; Phase 2 clinical trials are conducted in a limited patient population afflicted with a specific disease in order to assess appropriate dosages and dose regimens, expand evidence of the safety profile, and evaluate preliminary efficacy; and Phase 3 larger scale, multicenter, well-controlled clinical trials are conducted on patients with a specific disease to generate enough data to statistically evaluate the efficacy and safety of the product for approval, as required by the FDA, to establish the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug.

pharmacokinetic (PK) properties." *Id.* at 133. "By virtue of its structure and size, we believe izokibep has several key features different from traditional monoclonal antibodies," including "high potency" compared to the current "FDA-approved anti-IL-17A agents secukinumab (marketed by Novartis AG) and ixekizumab (marketed by Eli Lilly and Company)," an "albumin-binding domain increases the plasma half-life of izokibep and enhances its ability to target sites of inflammation," a "small size" to reach "difficult to penetrate tissues," and, "as demonstrated in comparative analyses assessing binding affinity, izokibep molecules are also more potent than the currently marketed monoclonal antibodies targeting IL-17A, secukinumab and ixekizumab" so "[w]e believe izokibep can deliver in a single subcutaneous injection exposure levels that the marketed anti-IL-17A monoclonal antibodies require IV infusion to deliver." *Id.* at 133-35.

228. Given this vast potential, Acelyrin describes izokibep as a "'diamond[] in the rough,' where, based on molecule characteristics, [the Company's] collective experience and expertise, and the evolving scientific and medical understanding, [Acelyrin] can establish a clinical development plan that tests [its] hypotheses as to what those benefits could mean for patients." *Id.* at 107, 128.

### 2. Acelyrin's Development of Izokibep for the Treatment of HS is Critical to the Company's Success.

229. One of the main pipelines for izokibep is for the treatment of moderate-to-severe HS, a chronic autoimmune condition where the hallmark of disease is skin abscesses, nodules, fistulae, and scar tissue. Moderate to severe HS is characterized by the presence of HS lesions in more than two distinct anatomic areas (groin, gluteal cleft, under the breasts, across the upper back and neck), with one of these areas having Hurley Stage II or III, which includes tunnelling or scarring in the skin pockets. *Id.* at 136, 141.

230. Efficacy of treatments in HS is measured by improvements in Hidradenitis Suppurativa Clinical Response (HiSCR), the clinically validated scoring

system that is used to assess disease activity. To illustrate, HiSCR50 represents a 50% improvement in abscesses and inflammatory nodules without worsening in either of these individually or worsening in tunnelling; high order responses, such as 75% improvement (HiSCR75), 90% improvement (HiSCR90), and 100% improvement (HiSCR100, which means there are no abscesses or inflammatory nodules and no new fistulae/tunnels), represent even greater clinical responses in the reduction of inflammatory nodules and abscesses as well as fistulae/tunnels. *Id.* at 136.

231. Notably, this debilitating condition currently has no FDA approved treatment that can fully resolve these skin lesions, leaving many to suffer without cure. The only FDA-approved treatment, AbbVie's Humira adalimumab, has only half reached the scale of 50% resolution and none reach 100%. (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.)

232. Acelyrin presented izokibep as an untapped agent that, if approved by the FDA for treatment of HS, would cover an "unmet need" with "several multi-billion-dollar indications." (Acelyrin Presentation, Mar. 2, 2023.) Indeed, market interest in these trial results was at a fever pitch, noting izokibep's potential "blockbuster" indications. (Piper Sandler, "Acelyrin Addressing Investors' Burning Questions & Our HS TableMania," Aug. 13, 2023.) As one report noted: "Rough diamonds may be mistaken for worthless pebbles, but a courageous and exceptional management team like Acelyrin can cut and polish them into precious gems," with lead product "[i]zokibep … [an] example[] of this," with "best in-class, multi-billion-dollar potential. We expect this team to generate outsized returns for investors." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.)

233. In May 2022, Acelyrin began its izokibep Phase 2 clinical trials for HS, which the Company divided into Parts A and B. (See clincicaltrials.gov.)

234. Part A was "designed to inform [Acelyrin's] own internal decision-making about the future of the izokibep development program in HS," and "[the Company's] internal hurdle for continuing to advance development in HS was to see high orders of HiSCR responses" in Part A, while the more clinically rigorous Part B would test these results against placebo-controlled groups (or "arms"). (See May 3, 2023 Prospectus at 140-41.)

235. Part A involved 30 participants over 12 weeks and was designed to be an exploratory open-label, single-arm investigation, meaning every patient receiving treatment received the same dose, and all knew they were receiving izokibep (versus a placebo). Patients received an injection of 160 mg of izokibep per week for a total of 12 weeks. Part A measured the portion of subjects achieving 50%, 75%, 90%, and 100% symptom resolution on the HiSCR scale. *Id.*

236. Part B—which tracked 175 patients over a 16-week period—was a randomized, double-blinded, placebo-controlled, four-arm study. Of the 175 randomized patients, 57 received the 160 mg dose per week (QW dosing), 59 received the 160 mg dose every other week (Q2W dosing), and 29 and 30, respectively, were in placebo groups at the corresponding dosing frequencies. The primary endpoint for this analysis was HiSCR75. (Acelyrin Presentation, Aug. 1, 2023.)

237. Although unknown to the public at the time, Acelyrin had "agreed" with the FDA to use a non-responder imputation (NRI) "analysis" method to assess the Part B results. (Acelyrin Results Call, Sept. 11, 2023.) The mode of analysis assumes that any patients who discontinue the study are considered non-responders regardless of the reason for discontinuing or if the patient had indeed responded. In other words, patients discontinuing during the trial are treated as non-responders, regardless of the status they had prior to dropout. As the agreed-to method with the FDA, if Part B missed, Acelyrin would be unable to use the results of this trial for registrational

purposes—and instead need to perform additional testing that could confirm Acelyrin's hypothesis about izokibep's efficacy in treatment HS.

238. Discontinuations, or "dropouts," are a critical issue in clinical trials, particularly when they lead to patients being lost to follow up (LTFU). That is because patients who are not available for analysis at the end of a trial represent a problem for the sponsor and for regulatory agencies. According to one article on the subject, for instance, "the greatest contemporary threat [to randomized clinical trials] is considered to be to patients discontinuing or withdrawing from the trial, that is, withdrawing from the protocol-specified assessments needed to evaluate efficacy and safety."[10] According to the FDA, "withdrawn subjects are more likely to have experienced adverse events or a failure of efficacy, and the exclusion of their data has an increased probability of introducing bias and negatively impacting the scientific validity of the research."[11] Similarly, the European Medicines Agency has stated that "missing data are a potential source of bias when analyzing clinical trials. Interpretation of the results of a trial is always problematic when the proportion of missing values is substantial."[12] Put simply, patient dropouts decrease the sample size, thereby negatively affecting the likelihood of arriving at statistically significant results; and can introduce bias into the trial because dropouts may not be randomly distributed. And significantly, high dropout rates can undermine the results of a clinical research effort, representing the death knell for FDA approval – and thus any future commercial prospects.

---

[10] https://www.ahajournals.org/doi/full/10.1161/circheartfailure.115.002842

[11] Guidance for Sponsors, Clinical Investigators, and IRBs Data Retention When Subjects Withdraw from FDA-Regulated Clinical Trials. U.S. Food and Drug Administration Oct. 2008.

[12] Guideline on Missing Data in Confirmatory Clinical Trials. European Medicines Agency July 2010.

239. In January 2023, Acelyrin revealed its Part A trial results. After 12 weeks of treatment, Acelyrin announced that izokibep demonstrated "high orders of HiSCR" showing 71% of participants achieving HiSCR50, 57% achieving HiSCR75, 38% achieving HiSCR90 and 33% achieving HiSCR100. (See May 3, 2023 Prospectus at 141.)

240. These results played a key role in Acelyrin's campaign to raise the hype surrounding the upcoming IPO. Acelyrin, for instance, touted the Part A findings in its road show presentations and its May 5, 2023 IPO offering documents, stating, "As presented at the 2023 American Academy of Dermatology (AAD) annual meeting, izokibep demonstrated high orders of HiSCR in Part A of our Phase 2b/3 trial in HS … report[ing] data as observed at 12 weeks with 71% of participants achieving HiSCR50, 57% achieving HiSCR75, 38% achieving HiSCR90 and 33% achieving HiSCR100" with "[b]oth Hurley Stage II and III participants [] present in the populations achieving the highest orders of response (HiSCR90 and HiSCR100)." *Id.* (Emphasis added.)

241. These results were incredibly exciting for investors. For example, analysts at Piper Sandler spoke to a Key Opinion Leader (KOL) in the HS field who reported that "it was the best responses I have ever seen in any drug I have ever used both commercially and in clinical trials." (Piper Sandler - Part 1: Our Expert KOL Call, July 23, 2023.)

242. But Acelyrin also revealed that Part A experienced a high number of patient discontinuations. Nine out of thirty participants dropped out during the study—nearly *30%* of the patient population. (See May 3, 2023 Prospectus at 8.)

243. Acelyrin provided three reasons for this: two patients experienced gastrointestinal symptoms events, three experienced injection-site reactions (ISRs), and four patients moving away from study sites due to the COVID-19 pandemic. *Id.*

244. Acelyrin minimized concerns about safety impacting these discontinuations, assuaging the market that the ISRs were mild, and the

gastrointestinal issues were preexisting, such that those patients should have been excluded from the study altogether. *Id.*at 153.

245. Critically, however, at the time Acelryin did not reveal the method it used to calculate Part A's game-changing results. Acelyrin's Part A results rely on a method known as last observation carried forward (LOCF). Unlike the NRI method, the LOCF method assumes discontinued patients would have exhibited the same results at the end of the trial as they had on their last observation. When presenting the Part A results to investors, Acelyrin, however, did not use the term LOCF, instead describing the data "as observed." *Id.* at 8, 132, 141.

246. Purporting to learn from the Part A results, Acelyrin worked to resolve these high discontinuation rates in the more rigorous Part B trial by, for instance, issuing incoming Part B patients an "FAQ" to educate them on ISRs and other adverse reactions to the izokibep injections. (Piper Sandler, "Acelyrin Part 2: Takeaways from Our SLRN Fireside Chat," July 23, 2023.)

247. At the time Acelyrin disclosed its Part A trial results in March 2023, the Part B trial was already well underway, with the lion's share of sites active for treatment by the latter half of 2022. Like the Part A results, however, Part B's ongoing trial also witnessed high dropout rates. Critically, however, Acelyrin did not disclose the agreed-to method of analysis for Part B was NRI.

248. Acelyrin was under pressure to complete its Part B results given that competitor MoonLake Therapies was also racing to be the first next-gen HS inhibitor. Like Acelyrin, the efficacy of MoonLake's own compound (sonelokimab) was based on the hypothesis that smaller molecules can more deeply penetrate tissues and see better results.

249. MoonLake would be releasing Phase 2 data for its molecule in HS in June 2023. (Morgan Stanley, "Evaluating Key Considerations Ahead of PhII Part B Data for Izokibep in HS," Sept. 5, 2023.) Given this upcoming showdown, analysts eagerly awaited Acelyrin's "[k]ey immunology pipeline readout [from the Part B HS

trial] … given it marks the first pipeline readout for SLRN following the company's IPO and given the focus placed on therapies for HS by a recent data set from competitor MoonLake Therapeutics." *Id.* Indeed, analysts "expect the benchmark for the [Acelyrin] Part B data to be formed by the recent sonelokimab data from MoonLake," noting "[w]hile the initial izokibep data is impressive, given the small *n* [sample size] of the Part A data we believe that the upcoming Part B data readout represents the key data set for determining izokibep's competitive strength & positioning" for the burgeoning HS market. *Id.* Investors thus closely watched MoonLake's contemporaneously developed agent alongside izokibep's results.

**3. Acelyrin Issues its IPO, Misleading Investors About its Izokibep Clinical Trials and the Drug's Prospects for the Treatment of HS.**

250. On April 13, 2023, Acelyrin filed the Registration Statement on Form S-1 with the SEC in connection with its IPO, which, after several amendments, was declared effective by the SEC on May 4, 2023. Between February and April 2023, the Company and the SEC exchanged draft registration statements and correspondence about the registration statement's disclosures, with the SEC directing Acelyrin to remove any and all reference to the safety and efficacy of the Company's product candidates given that such "conclusions that are within the sole authority of the FDA and are assessed throughout the entire development process" and to "…describe the relevant preclinical and clinical trials and objective results of such trials…" (See Mar. 13, 2023 Ltr. from SEC to Acelyrin; Apr. 6, 2023 Ltr. from SEC to Acelyrin.)

251. On May 4, 2023, pursuant to the Registration Statement, Acelyrin's common stock began publicly trading on the NASDAQ under the trading symbol "SLRN".

252. On May 5, 2023, Acelyrin filed the Prospectus on Form 424B4 with the SEC in connection with the IPO (the "May 5, 2023 Prospectus"), which incorporated and formed part of the Registration Statement.

253. Pursuant to the Offering Documents, Acelyrin issued 30 million shares of its common stock to the public at the Offering price of $18.00 per share for proceeds to the Company of $502.2 million after applicable underwriting discounts and commissions.

254. The Offering Documents touted the success of izokibep's purported efficacy in treating HS during Part A of the Phase 2b/3 clinical trials and assuaged any fears about Part A's one-third discontinuation rate.

255. According to the Offering Documents, the confirmatory Part B clinical trial was "ongoing" with top line results expected in the second half of 2023. (See May 5, 2023 Prospectus at 5, 137.)

256. The Offering Documents made several general disclosures about the risk of potential trial participant discontinuations and dropouts, including at higher rates than anticipated, and the negative impact of such discontinuations on drug approval, the trial data quality, and research and development costs.

257. The Offering Documents also made limited, specific disclosures relevant to the discontinuation risk, specifically the nine discontinuations in the Part A trial for injection site reactions, physical relocation and lost to follow up, and adverse events.

258. However, nowhere in the Offering Documents do they discuss or mention any discontinuations in the ongoing Part B trial.

259. Nor do the Offering Documents inform investors about the methodology used to calculate either the Part A or Part B results.

**4. Unbeknownst to Investors, Patient Discontinuations Undermined Acelyrin's Izokibep Clinical Trials for HS.**

260. While the Offering Documents bolstered investors' confidence in izokibep as a revolutionary treatment for HS, high levels of patient discontinuations compromised the trials' integrity, and as alleged *infra* in Section II.E., the Offering Documents misled investors by withholding (1) the trials' different methodologies,

effectively obscuring the impact of patient discontinuation in Part A; and (2) the rate of these discontinuations seen in Part B at the time of the IPO and beyond until Acelyrin finally released its top line Part B results in September 2023.

261. Plaintiffs consulted expert Todd Clark to assess Defendants' statements regarding the Part A and B HS trial data and results. Mr. Clark has a Master of Science degree in drug development and regulation from Johns Hopkins University and an MBA from the Kellogg School of Business at Northwestern University. He is a pharmaceutical expert with approximately thirty years of experience consulting for branded and generic drug companies, as well as biotech firms, investment banks, and health technology services to advise them on, among other things, drug development and clinical trial design. He served in an executive role at the largest pharmaceutical marketing communications firm in the world prior to 1998, at which time he founded the consulting company he runs today. In his consulting role, Mr. Clark has consulted with many of the top pharmaceutical companies in the world, has published extensively on industry topics, including clinical trial issues, and is frequently quoted in trade journals and by academics and has Clark has testified in numerous cases as an expert on pharmaceutical matters.

262. Mr. Clark's expert analysis shows that, by the time of the May 4, 2023 IPO, (1) the Offering Documents' failure to disclose the difference in Part A and Part B methodologies materially mispresented the impact of patient discontinuation in both trials and (2) based on publicly available information about the progress of Part B, the Securities Act Defendants possessed the ability to make the Offering Documents not misleading as they would have received enough data on discontinuations in Part B to know that this issue continued to plague the Phase 2b/3 trial for HS— and enough to know the ability of the highly anticipated Part B to meet its primary endpoint was endangered by this issue.

### 5. By Omitting the Methodologies, the Offering Documents Materially Misrepresented the Impact of Patient Dropouts in the HS Trials.

263. For Part A, Acelyrin's omission of the LOCF method strategically misled investors about the import of the data, thus "gaming expectations" of the Part B results.

264. As discussed, the Offering Documents touted Part A's efficacy results, but did not disclose that it came to those results using the LOCF method. Using that method, the Offering Documents obfuscated the impact of the high number of patient discontinuations in the Part A results—in fact, by definition, those dropouts *were not part of the final Part A analysis*.

265. In discussing Part A results, however, the Offering Documents say, "we have reported data as observed at 12 weeks." In Mr. Clark's view, this is decidedly *not* the same as saying "using a last-observation-carried-forward method to account for discontinuations" which is how it should have been described if Acelyrin was being transparent. According to Mr. Clark's experience, even for a trained eye, it is very easy to gloss over "data as observed," especially when this phrase is presented without any context as to the fact that it's being used to account for discontinuations. Simply, used alone, "as observed" does not imply a connection to discontinuation rates. Thus, in Mr. Clark's view, given the absence of other detailed sources of information available to investors at the time (e.g., the trial protocol, journal articles, etc.) the way that Acelyrin framed Part A results prior to the IPO would be very difficult for even a trained outsider to identify.

266. This omission would be material to an investor. For one, while LOCF is used in clinical trials, it is problematic in that it stands to introduce bias into the trial—an issue of particular concern for studies with high dropout rates like Part A. As one expert expounds in *Fallacies of Last Observation Carried Forward*: "The only condition where LOCF is unbiased is when the missing data occurs completely by chance and the data used as the basis for the LOCF imputation has exactly the

same distribution as does the unknown missing data" but "[s]ince it can never be proven that these distributions are exactly the same, all LOCF analyses are suspect and should be dismissed."[13] In contrast, had the Part A results been calculated under more rigorous models (like the NRI), the Part A results would have been less impressive. In consequence, investors would not view Part A as an indication of the likely success (or not) of the upcoming Part B results.

267. Regarding Part B, the Offering Documents' omission of the agreed-to methodology (the NRI) was also material.

268. Because NRI (unlike LOCF) assumes that discontinued patients are non-responders, using the NRI method inevitably results in lower response rates than LOCF if there are any dropouts at all. Thus, if there were *any* dropouts at all in Part B—a near-certain event given the near 30% dropout rate in Part A—then results for that portion of the study would be lower than those reported for Part A.

269. At bottom, Acelryin was setting up expectation for an "apples-to-apples" comparison with results the Company had shared from Part A, when, in reality, the NRI-based primary endpoint for Part B would yield "apples-to-oranges" results. As the trial sponsor, Acelyrin knew that Part A and Part B results would be calculated differently, and if Acelyrin had been transparent that Part A results were calculated using LOCF and that Part B outcomes would be calculated using NRI, then observant, trained analysts could have predicted that Part B results would be lower than Part A simply because of the difference in calculations. In Mr. Clark's opinion, however, by failing to specify the methodology used to calculate the results, those results were not presented with that level of transparency. Had investors known of these critical differences in treating discontinuation rates, that information would have curbed enthusiasm for the Part B results, and of course, the value of the IPO.

---

[13] John M. Lachin, *Fallacies of Last Observation Carried Forward*, National Journal of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4785044/.

270. Most important, Acelyrin touted these "as observed" results without disclosing that the FDA would judge the outcome of Part B using the NRI method.

### 6. Ongoing Dropouts Predating the IPO Tanked Part B's Statistical Significance.

271. The Offering Documents also omitted material information about clinical trial dropouts based on near-real-time data received before the IPO.

#### a. The Majority of Part B Patients Completed or were Approaching the End of the Trial Before the IPO.

272. Even under conservative estimates, relying on publicly available data from the Part B timeline shows that the majority of patients had either completed the trial or had progressed at least as far past week 12 at the time of the IPO.

273. Among other indicators, 92% of all sites involved in the clinical trial were active by January 13, 2023, which is 16 weeks prior to the IPO date.

274. Moreover, before the Part B trial status was changed to "active, not recruiting," only three out of the 53 sites involved in the trial were removed from the list of recruiting sites, which implies a high rate of site performance.

275. Mr. Clark also noted that while Part A of the trial was conducted exclusively at U.S. sites (meaning that any non-U.S. sites could only be involved in Part B), the first non-U.S. sites were brought online no later than August 5, 2023; of the 27 non-U.S. sites that would eventually be brought online, 85% were initiated on or before November 8, 2022. Based on when non-U.S. sites were initiated (as noted above, all non-U.S. sites were for Part B), it is likely that Part B enrollment began around August 2022.

276. Moreover, Part B reached its "Primary Completion Date" (the on which the last patient is examined or receives the studied intervention) on August 2, 2023—meaning the last patient was first administered izokibep or placebo 16 weeks earlier, on or around April 12, 2023.

277. Finally, Mr. Clark relied on Acelyrin's own statements to investors on May 30, 2023, that Part B enrollment had concluded "early", and "ahead of schedule." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.) Thus, enrollment plainly concluded before the IPO, and most patients were either 16 weeks into treatment or close to it by that time.

**b. Acelyrin Learned About Part B Patient Discontinuations as They Occurred.**

278. Acelyrin tracked these discontinuations in near real-time. While Acelyrin would remain "blinded" to *efficacy* results, it had access to, and did in fact monitor, *discontinuations* in near real-time. As stated, "they have been tracking discontinuation rates across all studies and in the Ph2b Part B … not in real time, but they have an understanding at the end of the day." (Piper Sandler, "Acelyrin Part 2: Takeaways from Our SLRN Fireside Chat," July 23, 2023.) Thus, the majority of discontinuations across the Part B patient population occurred before the IPO.

279. Taken together, the Part B trial was at an advanced stage of completion on the IPO date and discontinuations would seriously undermine the Part B trial results and the ability to achieve primary endpoint. This is particularly true considering that the FDA and Acelyrin agreed to assess discontinuations using the NRI method before the IPO.

280. Mr. Clark also highlighted key facts suggesting these discontinuations would be material and impact the integrity of the trial. Part A had already suffered from a high rate (30%) of discontinuations. ISRs were the most significant cause of patient discontinuation in Part A that was directly related to treatment—and with Part B, two injections of 80 mg each were used to achieve the 160 mg dose, thereby presenting two opportunities for ISR with every administration. Acelyrin's steps to reduce discontinuations through patient education suggests Acelyrin would be on high alert for further discontinuations in Part B. Moreover, even if the educational efforts were successful in reducing ISR-related dropouts, there was no basis to

assume they would have any effect on lost-to-follow-up patients, an even larger source of discontinuations in Part A.

281. According to Mr. Clark, the high dropout rate in Part A, the degree of Part B completion, Acelyrin's acknowledged monitoring of dropouts during Part B, that the NRI was the relevant metric, and the number of trial dropouts Acelyrin observed at the time of the IPO would be material information likely impacting the integrity of the trial. It was therefore misleading for Acelyrin to tout Part A's efficacy results while the Part B trial continued to suffer from the same, high rate of discontinuation, and further for Acelyrin to omit this discontinuation information from the Offering Documents while disclosing trial discontinuation generally as a potential risk factor. In particular, the discontinuation rates appearing pre-IPO alone would cause concern because a) it indicated that the Company's efforts to reduce dropout rates from Part A might not be working, b) high dropout rates are often associated with significant adverse events (such as negative safety signals), and c) dropouts can affect the statistical significance/reliability of the trial data. Together, it was negligent for the Offering Documents to omit or provide misleading information about such discontinuations.

## E. Materially False and Misleading Statements for the Securities Act Claims

282. The Offering Documents were issued on May 4, 2023, when Acelyrin's common stock began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions in the Offering Documents.

283. Regarding clinical trials for izokibep, the Offering Documents described this "diamond in the rough" agent as "currently in development for multiple immunological indications including hidradenitis suppurativa (HS)" and that it "***has been administered to more than 400 participants and in some for up to three years***. ***More than 150 participants received doses up to 160 mg and more than 80***

***participants received up to 160 mg weekly, some out to six months***." (May 3, 2023 Prospectus at 6, 12, 128, 132.) (Emphasis added.)

284. The statement in ¶ 283 was false and misleading when made and omitted to disclose material facts because Acelyrin's disclosure of the number of doses and patients at the time of the IPO indicates that it had sufficient data to draw and disclose accurate conclusions regarding both Part A and B clinical trials, yet the statement failed to disclose material negative facts that provide critical insight into these numbers, specifically: (1) that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (2) that the Part A efficacy results omitted the nearly 30% dropout rate; and (3) that the high dropout rate in the ongoing Part B trial at the time of the IPO would also rendered those results not statistically significant. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, its public statements were materially false and misleading at all relevant times.

285. The Offering Documents described the Part A trial for HS, which "consisted of open label treatment with izokibep 160 mg administered subcutaneously (SC) weekly (QW)" for thirty participants, and explained how "***Part A of this trial was designed to inform our own internal decision-making about the future of the izokibep development program in HS***" and how ***"[o]ur internal hurdle for continuing to advance development in HS was to see high orders of HiSCR responses***" in Part A. *Id.* at 8, 140-41. (Emphasis added.)

286. The statements in ¶ 285 were false and misleading when made because: (1) the Part A results did not achieve the purported "high orders of HiSCR" described given the disclosed efficacy results omitted the nearly 30% dropout rate; (2) Acelyrin's "internal hurdle" was the high observed discontinuation in both Part A and B, not the illusory success of Part A's results purportedly showing "high orders" of HiSCR responses; (3) the misleading Part A results revealed nothing "about the

future of the izokibep development program in HS" given it failed to include key metrics of the high rate of patient discontinuations; and (4) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, its public statements were materially false and misleading at all relevant times.

287. The Offering Documents then touted the success of izokibep's purported efficacy in treating HS during Phase II Part A clinical trials. "As presented at the 2023 American Academy of Dermatology (AAD) annual meeting, ***izokibep demonstrated high orders of HiSCR in Part A*** of our Phase 2b/3 trial in HS … report[ing] data as observed at 12 weeks with 71% of participants achieving HiS CR50, 57% achieving HiSCR75, 38% achieving HiSCR90 and 33% achieving HiSCR100" with "[b]oth Hurley Stage II and III participants were present in the populations achieving the highest orders of response (HiSCR90 and HiSCR100)" (*id.* at 8, 141) (emphasis added), and Acelyrin assuaged any fears about Part A's one-third discontinuation rate, saying:

> ***Thirty participants were enrolled in the trial and nine discontinued for various reasons*** including physical relocation and lost to follow up (four), injection site reactions (three; two mild, one moderate), and serious adverse events (SAEs) relating to gastrointestinal symptoms (two). Of the two SAEs, one was Crohn's disease (potentially related) and the second was pre-existing diverticulitis with diverticular abscess and sepsis (not related). *Id.* at 8. (Emphasis added.)

288. The statements in ¶ 287 were false and misleading when made because: (1) the Part A results did not achieve the purported "high orders of HiSCR" described given the disclosed efficacy results omitted the nearly 30% dropout rate; (2) noting that nine participants "discontinued for various reasons" is misleading given those discontinuations were omitted from the Part A efficacy results; and (3) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods. Accordingly, Acelyrin

overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, its public statements were materially false and misleading at all relevant times.

289. Given the success of Part A, the "***double-blind, placebo-controlled Part B of this Phase 2b/3 trial is still actively ongoing and based on the Part A results***" with "expect[ed] enroll[ment]" of "approximately 150 patients." *Id.* at 8. (Emphasis added.) "After consultation with the FDA, the trial is expected to enroll participants with moderate-to-severe HS, diagnosed over a year before the expected first dose in the trial, with a total abscess and inflammatory nodule (AN) count of greater than five at screening and prior to enrollment and randomization. Participants will be randomized into four cohorts: two cohorts will receive placebo as either a QW or Q2W dosing. Two other cohorts will receive 160 mg izokibep as either QW or Q2W dosing. The primary endpoint is HiSCR75 at Week 16. Secondary endpoints include the reduction in participants assessment of skin pain, reduction in flares, and percentage of participants with reduced counts of abscesses and inflammatory nodules. After Week 16, participants that previously received placebo will be dosed with 160 mg izokibep on their previous dosing schedule until the end of the treatment period at Week 32," and "***[o]ur active ongoing trials with izokibep [include a] Phase 2b/3 trial of izokibep in HS … [with] [t]opline data in the Phase 2b/3 trial of izokibep in HS is expected in the second half of 2023.***" *Id.* at 6. (Emphasis added.)

290. The statements in ¶ 289 were materially false and misleading when made because: (1) Part B was not "based on Part A's results" given the modeling data was an apples-to-oranges comparison; (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations; and (4) the expected "[t]opline data" results for Part B were already compromised by a high rate of participant discontinuation. Accordingly, Acelyrin

overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, its public statements were materially false and misleading at all relevant times.

291. In the Offering Documents' "Management Discussion and Analysis of Financial Condition and Results of Operations" section, Acelyrin disclosed that: "***Our future research and development costs may vary significantly based on factors such as: … patient drop-out or discontinuation rates…***" *Id.* at 114. (Emphasis added.)

292. The statement in ¶ 291 was false and misleading when made because: (1) Acelyrin's "future research" already had been compromised by "patient drop-out[s]" and "discontinuation rates" that nullified the Part B results; (2) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; (3) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations; and (4) Acelyrin's "future research" already had been compromised by "patient drop-out[s]" and "discontinuation rates" witnessed in Part B. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

293. The Offering Documents provided several "***risk factors***" related to potential discontinuations "***in initiating or completing clinical trials due to unforeseen events or otherwise, that could delay or prevent our ability to receive marketing approval or commercialize our current and any future product candidates, including***" that "***participants may drop out or fail to return for post-treatment follow-up at a higher rate than we anticipate***." *Id.* at 26. (Emphasis added.) Indeed, "[p]articipant enrollment, a significant factor in the timing of clinical trials, is affected by many conditions including the size and nature of the patient

population, the number and location of clinical sites we enroll, the proximity of participants to clinical sites, the eligibility and exclusion criteria for the trial, the design of the clinical trial, the inability to obtain and maintain participant consents, [and] ***the risk that enrolled participants will drop out before completion***…" *Id.* (Emphasis added.)

294. The statements in ¶ 293 were false and misleading when made because the "risk" identified "in initiating or completing clinical trials … that could delay or prevent [Acelyrin's] ability to receive marketing approval or commercialize [its] current and any future product candidates" due to "participants … drop[ping] out or fail[ing] to return for post-treatment follow-up at a higher rate than we anticipate" had already materialized in Part B by the time of the IPO. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

295. The risk factors went on that Acelyrin "***ha[s] in the past and may in the future experience participant withdrawals or discontinuations from our trials***" and such "***[w]ithdrawal of participants from our clinical trials may compromise the quality of our data.***" *Id.* (Emphasis added.) "If additional adverse events, SAEs or other side effects are observed in any of our clinical trials that are atypical of, or more severe than, the known side effects of the respective class of agents that each of our product candidates are a part of, we may have difficulty recruiting participants to our clinical trials, ***participants may drop out of our trials***, or we may be required to abandon those trials or our development efforts of one or more product candidates altogether." *Id.* at 28. (Emphasis added.)

296. The statements in ¶ 295 were false and misleading when made because: (1) the "risk" that "[w]ithdrawal of participants from our clinical trials may compromise the quality of our data" had already materialized in Part B by the time

of the IPO; (2) noting that nine "discontinued for various reasons" in Part A is misleading given those discontinuations were omitted from the Part A efficacy results; (3) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; and (4) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

297. The risk factors again pointed to the HS Part A discontinuations, stating "for example, … ***nine participants withdrew from Part A of our ongoing Phase 2b/3 trial in HS*** for various reasons including injection site reactions, physical relocation and lost to follow up, and SAEs relating to gastrointestinal symptoms." *Id.* (Emphasis added.)

298. The statement in ¶ 297 was false and misleading because: (1) the "risk" that "[w]ithdrawal of participants from [Acelyrin's] clinical trials may compromise the quality of [its] data" had already materialized in Part B by the time of the IPO; (2) noting that nine "discontinued for various reasons" in Part A is misleading given those discontinuations were omitted from the Part A efficacy results; (3) Acelyrin omits that the Part A results used a LOCF analysis that would not be indicative of the future success of HS trials using more rigorous methods; and (4) Acelyrin omits that it agreed with the FDA to use the more rigorous NRI method in the Part B results that must account for patient discontinuations. Accordingly, Acelyrin overstated izokibep's clinical and/or commercial prospects, and, as a result, Acelyrin also overstated the Company's business prospects post-IPO; and as a result, the Company's public statements were materially false and misleading at all relevant times.

### F. The Registration Statement Failed to Comply with SEC Rules and Regulations and Applicable Accounting Principles

299. The Registration Statement failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were then having and were reasonably likely to have a material effect on Acelyrin's operating performance.

300. Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(2)(ii) ("Item 303"), required the Securities Act Defendants to "[d]escribe any known trends or uncertainties that have had or that [the registrant] reasonably [expects will] have a material favorable or unfavorable impact on sales or revenues or income from continuing operations." Similarly, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required in the "Risk Factors" section of registration statements and prospectuses "a discussion of the [most significant] factors that make [the offering] . . . speculative or risky" and requires each risk factor to "adequately describe[] the risk."

301. The Registration Statement failed to disclose the omitted material facts set forth herein: (1) Acelyrin's reported (and touted) results from its Phase 2b/3 Part A trial regarding the efficacy of izokibep in treating HS were artificially inflated because the Securities Act Defendants omitted the Part A participant discontinuations from the efficacy analysis; and (2) the high participant discontinuation rates from the ongoing Phase 2b/3 Part B trial of izokibep in treating HS, and the attendant negative consequences and risks stemming from this information, had already presented by the time of the IPO. These omitted material facts violated Item 303 because these undisclosed facts, trends, and uncertainties were known and would (and did) have an unfavorable impact on the Company's financial performance. The fact of high discontinuations in the Part B trial indicated the clinical trial was less likely to succeed, a material fact that, when later revealed in the Part B topline results, did result in a significant stock price drop.

302. The Registration Statement's failure to disclose these omitted material facts identified in Section II.E. *supra*, also violated Item 105 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Acelyrin stock speculative or risky. Indeed, as alleged above, the purported risk factors regarding the potential for and impact of clinical trial participant discontinuation provided in the Registration Statement were themselves materially false and misleading when made and failed to apprise investors of the most significant risks facing the Company at the time of the IPO because they identified the risk generally but failed to disclose that such risk had in fact already presented. The fact of high discontinuations in the Part B trial indicated the clinical trial was less likely to succeed.

303. In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part:

> Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects***, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

304. The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines

> that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

305. Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F." In particular, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release as support and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – *i.e.*, reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

306. Accordingly, Acelyrin had an affirmative obligation to disclose in the Registration Statement information required by Items 303. The Registration Statement, however, omitted material facts required to be stated therein because it failed to disclose information regarding the following known trends, events, or uncertainties in existence at the time of the IPO, specifically, (1) that Acelyrin's results from its Part A trial were artificially inflated because the Securities Act Defendants omitted the Part A participant discontinuations from the efficacy analysis; and (2) the high participant discontinuation rates from the Part B trial of izokibep in treating HS, and the attendant negative consequences and risks stemming from this information, had already presented by the time of the IPO.

307. The Registration Statement similarly omitted material facts required to be stated therein because it negligently failed to disclose information on some of the most material risks facing Acelyrin at the time of the IPO in violation of Item 303

and Item 105. As set forth above, the Registration Statement omitted material facts required to be stated therein because it failed to disclose the risks associated with the undisclosed trends, events, or uncertainties identified above. The foregoing rendered the IPO significantly riskier than portrayed. The absence of this information misled investors about the prospects and drawbacks of investing in Acelyrin, as well as the true risk profile of investing in Acelyrin Class A common stock.

**G. Events and Disclosures Following the Offering.**

308. On September 11, 2023, after the markets closed, Acelyrin issued a press release entitled "ACELYRIN, INC. Announces Top-Line Results from Placebo-Controlled Clinical Trial of Izokibep for Moderate-to-Severe Hidradenitis Suppurativa."

309. In that press release, Acelyrin "announced top-line results from Part B of a Phase 2b/3 trial evaluating izokibep for the treatment of moderate-to-severe Hidradenitis Suppurativa (HS)" revealing that "[t]he primary endpoint of HiSCR75 at week 16 did not meet statistical significance."

310. High discontinuation rates, occurring "as early as week four" were a primary reason for this failure:

> The randomized double-blind, placebo-controlled, multi-center trial evaluated the safety and efficacy of izokibep dosed 160 mg weekly (QW) and every two weeks (Q2W), versus placebo, in 175 patients with moderate-to-severe HS (Hurley Stage II and III). The trial was conducted at 50 sites globally and assessed various efficacy endpoints, including the primary endpoint of HiSCR75 (Hidradenitis Suppurativa Clinical Response) at 16 weeks utilizing a non-responder imputation (NRI) analysis method.
>
> ***In the primary NRI analysis of Part B, statistical significance was impacted by patients with HiSCR75-100 discontinuing as early as week 4 unrelated to adverse events***. …. Applying a Last Observation Carried Forward (LOCF) sensitivity analysis of the full dataset highlighted the ***impact of responder discontinuations on the primary analysis and showed statistical significance of HiSCR75 at week 16***….
>
> ***Also, given the number of responders who discontinued in the QW arm – the majority unrelated to an adverse event – a modified-NRI (mNRI) approach showed a high level of statistical significance and highlighted the impact of discontinuations on magnitude and***

> ***significance of response***. This analysis demonstrates the performance of izokibep at this juncture in the study – in isolation from the placebo rate increases observed later in the trial – and provides an exploratory approach to analyzing responder discontinuations. (Emphasis added.)

311. On September 11, 2023, Acelyrin held a call with investors to discuss these "extremely disappointing" results. For the HS Part B top line results, "the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in the primary non-responder imputation analysis" which Acelyrin stated was caused by "two" "***surprising***" "factors," the main one being "***discontinuation*** of HiSCR75 to HiSCR100 responders in the Q week arm due to reasons unrelated to adverse events."[14] (Acelyrin Results Call, Sept. 11, 2023) (Emphasis added.)

312. As Acelyrin explained, these "***discontinuations mattered and affected the outcome of the study***." *Id.* While "[t]he study was over enrolled to account for potential discontinuations, … ***there were both more discontinuations and importantly more responder discontinuations, including even HiSCR75 and HiSCR100 responders than we would expect***. ***Ordinarily, discontinuations tend to occur due to lack of response or for safety and tolerability issues. We did not see that in this study***." "***Discontinuation rates for this study were higher than expected,***

[14] The other was a "marked increase in placebo rates during the course of the study." (Acelyrin Results Call, 9/11/23) "[O]ur placebo rates that are markedly higher than historical precedent." (Acelyrin Results Call, 9/11/23) "Statistical significance was further impacted by the unexplained and marked increase in placebo range during the course of the study to unprecedented levels." (Acelyrin Results Call, 9/11/23) Although admittedly this "had doubled relative to historical precedents," Acelyrin would only say "[w]e really don't have a good explanation for why that should be happening." (Acelyrin Results Call, 9/11/23) Acelyrin would only provide that "to be honest, this is the first time in my career that I've seen responders discontinuing without adverse event like this, and also placebo responses sort of increasing in rates during the course of the study to these unprecedented high levels." (Acelyrin Results Call, 9/11/23)

and we tried to understand the potential drivers." Yet "[w]e ***have not identified a clear pattern for reasons for dropout***."[15] *Id.* (Emphasis added.)

313. During the question-and-answer segment, investors struggled "to wrap [their] head around the data," asking again for Acelyrin to explain "the reasons for the discontinuation specifically for the patients who are not discontinuing due to treatment or a side effect" and "what were the major reasons for discontinuations in the placebo? And how do we think about the high – the discontinuations in the placebo along with that high placebo response that you're seeing?" *Id.*

314. Acelyrin, however, would not provide additional explanation, and only reiterated it was "***really not seeing a pattern at all that we can speak to***." (Acelyrin Results Call, 9/11/23) (Emphasis added.) Acelyrin noted, however, that these discontinuations occurred "***early***." *Id.* (Emphasis added.)

315. Acelyrin discussed trial modifications to avoid these surprising and "unexplained" results: "There are modifications we are considering to address discontinuations … such as sample size, baseline characteristics, time point and subject to further discussion with health authorities, endpoint and statistical approaches in our continued efforts to bring izokibep to patients with HS." *Id.*

316. On this news, Acelyrin's stock price fell $17.19 per share, or 61.61%, over the following two trading sessions, to close at $10.71 per share on September 13, 2023.

317. These surprising results—and the lack of plausible explanation—left analysts scratching their heads. As one September 12, 2023, report noted "***it's difficult to glean much from the data given how poorly the trial was run [due to]***

[15] Despite positive safety claims, the highest dropout rates consistently occurred in the highest dose arm (160 mg QW). In its public disclosures, however, the Company repeatedly stated that it conducted an extensive analysis to determine root causes for discontinuation but never mentioned the possibility that there might be tolerability problems with the recommended therapeutic regimen of 160 QW. While there is insufficient data to support a causal link, this possibility should at least be considered.

***one of the highest … d/c [discontinuation] rates we've seen in HS***." (Jeffries, Sept. 12, 2013) (Emphasis added.)

318. As this report went on, given the "painfully disappointing HS data" from "***high dropouts***" the prior, expected "base case scenario of a 25-30% HiSCR75 delta at week 16 … was clearly wrong." (Jeffries, 9/12/23) (Emphasis added.) "The most problematic part of the SLRN HS data is that the only dose that looks competitive vs next-gen IL-17's = the 160mg QW dose (if you give SLRN the benefit of the doubt)" but ***"[u]nfortunately that dose also showed a ~25% D/C [discontinuation] rate (approx double the Q2W dose)—which isn't commercially viable***." *Id.* (Emphasis added.)

319. Regarding the "high rates of study discontinuation reported in the izo 160 mg QW arm," analysts noted that:

> ***The dropouts occurred among responders as early as week 4, which SLRN indicated may have impacted the significance of HiSCR responses***…Izo 160mg QW arm had the highest total d/c rates ~25%, almost double vs the Izo Q2W and pbo arms. The d/c rates due to AE were low 2-5% in the Izo dose groups, suggesting most of the d/c [discontinuations] were not related to safety/tolerability. Interestingly, there were seemingly high discontinuations in Part B in the pbo arm as well (~17%). Additionally, it's unclear how SLRN defines d/c unrelated to AE (vs non-tx related AE's) & what types of pts they censored in their KM curve as we're seeing some discrepancies in #'s reported in the slides…
>
> The reason for the non-treatment related d/c's [discontinuations] in izo's Part B trial is still being assessed. When we caught up with SLRN mgmt, they told us the reason for d/c [discontinuations] were labeled all kinds of different ways, but not labeled as related to AE. SLRN has looked at each of the d/c [discontinuations] cases on a subject level to dig for whether there is a safety/tolerability issue since it's unlikely due to lack of efficacy response. ***SLRN told us they found no pattern to why these d/c chose to drop out of the study***, other than in the weekly QW arm the majority of the dropouts were responders (8/14 responders, 7 of the HiSCR75-100, 2 of HiSCR100) and 11 of the 14 QW dropouts were not treatment-related.
>
> Based on our analysis, historical studies showed most of the IL-17 agents had <10% total d/c [discontinuations] rates, and the majority of the dropouts were safety-related. Despite Humira (adalimumab)

> showing relatively high d/c [discontinuations] rates ~18% in one Ph2 HS study, it had d/c of 2-3% in other trials. ***Given this, we think different trial designs or conduct could potentially play a role.*** Compared to other IL-17 studies, Izo in general had higher total d/c [discontinuations] rates of 12-25% in HS and 14-23% in PsO, but relatively low rate 2-5% in PsA. In HS Ph2/3 part A and Ph2 PsO, more d/c [discontinuations] were related to AE (5-17%) vs 2-5% in HS PartB. *Id.* (Emphasis added.)

320. Moving forward, analysts will "need more clarity on the regulatory path forward is (eg, ***trial design/stat modification) … [and] until mgmt provides a good explanation about what is causing the non-tx related dropouts***, izo's potential in HS remains a 'show me' story." *Id.* (Emphasis added.) Until then, investors will remain "skeptical of [Acelyrin's] data" given "***how poorly the trial was run***." *Id.* (Emphasis added.)

321. In a series of talks at analyst-hosted conferences following this news, Acelyrin would not provide any new information to explain the "surprising" dropout rates.

322. At a September 13, 2023, conference hosted by Morgan Stanley, Acelyrin reiterated:

> ***The discontinuations are happening early***. ***They're happening early in the treatment groups, as early as week four in dose treatment groups***….
>
> We asked ourselves the number of discontinuations … that changed during the course of the study or actually sort of ***reached levels that we frankly haven't seen in historical studies*** … And when we dug down to understand what was happening, we found that, especially in the weekly arm, that there were more discontinuations and the majority of those discontinuations were actually responder discontinuations, ***which is very unusual***….
>
> ***We looked across our discontinuations to understand whether or not there was a pattern…. So, it was very confusing to us*** … ***We looked both at what was reported to us as the reason of the discontinuation as well as we looked through the full database of everything we had on – had captured on these patients to ask ourselves, was there a tolerability pattern that we could see? And we have not seen that at***

> ***this point***. (Morgan Stanley, "Surprise Negative Outcome for Izokibep in HS," Sept. 13, 2023) (Emphasis added.)

323. In the question-and-answer portion, investors again pressed for any "hypothesis" to explain these dropouts and the data. In response, Acelyrin would only say it would not "speculate" as to a reason (*id.*):

> We went to the studies—study coordinators to then ask, hey, is there anything that you will have captured on any of these subjects from a discontinuation perspective that are in your database that is not necessarily in the electronic database so that we can continue to hunt for whether or not there's a pattern here. So we'll continue to assess these sorts of things. But at least at this juncture, there really isn't, you know, sort of anything that we can we can understand and we understand that that's unusual. *Id.*

324. Yet months later, Acelyrin continued to dodge the same questions.

325. For instance, on Acelyrin's November 7, 2023 earnings call, in response to the question "in regards to HS, I was wondering, have you been able to further analyze the result to better understand the placebo response and discontinuation rate observed?" and if this would impact a PsA trial, Acelyrin responded:

> Obviously, given our HS readout that we shared in September, we've been ***extraordinarily hyper-vigilant with regards to putting in any measures such that we understand real time or continue to understand and make sure that we are understanding in real time any discontinuations …*** We don't anticipate any read-through to our PsA and we think that our sort of blinded continued analysis haven't suggested to us any issues in that regard. We have continued further deep dives with regards to the HS dataset … [and] we anticipate having more information with regards to that program by end of year, early next year to share when we have sort of relevantly compiled both our conversations with the health authorities as well as the deep dives that continue to be ongoing. (Acelyrin Earning Call, Nov. 7, 2023) (Emphasis added.)

326. In response to the question "on HS, can you go over precisely what your HS protocol deemed to be drug related or not?" for dropouts, Acelyrin would only say:

> We actually went back through and didn't just take at face value whether or not it was reported to us, whether there was a lot to follow up … We went back through the entire electronic dataset and evaluated for whether or not there was a pattern, including looking for ISRs that weren't necessarily reported as an AE. *Id.*

327. Acelyrin continued to stonewall investors during a November 16, 2023 healthcare conference. When asked about the HS discontinuations and high placebo response "wave … which none of us had ever seen," Acelyrin continued its script that "we continue to interrogate that data set very carefully" and "we've ruled out all the obvious usual suspects," without identifying results or what those "suspects" were.

328. On November 7, 2023, Acelyrin issued a press release announcing the Company's Q3 2023 financial results and recent highlights while conspicuously omitting mention of the week 16 failures in Part B of the HS clinical trial, stating only, "[w]e believe in izokibep's potential in hidradenitis suppurativa, with ~25% of patients achieving HiSCR100 responses within 12 weeks, which means they rapidly achieved resolution of all abscesses and nodules without new draining tunnels" and "[a]s we previously shared, discussions with the FDA will help inform next steps to advance our registrational program" and "expect to have an update by the end of this year or early next year."

329. A few days later, on November 9, 2023, Acelyrin filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2023 (the "Q3 2023 10-Q").

330. The Q3 2023 10-Q contained substantively similar statements as referenced in Section II.E., *supra*, regarding the design and execution of the Company's izokibep clinical trials, as well as the drug's purported mechanism of

action in treating HS, except now the Company acknowledged the disastrous outcome of the Part B portion of its Phase 2b/3 trial in HS, "which significantly harmed [its] stock price."

331. In that Q3 10-Q, Acelyrin finally started disclosing the discontinuation issue from Part B.

332. For instance, in the "Management Discussion and Analysis of Financial Condition and Results of Operations" section, Acelyrin disclosed that: "Our future research and development costs may vary significantly based on factors such as … patient drop-out or discontinuation rates…"

333. This time, however, the section elaborated on the discontinuation issues in Part B:

> A change in the outcome of any of these variables with respect to the development of any of our product candidates could significantly change the costs and timing associated with the development of that product candidate. ***For example, in September 2023, we announced that the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in Part B of the Phase 2b/3 trial of izokibep in HS. The factors we believe contributed to the Part B results, including subject discontinuations unrelated to adverse events*** and a marked increase in placebo response rates during the course of the trial, ***could negatively impact the results of ongoing and future clinical trials of izokibep, including the ongoing Phase 3 trial of izokibep in HS, our ongoing Phase 2b/3 trial in PsA or trials in other indications. In any event, the negative results in Part B of the Phase 2b/3 trial may significantly extend our development timeline and significantly increase our development costs for HS.*** In this regard, we had previously planned for the inclusion of the Part B results from our Phase 2b/3 trial of izokibep in HS as part of the planned registrational package for HS. Subject to receiving feedback from the FDA regarding next steps for development of izokibep in HS, we may need to conduct and successfully complete both our ongoing Phase 3 trial in HS, as well as an additional Phase 3 trial in HS. (Q3 2023 10-Q at 48.) (Emphasis added.)

334. In the "Risk Factors" section of its Q3 10-Q, Acelyrin also for the first time highlighted the discontinuation plaguing Part B of the HS trials:

> Clinical testing can take many years to complete, and its outcome is inherently uncertain. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later-stage clinical trials. ***For example, despite encouraging results from the open-label Part A of our Phase 2b/3 trial of izokibep in HS, the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in the Part B portion of such trial. This result***

***significantly harmed our stock price and investor perceptions of the prospects for izokibep in HS, and may significantly extend our development timeline for such indication. The factors we believe contributed to the Part B results were primarily subject discontinuations unrelated to adverse events*** and a marked increase in placebo response rates during the course of the trial that led to overall placebo response rates that were markedly higher than historical rates in the HS indication. Our clinical trials are subject to significant risk factors that can have a material and negative impact on outcomes, many of which are beyond our control. ***Such factors include unexpectedly high*** placebo response rates and ***patient responder discontinuations unrelated to adverse events, such as we observed in our Phase 2b/3 trial of izokibep in HS…*** (Q3 2023 10-Q at 49-50.) (Emphasis added.)

We or our collaborators may experience delays in initiating or completing clinical trials due to unforeseen events or otherwise, that could delay or prevent our ability to receive marketing approval or commercialize our current and any future product candidates, including: …the number of participants required for clinical trials may be larger, enrollment in clinical trials may be slower, ***or participants may drop out or fail to return for post-treatment follow-up, in each case at a higher rate than we anticipate (as we experienced with respect to participant discontinuations in the Part B portion of our Phase 2b/3 trial of izokibep in HS)…***" (Q3 2023 10-Q at 49-50.) (Emphasis added.)

Participant enrollment, a significant factor in the timing of clinical trials, is affected by many conditions including the size and nature of the patient population, the number and location of clinical sites we enroll, the proximity of participants to clinical sites, the eligibility and exclusion criteria and overall design of the clinical trial, the inability to obtain and maintain participant consents, the ongoing risk that enrolled participants will drop out before completion, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the product candidate being studied in relation to other available therapies. Risks related to patient enrollment are heightened in longer clinical trials. In addition, our clinical trials will compete with other clinical trials for product candidates that are in the same areas as our product candidates, and this competition may reduce the number and types of participants available to us. Participants, including in any control groups, may withdraw from the clinical trial if they are not experiencing improvement in their underlying disease or condition or if they experience other difficulties or issues. Participants may also withdraw from the clinical trial if they experience improvement in their underlying manifestations of disease, and determine that further treatment is not necessary or unduly burdensome relative to their experienced improvement. Additionally, we could encounter delays if treating clinicians encounter unresolved ethical issues associated with enrolling participants in clinical trials of our product candidates in lieu of prescribing existing treatments that have established safety and efficacy profiles. Even if we are able to enroll a sufficient number of participants in our clinical trials, delays in enrollment or small population size may result in increased costs or may affect the timing or outcome of our clinical trials. ***We have in the past and may in the future experience participant withdrawals or discontinuations from***

> ***our trials. Such withdrawals may compromise the quality of our data or contribute to negative or inconclusive results from trials, as we experienced in the week 16 Part B results of our Phase 2b/3 trial of izokibep in HS.*** Any of these conditions may negatively impact our ability to successfully complete such trials and/or include results from such trials in regulatory submissions, which could adversely affect our ability to advance the development of our product candidates in a timely and cost-efficient manner, or at all. ***For example in light of our week 16 Part B results in our Phase 2b/3 trial of izokibep in HS, subject to FDA feedback, the timeline for any potential related BLA submission for such indication may be significantly extended (or ultimately may not occur)…*** (Q3 2023 10-Q at 50.) (Emphasis added.)
>
> Our clinical trial results may also not support approval. In addition, our product candidates could fail to receive regulatory approval for many reasons, including the following:… the results of clinical trials may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval, including due to the heterogeneity of patient populations, ***participant discontinuation rates, or apparent improvement in trial participants receiving placebo such as those observed in week 16 results of Part B of the Phase 2b/3 trial of izokibep in HS…*** (Q3 2023 10-Q at 58.) (Emphasis added.)

335. That Acelyrin finally disclosed these risks to the market confirm they are material.

336. On November 27, 2023, Acelyrin issued a press release blaming its CRO Fortrea—the entity responsible for executing Acelyrin's HS and PsA clinical trials—for the errors uncovered in these trials, and resulting, at least in part, in a statistically insignificant outcome at primary endpoint week 16 in Part B of the Phase 2b/3 HS trial, stating:

> In September 2023, ACELYRIN disclosed top-line results from Part B of its Phase 2b/3 trial evaluating izokibep for the treatment of moderate-to-severe Hidradenitis Suppurativa ("HS trial"). ***Given certain confounding factors observed in the trial, including responder discontinuations without adverse events and a marked increase in placebo rates arising in the latter half of the study, the Company implemented quality control measures above and beyond standard protocol*** for the ongoing open-label extension of the HS trial, the ongoing Phase 3 trial in HS, and the ongoing PsA trial. These trials are being conducted by the same Contract Research Organization (CRO). The CRO does not conduct any trials on behalf of ACELYRIN beyond the izokibep clinical program…
>
> **Next Steps.** ACELYRIN's wide-ranging review of the ongoing izokibep trials, including operational execution by the CRO, is continuing. ACELYRIN will contract with a third-party to conduct an independent audit of the trials being conducted by the CRO for ACELYRIN, including the HS trial and the PsA trial. ACELYRIN will not use this

> CRO for any new trials that it conducts. Based on the outcome of its ongoing evaluation and the planned audit, the Company will determine the best path forward for the development of izokibep on behalf of patients. This will include a determination of whether to transition its ongoing trials to a new CRO or complete the trials with the current CRO…
>
> "We are disappointed by these developments, especially for the patients who need better treatment options for psoriatic arthritis and hidradenitis suppurativa," said Shao-Lee Lin, MD, PhD, founder and CEO of ACELYRIN. "However, we are a company founded on truth and transparency, and we are grateful that through the tenacity of our internal team we were able to identify these errors. We are committed to delivering the best possible outcome for patients, physicians and shareholders as we continue to pursue development of izokibep as a potentially differentiated treatment for multiple immunologic conditions." (Emphasis added.)

337. In response, the same day, Fortrea filed its own 8-K, "disput[ing] the accuracy of statements that ACELYRIN has made and the characterization of those statements in subsequent media reports." Specifically, "ACELYRIN implied, and media reported that the trial evaluating the product in the treatment of Hidradenitis Suppurativa (HS) was not conducted properly by Fortrea and that this may have impacted the outcome of the trial," but "Fortrea objects to the implications that Fortrea's study conduct impacted the trial outcomes" and "stands behind its conduct of the HS clinical trial in accordance with the protocol and applicable regulatory requirements." "Fortrea has successfully conducted thousands of clinical trials for more than 30 years, all while upholding the highest standards of integrity for all our customers. We have an unwavering commitment to the safety and well-being of patients and clinical trial participants, to data integrity, and to the ethical conduct of clinical trials."

338. This finger-pointing further confirms serious errors pervaded the Part B results.

339. Accelyrin's share price has continued to decline, falling as low as $5.90 per share on January 19, 2024, and at the time of this Complaint, trading at $6.65 per share, more than 60% below the Offering price of $18.00.

### H. Class Action Allegations for the Securities Act Claims

340. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all purchasers of Acelyrin Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO (the "Securities Act Class" or the "Class"). Excluded from the Securities Act Class are the Securities Act Defendants, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

341. The members of the Securities Act Class are so numerous that joinder of all members is impracticable. Acelyrin Class A common stock is actively traded on the NASDAQ, and 30 million shares were sold in the IPO. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Securities Act Class. Record owners and other members of the Securities Act Class may be identified from records maintained by Acelyrin or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

342. Lead Plaintiffs' claims are typical of the claims of the members of the Securities Act Class, as all members of the Class are similarly affected by the Securities Act Defendants' wrongful conduct in violation of the federal securities laws as complained of herein.

343. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class and have retained counsel competent and experienced in class and securities litigation.

344. Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Securities Act Defendants violated the Securities Act;

(b) whether the Registration Statement issued by the Securities Act Defendants to the investing public in connection with the IPO was negligently prepared and contained inaccurate statements of material fact or omitted material information required to be stated therein; and

(c) to what extent the members of the Securities Act Class have sustained damages and the proper measure of damages.

345. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## I. Securities Act Counts

### COUNT I

### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST THE SECURITIES ACT DEFENDANTS

346. Lead Plaintiffs repeat and incorporate each allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct. Lead Plaintiffs expressly disavow reliance on, or incorporation of, any allegation of fraud, recklessness, or intentional misconduct for purposes of claims under the Securities Act. Lead Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if set forth herein, except these Securities Act claims

expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations in Section I.

347. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, by Lead Plaintiffs on behalf of the Class, against all Securities Act Defendants.

348. The Offering Documents for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

349. Acelyrin is the registrant for the IPO. As the issuer of its common stock, Acelyrin is strictly liable to Lead Plaintiffs and the Securities Act Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required to be disclosed therein pursuant to the regulations governing the Registration Statement's preparation.

350. The Individual Securities Act Defendants signed the Registration Statement either personally or through an attorney-in-fact and caused its issuance. Each of the Individual Securities Act Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Securities Act Defendants had a duty to ensure that such statements were true and accurate, and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of the Individual Securities Act Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material facts. As such, the Individual Securities Act Defendants are strictly liable to Plaintiff and the Securities Act Class under Section 11 of the Securities Act.

351. The Securities Act Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate. By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

352. At the time of their purchases of Acelyrin Class A common shares pursuant and/or traceable to the to the Registration Statement issued in connection with the IPO, Lead Plaintiffs and other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the action commenced. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action commenced.

353. Lead Plaintiffs and the Securities Act Class have sustained damages. The value of Acelyrin securities has declined substantially subsequent and due to the Securities Act Defendants' violations.

**COUNT II**

**FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST THE SECURITIES ACT DEFENDANTS**

354. Lead Plaintiffs repeat and incorporate every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct. Lead Plaintiffs expressly disavow reliance on, or incorporation of, any allegation of fraud, recklessness, or intentional misconduct for purposes of claims under the Securities Act. Lead Plaintiffs repeat, incorporate, and reallege each of the

allegations set forth above as if set forth herein, except these Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations in Section I.

355. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Lead Plaintiff and the Class against the Individual Securities Act Defendants for their control of Acelyrin, and against Acelyrin for its control of the Individual Securities Act Defendants and all its employees and subsidiaries in connection with the controlled persons' violations of Section 11 of the Securities Act relating to the IPO.

356. The Individual Securities Act Defendants possessed the power to control, and did control, directly and/or indirectly, the actions of Acelyrin at all relevant times. By virtue of their positions as directors and/or senior officers of Acelyrin, the Individual Securities Act Defendants possessed the power and authority to control the contents of Acelyrin's Registration Statement and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Securities Act Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Acelyrin. Acelyrin also exercised control over and directed the actions of its senior managers, directors, employees, and agents, including the Individual Securities Act Defendants.

357. This claim is brought within the applicable statute of limitations.

358. As control persons of Acelyrin, the Securities Act Defendants are liable jointly and severally and to the same extent as Acelyrin for its violations of Section 11 of the Securities Act. By reason of such conduct and participation, the Securities Act Defendants are liable pursuant to Section 15 of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining this action to be properly maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as Class Representatives and Hagens Berman Sobol Shapiro LLP and Pomerantz LLP as co-Lead Class Counsel;

B. Awarding damages in favor of Lead Plaintiffs and the Classes against Defendants, jointly and severally, by reason of the acts and transactions alleged herein in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Awarding Lead Plaintiffs and the Classes their reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D. Awarding Lead Plaintiffs and the Classes such other and further relief, including any injunctive or other equitable relief, as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiffs hereby demand a trial by jury.

DATED: March 26, 2024

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ *Lucas E. Gilmore*
LUCAS E. GILMORE

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Lead Plaintiff Kamel Boukadoum and Co-Lead Counsel for the Class*

DATED: March 26, 2024

POMERANTZ LLP

By: /s/ *Jennifer Pafiti*
JENNIFER PAFITI

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff Fred Bergman and Co-Lead Counsel for the Class*

**Attestation**

I, attest that all other signatories listed, and on whose behalf this document is submitted, concur in the filing's content and have authorized the filing.

Dated: March 26, 2024

*<u>/s/ Lucas E. Gilmore</u>*
Lucas E. Gilmore