Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Kamel Boukadoum and*
*Co-Lead Counsel for the Class*

[Additional counsel on signature page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| KAMEL BOUKADOUM, ESTATE OF FRED BERGMAN, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ACELYRIN, INC., SHAO-LEE LIN, MARDI C. DIER, BRUCE C. COZADD, DAN BECKER, ALAN B. COLOWICK, HENRY O. GOSEBRUCH, PATRICK MACHADO, BETH SEIDENBERG, and DAWN SVORONOS,<br><br>Defendants. | No. 2:23-cv-09672-FMO-MAA<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>Courtroom: 6D<br>Judge: Hon. Fernando M. Olguin |

# TABLE OF CONTENTS


Page

I. NATURE OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 5

III. THE PARTIES .......... 5

IV. SUBSTANTIVE ALLEGATIONS .......... 8

A. Acelyrin's Lead Product Candidate, Izokibep .......... 8

B. Acelyrin's Development of Izokibep for the Treatment of HS is Critical to the Company's Success .......... 10

C. Acelyrin Issues its IPO, Detailing its Izokibep Clinical Trials and the Drug's Prospects for the Treatment of HS. .......... 16

D. High Numbers of Patient Discontinuations Compromised Acelyrin's Izokibep Clinical Trials for HS. .......... 17

E. Ongoing Dropouts Predating the IPO Tanked Part B's Statistical Significance. .......... 20

1. The Majority of Part B Patients Completed or Were Approaching the End of the Trial Before the IPO. .......... 20

2. Acelyrin Learned About Part B Patient Discontinuations as They Occurred. .......... 21

3. There Was Sufficient Information at the Time of the IPO to Understand that Part B Faced a High Likelihood of Failure .......... 23

4. Based on the High Discontinuation Rates from Part A, There Was Reason to Monitor for Similar Results in Part B. .......... 24

V. MATERIALLY INCOMPLETE AND THEREFORE MISLEADING STATEMENTS FOR THE SECURITIES ACT CLAIMS .......... 25

A. The Registration Statement Failed to Comply with SEC Rules and Regulations and Applicable Accounting Principles ..... 31

VI. EVENTS AND DISCLOSURES FOLLOWING THE OFFERING. ..... 35

VII. CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS ..... 45

VIII. CAUSES OF ACTION ..... 47

COUNT I FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS ..... 47

COUNT II FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS ..... 49

PRAYER FOR RELIEF ..... 49

DEMAND FOR TRIAL BY JURY ..... 50

Lead Plaintiffs Kamel Boukadoum and the Estate of Fred Bergman ("Lead Plaintiffs") by and through their undersigned counsel, bring this action on behalf of themselves and purchasers of Acelyrin, Inc. ("Acelyrin" or "the Company") securities pursuant and/or traceable to Acelyrin, Inc.'s May 4, 2023 initial public offering (the "Class"). Excluded from the Class are Defendants, their families, and their affiliates.

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of its undersigned counsel, including from the following sources: (i) Acelyrin's public documents, conference calls, announcements and filings with the SEC made by Acelyrin; (ii) research reports from securities and financial analysts; (iii) Company wire and press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Acelyrin securities; (vii) consultation with experts; and (viii) additional materials and data concerning the Company and industry as identified herein.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of investors that purchased or otherwise acquired Acelyrin, Inc. shares in and/or traceable to the registration statement for the Company's May 4, 2023 IPO (the "Class"). This action is brought solely under Sections 11 and 15 of the Securities Act of 1933. Lead Plaintiffs do not allege, and this Complaint does not assert, that any Defendant acted with scienter, fraudulent intent, or an intent to deceive. Rather, Lead Plaintiffs allege that Defendants failed to exercise reasonable care and due diligence in the preparation of the Registration Statement, and that as a result, the Offering Documents contained material misstatements and omissions. The allegations herein do not sound in fraud.

2. At all relevant times, Acelyrin was a clinical-stage biopharmaceutical company focused on developing transformative medicines for immunological diseases. The Company's lead product candidate, izokibep, was a novel antibody designed to treat hidradenitis suppurativa (HS), a chronic and debilitating inflammatory skin condition, along with other immunological disorders such as psoriatic arthritis, axial spondyloarthritis, and uveitis.

3. Izokibep's success was crucial to Acelyrin, as it was the Company's most advanced program and represented a significant potential market opportunity. The positive results from earlier clinical trials of izokibep were a key selling point in Acelyrin's May 4, 2023 initial public offering (IPO), which raised over $500 million in proceeds. As a clinical-stage company, Acelyrin was dependent on the IPO proceeds to fund its ongoing operations and clinical development programs.

4. Unbeknownst to investors, Acelyrin's May 4, 2023 Registration Statement (the "Registration Statement") that incorporated by reference the Company's May 3, 2023 second amended Form S-1 (the "May 3, 2023 Prospectus") (together, the "Offering Documents"), was prepared without the exercise of reasonable care and due diligence required by the Securities Act, and as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with governing rules and regulations.

5. Specifically, the Offering Documents failed to adequately disclose risks related to high patient discontinuation rates observed in an ongoing Part B clinical trial of izokibep, and omitted to disclose that the high discontinuation rates from the ongoing Part B trial had already compromised the integrity and results of that trial by the time of the IPO.

6. The Offering Documents disclosed the theoretical risk that "participants [in clinical trials] ***may*** drop out or fail to return for post-treatment follow-up at a

higher rate than anticipated" and that Acelyrin "***may*** experience participant withdrawals or discontinuations" that "may compromise the quality of our data." (Emphasis added). These risk disclosures, however, were materially incomplete and therefore misleading because, by the time of the IPO, Defendants possessed contemporaneous data showing that elevated discontinuation rates were already occurring in the ongoing Part B trial. This information was material because it indicated that the disclosed risk of discontinuations compromising trial data was not merely theoretical—it was actively materializing.

7. A reasonable investor assessing the risk profile of Acelyrin stock would have considered it significant that the Company was already observing discontinuation patterns in Part B that heightened the probability of the very outcome the risk factors warned might occur. Investors would have viewed observable discontinuation patterns as a critical valuation red flag because such trends signal an imminent failure of the trial's statistical integrity, which at a minimum forces the Company to restart the clinical process—delaying potential commercialization and cash flows by several years.

8. Acelyrin and its officers Shao-Lee Lin (Founder and CEO) and Mardi Dier (CFO), as well as its Board Directors—all signatories to the Offering Documents—possessed the material information and power to ensure the Offering Documents accurately disclosed the patient discontinuation rate risk related to the Part B trial based on the Company's access to study results, near real-time clinical trial data, and the timing of patient enrollments and drop-outs.

9. As set forth more fully below, based on the timeline of patient enrollment, the trial's primary completion date, and Acelyrin's acknowledged practice of monitoring discontinuation data, by the time of the May 4, 2023 IPO, Defendants had access to data showing that overall discontinuation rates in Part B were on a trajectory that materially heightened the risk of the trial missing its primary

endpoint. Based on expert analysis, the observed rate among patients who had already completed treatment was approaching the 20% threshold that clinical literature identifies as fatal to a trial's outcome — and with an estimated 44% of patients still under treatment, additional discontinuations were virtually certain to follow. This rate was material because, based on expert analysis of the Part B trial design and the stringent non-responder imputation (NRI) methodology that Acelyrin had agreed with FDA to apply, an overall discontinuation rate at this level would cause the trial to miss its primary endpoint—in other words, cause the trial to fail. The Offering Documents disclosed the general risk that discontinuations could occur and could compromise trial results—but the Offering Documents failed to inform investors that the risk was already materializing.

10. On September 11, 2023, Acelyrin announced disappointing top-line results from Part B of the Phase 2b/3 trial of izokibep in HS patients. The Company revealed that the trial failed to meet its primary endpoint or statistical significance, largely due to unexpectedly high discontinuation rates among trial participants.

11. These surprising results—and the lack of plausible explanation—left analysts scratching their heads. As one September 12, 2023, report noted "it's difficult to glean much from the data given ***how poorly the trial was run [due to] one of the highest … d/c [discontinuation] rates we've seen in HS***." (Jeffries, Sept. 12, 2023) (Emphasis added.)

12. Following this news, reports from securities analysts, and further disclosures from the Company, the value of the Company's shares plummeted to below the $18 per share IPO price. Acelyrin's share price continued to decline, falling as low as $5.90 per share, and as of March 26, 2024 (the date the First Amended Complaint was filed), trading at $6.65 per share, more than 60% below the initial Offering price of $18.00.

13. As alleged herein, because of Defendants' wrongful acts and omissions, and the precipitous share price decline in Acelyrin's common stock, Lead Plaintiffs and other Class members have suffered and continue to suffer significant losses and damages.

## II. JURISDICTION AND VENUE

14. The Securities Act claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k). Jurisdiction is conferred by Section 22 of the Securities Act (15 U.S.C. §77v).

15. Venue for the Securities Act claims asserted herein is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 22 of the Securities Act (15 U.S.C. §77v) because at all relevant times Acelyrin was headquartered in this District, Defendants were found or transacted business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

16. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. THE PARTIES

17. As set forth in their previously filed Certifications incorporated by reference herein [Dkt. Nos. 26-3; 30-3], Lead Plaintiffs Kamel Boukadoum and the Estate of Fred Bergman purchased or otherwise acquired Acelyrin shares pursuant and/or traceable to the Registration Statement for the IPO and were damaged thereby.

18. Defendant Acelyrin is a Delaware corporation with principal executive offices located at 4149 Liberty Canyon Road, Agoura Hills, California 91301 at all relevant times. Following the IPO, the Class A common stock of the Company traded in an efficient market on the NASDAQ under the trading symbol "SLRN". Acelyrin

describes itself as "a late-stage clinical biopharma company focused on identifying, acquiring, and accelerating the development and commercialization of transformative medicines," particularly with a focus on "the treatment of diseases with pathology related to excess activation of the immune system." (*See* May 3, 2023 Prospectus at 1.)

19. At all relevant times, Defendant Shao-Lee Lin ("Lin") served as Acelyrin's Founder, Chief Executive Officer, and a Director of the Company. Lin signed the Registration Statement as "Founder, Chief Executive Officer and Director (*Principal Executive Officer*)."

20. At all relevant times, Defendant Mardi C. Dier ("Dier") served as Acelyrin's Chief Financial Officer and Chief Business Officer. Dier signed the Registration Statement as "Chief Financial Officer and Chief Business Officer (*Principal Executive Financial and Accounting Officer*)."

21. At all relevant times, Defendant Bruce C. Cozadd ("Cozadd") served as Director and Chair of Acelyrin's Board of Directors. Cozadd signed the Registration Statement as "Director."

22. At all relevant times, Defendant Dan Becker ("Becker") served as Director on Acelyrin's Board of Directors. Becker signed the Registration Statement as "Director."

23. At all relevant times, Defendant Alan B. Colowick ("Colowick") served as Director on Acelyrin's Board of Directors. Colowick signed the Registration Statement as "Director."

24. At all relevant times, Defendant Henry O. Gosebruch ("Gosebruch") served as Director on Acelyrin's Board of Directors. Gosebruch signed the Registration Statement as "Director."

25. At all relevant times, Defendant Patrick Machado ("Machado") served as Director on Acelyrin's Board of Directors. Machado signed the Registration Statement as "Director."

26. At all relevant times, Defendant Beth Seidenberg ("Seidenberg") served as Director on Acelyrin's Board of Directors. Seidenberg signed the Registration Statement as "Director."

27. At all relevant times, Defendant Dawn Svoronos ("Svoronos") served as Director on Acelyrin's Board of Directors. Svoronos signed the Registration Statement as "Director."

28. Defendants Lin, Dier, Cozadd, Becker, Colowick, Gosebruch, Machado, Seidenberg, and Svoronos are sometimes referred to herein collectively as the "Individual Defendants." Each of the Individual Defendants signed the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO for their own financial benefit and the financial benefit of Acelyrin. Prior to the consummation of the IPO, Acelyrin entered into separate indemnification agreements with each of its directors and executive officers and purchased directors' and officers' liability insurance.

29. Acelyrin and the Individual Defendants are sometimes referred to herein collectively as the "Defendants."

30. Pursuant to the Securities Act, the Defendants are strictly liable for the materially untrue and misleading statements and omissions in or incorporated in the Offering Documents. By virtue of their positions with the Company and as signers of the Offering Documents, each of the Individual Defendants possessed the power and authority to control the contents of Acelyrin's Offering Documents.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Acelyrin's Lead Product Candidate, Izokibep

31. At all relevant times, Acelyrin, founded in 2020, was a late-stage clinical biopharma company that focused on identifying, acquiring, and accelerating the development and commercialization of transformative medicines for difficult-to-treat autoimmune disorders that historically have eluded full disease resolution. As a result, potential remedies purporting to improve on the limited treatment options available present "multi-billion-dollar opportunities in the aggregate" in untapped markets and revenues. (*See* May 3, 2023 Prospectus at 1.)

32. But as a new company, Acelyrin had a limited portfolio of drug candidates being developed for commercialization, including drug agents izokibep, lonigutamab, and SLRN-517. While the latter two were in early stages of development in Phase 1 (and were obtained through a recent acquisition), Acelyrin developed izokibep from the ground up, and it was the Company's most advanced, "lead product candidate" in the later stages of Phase 2 development for hidradenitis suppurativa (HS), psoriatic arthritis (PsA), and uveitis.[1] *Id.* at 128-29.

33. As such, izokibep was considered the "poster child for Acelyrin's strategic approach, which is to identify, acquire, and accelerate the development and

[1] Before seeking FDA approval, drugs typically go through three phases of development: Phase 1 clinical trials are conducted in a small number of volunteers or patients to assess the early tolerability and safety profile, and the pattern of drug absorption, distribution, and metabolism; Phase 2 clinical trials are conducted in a limited patient population afflicted with a specific disease in order to assess appropriate dosages and dose regimens, expand evidence of the safety profile, and evaluate preliminary efficacy; and Phase 3 are larger scale, multicenter, well-controlled clinical trials conducted on patients with a specific disease to generate enough data to statistically evaluate the efficacy and safety of the product for approval, as required by the FDA, to establish the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug.

commercialization of transformative medicines." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.)

34. Acelyrin's Offering Documents stated izokibep's special characteristics, stating "[t]he [d]esign of Izokibep is [h]ighly [d]ifferentiated from [m]onoclonal [a]ntibodies." (*See* May 3, 2023 Prospectus at 4.) This "small protein therapeutic [is] designed to bind the homodimeric IL-17A molecule with high potency" and "[i]n contrast to conventional monoclonal antibodies, izokibep is much smaller – approximately one-tenth the size of a traditional monoclonal antibody – containing two IL-17A binding domains and an albumin binding domain that results in improved pharmacokinetic (PK) properties." *Id.* "By virtue of its structure and size, we believe izokibep has several key features different from traditional monoclonal antibodies," including "high potency" compared to the current "FDA-approved anti-IL-17A agents secukinumab (marketed by Novartis AG) and ixekizumab (marketed by Eli Lilly and Company)," an "albumin-binding domain increases the plasma half-life of izokibep and enhances its ability to target sites of inflammation," a "small size" to reach "difficult to penetrate tissues," and, "as demonstrated in comparative analyses assessing binding affinity, izokibep molecules are also more potent than the currently marketed monoclonal antibodies targeting IL-17A, secukinumab and ixekizumab" so "[w]e believe izokibep can deliver in a single subcutaneous injection exposure levels that the marketed anti-IL-17A monoclonal antibodies require IV infusion to deliver." *Id.*

35. Given this vast potential, Acelyrin described izokibep as a "'diamond[] in the rough,' where, based on molecule characteristics, [the Company's] collective experience and expertise, and the evolving scientific and medical understanding, [Acelyrin] can establish a clinical development plan that tests [its] hypotheses as to what those benefits could mean for patients." *Id.* at 104, 125.

**B. Acelyrin's Development of Izokibep for the Treatment of HS is Critical to the Company's Success**

36. One of the main pipelines for izokibep is for the treatment of moderate-to-severe HS, a chronic autoimmune condition where the hallmark of disease is skin abscesses, nodules, fistulae, and scar tissue. Moderate to severe HS is characterized by the presence of HS lesions in more than two distinct anatomic areas (groin, gluteal cleft, under the breasts, across the upper back and neck), with one of these areas having Hurley Stage II or III, which includes tunnelling or scarring in the skin pockets. *Id.* at 138.

37. Efficacy of treatments in HS is measured by improvements in Hidradenitis Suppurativa Clinical Response (HiSCR), the clinically validated scoring system that is used to assess disease activity. To illustrate, HiSCR50 represents a 50% improvement in abscesses and inflammatory nodules without worsening in either of these individually or worsening in tunnelling; high order responses, such as 75% improvement (HiSCR75), 90% improvement (HiSCR90), and 100% improvement (HiSCR100, which means there are no abscesses or inflammatory nodules and no new fistulae/tunnels), represent even greater clinical responses in the reduction of inflammatory nodules and abscesses as well as fistulae/tunnels. *Id.* at 4-5.

38. At all relevant times, this debilitating condition had no FDA approved treatment that could fully resolve these skin lesions, leaving many to suffer without cure. The only FDA-approved treatment, AbbVie's Humira adalimumab, had only half reached the scale of 50% resolution and none reach 100%. (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.)

39. Acelyrin presented izokibep as an untapped agent that, if approved by the FDA for treatment of HS, would cover an "unmet need" with "several multi-billion-dollar indications." (Acelyrin Presentation, Mar. 2, 2023.) Indeed, market

interest in these trial results was at a fever pitch, noting izokibep's potential "blockbuster" indications. (Piper Sandler, "Acelyrin Addressing Investors' Burning Questions & Our HS TableMania," Aug. 13, 2023.) As one report noted: "Rough diamonds may be mistaken for worthless pebbles, but a courageous and exceptional management team like Acelyrin can cut and polish them into precious gems," with lead product "[i]zokibep … [an] example[] of this," with "best in-class, multi-billion-dollar potential. We expect this team to generate outsized returns for investors." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.)

40. In May 2022, Acelyrin began its izokibep Phase 2 clinical trials for HS, which the Company divided into Parts A and B. (*See* clinicaltrials.gov.)

41. Part A was "designed to inform [Acelyrin's] own internal decision-making about the future of the izokibep development program in HS," and "[the Company's] internal hurdle for continuing to advance development in HS was to see high orders of HiSCR responses" in Part A, while the more clinically rigorous Part B would test these results against placebo-controlled groups (or "arms"). (*See* May 3, 2023 Prospectus at 137-38.)

42. Part A involved 30 participants over 12 weeks and was designed to be an exploratory open-label, single-arm investigation, meaning every patient receiving treatment received the same dose, and all knew they were receiving izokibep (versus a placebo). Patients received an injection of 160 mg of izokibep per week for a total of 12 weeks. Part A measured the portion of subjects achieving 50%, 75%, 90%, and 100% symptom resolution on the HiSCR scale. *Id.*

43. Part B—which tracked 175 patients over a 16-week period—was a randomized, double-blinded, placebo-controlled, four-arm study. Of the 175 randomized patients, 57 received the 160 mg dose per week (QW dosing), 59 received the 160 mg dose every other week (Q2W dosing), and 29 and 30,

respectively, were in placebo groups at the corresponding dosing frequencies. The primary endpoint for this analysis was HiSCR75. (Acelyrin Presentation, Aug. 1, 2023.)

44. Although unknown to the public at the time, Acelyrin had "agreed" with the FDA to use a non-responder imputation (NRI) "analysis" method to assess the Part B results. (Acelyrin Results Call, Sept. 11, 2023.) The mode of analysis assumes that any patients who discontinue the study are considered non-responders regardless of the reason for discontinuing or if the patient had indeed responded. In other words, patients discontinuing during the trial are treated as non-responders, regardless of the status they had prior to dropout. As the agreed-to method with the FDA, if Part B missed, Acelyrin would be unable to use the results of this trial for registrational purposes—and instead need to perform additional testing that could confirm Acelyrin's hypothesis about izokibep's efficacy in treatment for HS.

45. Discontinuations, or "dropouts," are a critical issue in clinical trials, particularly when they lead to patients being lost to follow up. That is because patients who are not available for analysis at the end of a trial represent a problem for the sponsor and for regulatory agencies. According to one article on the subject, for instance, "the greatest contemporary threat [to randomized clinical trials] is considered to be to patients discontinuing or withdrawing from the trial, that is, withdrawing from the protocol-specified assessments needed to evaluate efficacy and safety."[2] According to the FDA, withdrawn subjects are more likely to have experienced adverse events experienced by the subject and would be unable to evaluate whether changes to the protocol or the informed consent documents are

[2] https://www.ahajournals.org/doi/full/10.1161/circheartfailure.115.002842.

needed."[3] Similarly, the European Medicines Agency has stated that "missing data are a potential source of bias when analyzing clinical trials. Interpretation of the results of a trial is always problematic when the proportion of missing values is substantial."[4] Put simply, patient dropouts decrease the sample size, thereby negatively affecting the likelihood of arriving at statistically significant results; and can introduce bias into the trial because dropouts may not be randomly distributed. And significantly, high dropout rates can undermine the results of a clinical research effort, representing the death knell for FDA approval – and thus any future commercial prospects.

46. In January 2023, Acelyrin revealed its Part A trial results. After 12 weeks of treatment, Acelyrin announced that izokibep demonstrated "high orders of HiSCR" showing 71% of participants achieving HiSCR50, 57% achieving HiSCR75, 38% achieving HiSCR90 and 33% achieving HiSCR100. (*See* May 3, 2023 Prospectus at 5, 138.)

47. These results played a key role in Acelyrin's campaign to raise the hype surrounding the upcoming IPO. Acelyrin, for instance, stated the Part A findings in its road show presentations and its May 5, 2023 IPO Offering Documents, stating, "As presented at the 2023 American Academy of Dermatology (AAD) annual meeting, izokibep demonstrated high orders of HiSCR in Part A of our Phase 2b/3 trial in HS … report[ing] data as observed at 12 weeks with 71% of participants achieving HiSCR50, 57% achieving HiSCR75, 38% achieving HiSCR90 and 33%

---

[3] F.D.A., "Guidance for Sponsors, Clinical Investigators, and IRBs Data Retention When Subjects Withdraw from FDA-Regulated Clinical Trials. U.S. Food and Drug Administration" (Oct. 2008), https://www.fda.gov/media/75138/download.

[4] European Medicines Agency, "Guideline on Missing Data in Confirmatory Clinical Trials" (Apr. 23, 2009), https://www.ema.europa.eu/en/documents/scientific-guideline/draft-guideline-missing-data-confirmatory-clinical-trials_en.pdf.

achieving HiSCR100" with "[b]oth Hurley Stage II and III participants [] present in the populations achieving the highest orders of response (HiSCR90 and HiSCR100)." *Id.* at 138 (emphasis added.)

48. These results were incredibly exciting for investors. For example, analysts at Piper Sandler spoke to a Key Opinion Leader (KOL) in the HS field who reported that "it was the best responses I have ever seen in any drug I have ever used both commercially and in clinical trials." (Piper Sandler - Part 1: Our Expert KOL Call, July 23, 2023.)

49. But Acelyrin also revealed that Part A experienced a high number of patient discontinuations. Nine out of thirty participants dropped out during the study—nearly *30%* of the patient population. (*See* May 3, 2023 Prospectus at 5.)

50. Acelyrin provided three reasons for this: two patients experienced gastrointestinal symptoms events, three experienced injection-site reactions (ISRs), and four patients moving away from study sites due to the COVID-19 pandemic. *Id.*

51. Acelyrin minimized concerns about safety impacting these discontinuations, assuaging the market that the ISRs were mild, and the gastrointestinal issues were preexisting, such that those patients should have been excluded from the study altogether. *Id.* at 10.

52. Unlike the more rigorous NRI method that Acelyrin had agreed to use for Part B, Acelyrin's Part A results relied on a methodology that assumes discontinued patients would have exhibited the same results at the end of the trial as they had on their last observation. *Id.* at 5, 129, 138 (describing the data "as observed.").

53. Purporting to learn from the Part A results, Acelyrin worked to resolve these high discontinuation rates in the more rigorous Part B trial by, for instance, issuing incoming Part B patients an "FAQ" to educate them on ISRs and other

adverse reactions to the izokibep injections. (Piper Sandler, "Acelyrin Part 2: Takeaways from Our SLRN Fireside Chat," July 23, 2023.)

54. At the time Acelyrin disclosed its Part A trial results in March 2023, the Part B trial was already well underway, with the lion's share of sites active for treatment by the latter half of 2022. Like the Part A results, however, Part B's ongoing trial also witnessed high dropout rates.

55. Acelyrin was under pressure to complete its Part B results given that competitor MoonLake Therapies was also racing to be the first next-gen HS inhibitor. Like Acelyrin, the efficacy of MoonLake's own compound (sonelokimab) was based on the hypothesis that smaller molecules can more deeply penetrate tissues and see better results.

56. MoonLake would be releasing Phase 2 data for its molecule in HS in June 2023. (Morgan Stanley, "Evaluating Key Considerations Ahead of PhII Part B Data for Izokibep in HS," Sept. 5, 2023.) Given this upcoming showdown, analysts eagerly awaited Acelyrin's "[k]ey immunology pipeline readout [from the Part B HS trial] … given it marks the first pipeline readout for SLRN following the company's IPO and given the focus placed on therapies for HS by a recent data set from competitor MoonLake Therapeutics." *Id.* Indeed, analysts "expect the benchmark for the [Acelyrin] Part B data to be formed by the recent sonelokimab data from MoonLake," noting "[w]hile the initial izokibep data is impressive, given the small *n* [sample size] of the Part A data we believe that the upcoming Part B data readout represents the key data set for determining izokibep's competitive strength & positioning" for the burgeoning HS market. *Id.* Investors thus closely watched MoonLake's contemporaneously developed agent alongside izokibep's results.

### C. Acelyrin Issues its IPO, Detailing its Izokibep Clinical Trials and the Drug's Prospects for the Treatment of HS.

57. On April 13, 2023, Acelyrin filed the Registration Statement on Form S-1 with the SEC in connection with its IPO, which, after several amendments, was declared effective by the SEC on May 4, 2023. Between February and April 2023, the Company and the SEC exchanged draft registration statements and correspondence about the registration statement's disclosures, with the SEC directing Acelyrin to remove any and all reference to the safety and efficacy of the Company's product candidates given that such "conclusions that are within the sole authority of the FDA and are assessed throughout the entire development process" and to "…describe the relevant preclinical and clinical trials and objective results of such trials…" (*See* Mar. 15, 2023 Ltr. from SEC to Acelyrin; Apr. 6, 2023 Ltr. from SEC to Acelyrin.)

58. On May 4, 2023, pursuant to the Registration Statement, Acelyrin's common stock began publicly trading on the NASDAQ under the trading symbol "SLRN".

59. On May 5, 2023, Acelyrin filed the Prospectus on Form 424B4 with the SEC in connection with the IPO (the "May 5, 2023 Prospectus"), which incorporated and formed part of the Registration Statement.

60. Pursuant to the Offering Documents, Acelyrin issued 30 million shares of its common stock to the public at the Offering price of $18.00 per share for proceeds to the Company of $502.2 million after applicable underwriting discounts and commissions.

61. The Offering Documents stated the success of izokibep's purported efficacy in treating HS during Part A of the Phase 2b/3 clinical trials and assuaged any fears about Part A's one-third discontinuation rate.

62. According to the Offering Documents, the confirmatory Part B clinical trial was "ongoing" with top line results expected in the second half of 2023. (*See* May 5, 2023 Prospectus at 5, 137.)

63. The Offering Documents made several general disclosures about the risk of potential trial participant discontinuations and dropouts, including at higher rates than anticipated, and the negative impact of such discontinuations on drug approval, the trial data quality, and research and development costs.

64. The Offering Documents also made limited, specific disclosures relevant to the discontinuation risk, specifically the nine discontinuations in the Part A trial for injection site reactions, physical relocation and lost to follow up, and adverse events.

65. However, nowhere in the Offering Documents do they discuss or mention any discontinuations in the ongoing Part B trial.

### D. High Numbers of Patient Discontinuations Compromised Acelyrin's Izokibep Clinical Trials for HS.

66. While the Offering Documents bolstered investors' confidence in izokibep as a revolutionary treatment for HS, the fact of early patient discontinuations compromised the trials' integrity, and as alleged *infra* in Section V, the Offering Documents were materially misleading because they omitted facts necessary to make the statements therein not misleading by failing to disclose the rate of these discontinuations seen in Part B at the time of the IPO, a fact that was not disclosed until Acelyrin finally released its top line Part B results in September 2023.

67. Plaintiffs consulted with expert Todd Clark to assess Defendants' statements regarding the Part A and B HS trial data and results. Mr. Clark has a Masters of Science degree in drug development and regulation from Johns Hopkins University and an MBA from the Kellogg School of Business at Northwestern University. He is a pharmaceutical expert with approximately thirty years of

experience consulting for branded and generic drug companies, as well as biotech firms, investment banks, and health technology services to advise them on, among other things, drug development and clinical trial design. He served in an executive role at the largest pharmaceutical marketing communications firm in the world prior to 1998, at which time he founded the consulting company he runs today. In his consulting role, Mr. Clark has consulted with many of the top pharmaceutical companies in the world, has published extensively on industry topics, including clinical trial issues, and is frequently quoted in trade journals and by academics and has Clark has testified in numerous cases as an expert on pharmaceutical matters.

68. As he frequently does for pharmaceutical industry clients, Mr. Clark relied on known characteristics regarding Part B's size, treatment period, data-cutoff date, and discontinuation rates, as well as site activation dates and other information from clinicaltrials.gov to analyze enrollment, treatment, and discontinuation activity over the course of the trial.

69. Mr. Clark's expert analysis shows that:

(a) By the time of the May 4, 2023 IPO, Part B treatment had been substantially completed. Based on publicly available clinical trial registry data, site activation dates, and the August 2, 2023 Primary Completion Date for Part B, an estimated 56% of Part B patients had completed the 16-week treatment period by the IPO date.

(b) Acelyrin acknowledged monitoring discontinuation data on an ongoing basis during Part B, stating it had "an understanding at the end of the day" of discontinuation rates.

(c) Clinical literature establishes that discontinuation rates above 5% may be problematic and rates approaching or exceeding 20% may be fatal to a trial's

outcome.[5] These thresholds apply to clinical trials generally, irrespective of the method used to handle dropouts in the final analysis. Because Part B relied on the stringent NRI methodology — under which every discontinuation is counted as a treatment failure regardless of whether the patient was responding — the effective risk threshold is lower than in trials using more forgiving analytical methods such as Last Observation Carried Forward ("LOCF"). Accordingly, a discontinuation rate that might be manageable in another trial design poses materially heightened risk under NRI.

(d) Given that an estimated 56% of Part B patients had completed the 16-week treatment period by the IPO date, Acelyrin had a substantial basis from which to assess the trajectory of discontinuation rates. With an estimated 44% of patients still under active treatment, additional discontinuations were virtually certain to accumulate, meaning the observable rate at the time of the IPO represented a floor, not a ceiling. A company exercising reasonable care and monitoring discontinuations on an ongoing basis would have recognized that the rate was trending into the range that clinical literature identifies as materially threatening to a trial's ability to achieve its primary endpoint — particularly under NRI methodology.

(e) The ultimate Part B discontinuation rate of approximately 18-19% overall (with 25% in the izokibep QW arm) confirms that the trajectory observable at the time of the IPO did in fact result in rates that, combined with the disproportionate loss of responders, compromised the primary endpoint analysis. As

[5] *See*, Schulz KF, Grimes DA. Sample size slippages in randomized trials: exclusions and the lost and wayward. Lancet. 2002 Mar 2;359(9308):781-5. doi: 10.1016/S0140-6736(02)07882-0. PMID: 11888606. *See also*, Dettori JR. Loss to follow-up. Evid Based Spine Care J. Feb 2011 Feb;2(1):7-10. doi: 10.1055/s-0030-1267080. PMID: 22956930; and Dumville JC, Torgerson DJ, Hewitt CE. Reporting attrition in randomised controlled trials. BMJ. 2006 Apr 22;332(7547):969-71. doi: 10.1136/bmj.332.7547.969. PMID: 16627519; PMCID: PMC1444839.

Acelyrin itself has acknowledged, these discontinuation patterns were a primary cause of the trial's failure to achieve statistical significance.

## E. Ongoing Dropouts Predating the IPO Tanked Part B's Statistical Significance.

### 1. The Majority of Part B Patients Completed or Were Approaching the End of the Trial Before the IPO.

70. Even under conservative estimates, relying on publicly available data from the Part B timeline shows that the majority of patients had completed the trial at the time of the IPO. In summary, Mr. Clark modeled the enrollment and treatment timelines as follows.

71. First, based on information from clinicaltrials.gov, Mr. Clark observed that 92% of all sites involved in the clinical trial were active by January 13, 2023, which is 16 weeks prior to the IPO date. The trial was therefore very near to its eventual capacity long before May 4, 2023.

72. Mr. Clark also observed that while Part A of the trial was conducted exclusively at U.S. sites (meaning that any non-U.S. sites could only be involved in Part B), the first non-U.S. sites were brought online no later than August 5, 2022; of the 27 non-U.S. sites that would eventually be brought online, 85% were initiated on or before November 8, 2022, according to information from clinicaltrials.gov. Based on when non-U.S. sites were initiated, it is likely that Part B enrollment began around August 2022.

73. Part B reached its "Primary Completion Date" ("the date on which the last participant in a clinical study was examined or received an intervention to collect final data for the primary outcome measure") on August 2, 2023—meaning the last patient was first administered izokibep or placebo 16 weeks earlier, on or around April 12, 2023, almost one month prior to the IPO. *See*, https://classic.clinicaltrials.gov/ct2/show/NCT05355805?term=NCT05355805&draw=2&rank=1 (August 2, 2023 primary completion date). *See also*

www.clinicaltrialsregister.eu/ctr-search/trial/2021-005713-13/ES/ at E.8.8. (indicating Part B trial end date defined as the date of the last visit of the last subject).

74. Based on his analysis, Mr. Clark submits that at the time of the May 2023 IPO, an estimated 56% of patients had completed the 16-week trial. These completion figures are significant because they indicate that the majority of the placebo-controlled portion of Part B was over by the May 2023 IPO and Acelyrin would have been able to observe any discontinuations experienced by these patients by the IPO date, thereby providing Acelyrin with substantial data to predict the trajectory of discontinuation rates.

75. Finally, Mr. Clark relied on Acelyrin's own statements to investors on May 30, 2023, that Part B enrollment had concluded "early", and "ahead of schedule." (TD Cowen, "Initiation: Diamonds Are A Biotech Investor's Best Friend," May 30, 2023.) These statements along with the fact that the last patient's first dose would have been administered around April 12, 2023 in order to meet the 16-week treatment period by the August 2, 2023 primary completion date, show that enrollment was concluded before the May IPO.

**2. Acelyrin Learned About Part B Patient Discontinuations as They Occurred.**

76. Acelyrin tracked these discontinuations in near real-time. While Acelyrin would remain "blinded" to *efficacy* results, it had access to, and did in fact monitor, *discontinuations* in near real-time. As stated, "they have been tracking discontinuation rates across all studies and in the Ph2b Part B … not in real time, but they have an understanding at the end of the day." (Piper Sandler, "Acelyrin Part 2: Takeaways from Our SLRN Fireside Chat," July 23, 2023.)

77. Thus, Acelyrin was apprised of dropouts throughout the trial, meaning that Defendants had the ability to know of these facts before the IPO.

78. Moreover, under standard U.S. sponsor monitoring practices, Acelyrin—as the IND sponsor—had an obligation to "monitor the progress of all clinical investigations being conducted under its IND," [21 C.F.R. § 312.56(a)], and therefore had at a minimum rolling visibility into accumulating blinded operational trial metrics as those data were reported and entered (including discontinuations, missed visits, and loss to follow-up). *See also* 21 C.F.R. § 312.50 (requiring sponsors to "ensur[e] proper monitoring of the investigation(s)" and that it "is conducted in accordance with the general investigational plan and protocols contained in the IND"); 21 C.F.R. § 812.40 (drug "[s]ponsors are responsible for … ensuring proper monitoring of the investigation").

79. Consistent with FDA's *Oversight of Clinical Investigations — A Risk-Based Approach to Monitoring* (Aug. 2013) ("2013 Guidance"), sponsors and representatives should conduct centralized monitoring—i.e., "a remote evaluation carried out by sponsor personnel or representatives"—to "[m]onitor data quality through routine review of submitted data to identify and follow-up on missing data, inconsistent data, data outliers, and potential protocol deviations," and "[a]nalyze site … performance metrics" such as "high screen failure or withdrawal rates." This approach was elaborated in FDA's April 2023 guidance *A Risk-Based Approach to Monitoring of Clinical Investigations Questions and Answers* ("2023 Guidance"), which affirms that electronic data capture (EDC) systems enable assessment of quality metrics (e.g., missing data, data error rates, protocol violations) in real time to identify higher-risk sites, allowing sponsors to review study data in real time across clinical sites and detect issues like delays in entering data or incomplete entries more quickly than on-site monitoring alone.

80. Accordingly, even while treatment assignments and interim comparative results remained blinded, Acelyrin could have and should have observed discontinuations on a timely, ongoing, near-real-time basis in order to assess risks.

### 3. There Was Sufficient Information at the Time of the IPO to Understand that Part B Faced a High Likelihood of Failure

81. In Mr. Clark's opinion, a company that was being informed of discontinuations on an ongoing basis had substantial reason to conclude that Part B faced heightened risk of failure at the time of the IPO. This remains the case even if the company was blinded to the details of those discontinuations and even if it did not know that the placebo-response rate would be unusually high. The basis for Mr. Clark's opinion is as follows.

82. First, the end-of-trial discontinuation rate in Part B was 18 to 19% (September 11, 2023 presentation, Slides 6 and 11). Although patients tended to drop out more often in the final four-weeks than at any other point in their 16-week treatment cycle (September 11, 2023 presentation, Slide 11), this is distinct from the distribution of events over the course of the overall trial in calendar time. This means that discontinuation rates as the trial progressed and more patients completed the treatment period could provide a reasonable estimate of the final rate.

83. Second, Acelyrin was informed as to discontinuations on an ongoing basis and would also have known (a) that a substantial portion of the patient population had completed the trial, thereby providing a sufficient basis for projecting the final rate; and (b) that another large contingent of patients was still under treatment, meaning that more discontinuations would occur.

84. Third, a trial where an estimated 56% of all patients had already completed the treatment cycle that was on a trajectory to experience a discontinuation rate near or exceeding 20% was already at a problematic point. With only a minor uptick in the rate of discontinuations among the estimated 44% of patients still on active treatment, it could easily tip into a range where discontinuations alone would cause trial failure. The materiality of this information does not depend on whether the discontinuation rate ultimately exceeded 20%. Rather, the fact that the observable

rate was already approaching a recognized danger threshold with a substantial portion of the trial still ahead constituted a known trend materially heightening the risk of trial failure. Again, this information was knowable by early May 2023, as was the fact that 30% of patients dropped out in Part A. Even subject to the limitations imposed by blinding, these considerations alone could reasonably be understood as raising serious doubts about the viability of Part B by the time of the IPO.

85. Fourth, based on Acelyrin's September 11, 2023 slide presentation, the Part B trial was randomized in a 2:1 ratio with approximately 66% of the 175 patients assigned to active drug arms and only 34% assigned to placebo. As set forth above, Acelyrin admitted that it was monitoring discontinuations. Due to the patient distribution, even if the discontinuation events were randomly distributed, there would be a two-thirds probability that a dropout occurred in an active arm.

86. Fifth, it is also predictable that injection-site reactions, one of the most common treatment-related cause of discontinuation in Part A, would occur more frequently in patients on the once-weekly arm and that an investigative agent would be more likely to cause these reactions than a placebo.

#### 4. Based on the High Discontinuation Rates from Part A, There Was Reason to Monitor for Similar Results in Part B.

87. Mr. Clark also highlighted key facts suggesting these discontinuations would be material and impact the integrity of the trial. Part A had already suffered from a high rate (30%) of discontinuations, all of whom were on active therapy. Acelyrin's steps to reduce discontinuations through patient education suggest Acelyrin was already attuned to the likelihood that it might be subject to similar issues. Moreover, even if the educational efforts were successful in reducing ISR-related dropouts, there was no basis to assume they would have any effect on lost-to-follow-up patients, an even larger source of discontinuations in Part A.

88. Taking these points together: Defendants knew that Part A experienced high discontinuations, all of whom were on active therapy; it would be expected that Part B dropouts were much more likely to occur in the active arms both because these were a larger cohort by a 2:1 ratio and because placebo would be less likely to result in injection-site reactions; the Part B trial was at an advanced stage of completion on the IPO date; and discontinuations would seriously undermine the Part B trial results and the ability to achieve primary endpoint. This is particularly true considering that the FDA and Acelyrin agreed to assess discontinuations using the NRI method before the IPO.

89. According to Mr. Clark, the high dropout rate in Part A, the degree of Part B completion, Acelyrin's acknowledged monitoring of dropouts during Part B, the use of NRI as the relevant metric, and the number of trial dropouts Acelyrin observed at the time of the IPO would be material information likely impacting the integrity of the trial.

## V. MATERIALLY INCOMPLETE AND THEREFORE MISLEADING STATEMENTS FOR THE SECURITIES ACT CLAIMS

90. The Offering Documents were issued on May 4, 2023, when Acelyrin's common stock began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions in the Offering Documents.

91. In the Offering Documents, Acelyrin discloses the timeline for its Phase 2b/3 trial for HS:

> *Summary Overview of Izokibep*
>
> Izokibep is currently in development for multiple immunological indications including hidradenitis suppurativa (HS), psoriatic arthritis (PsA), axial spondyloarthritis (AxSpA) and uveitis. Izokibep has been administered to more than 400 participants and in some for up to three years. More than 150 participants received doses up to 160 mg and more than 80 participants received up to 160 mg weekly, some out to six months. ***Izokibep has generally been well-tolerated with localized mild-to-moderate injection site reactions being the most common adverse event.***

> ***Our active ongoing trials with izokibep are a*:**
> - ***Phase 2b/3 trial of izokibep in HS*;**
> - Phase 2b/3 trial of izokibep in PsA; and
> - Phase 2b/3 trial of izokibep in uveitis.
>
> ***
>
> ***Topline data in the Phase 2b/3 trial of izokibep in HS is expected in the second half of 2023.*** Longer term results in the Phase 2b/3 trial of izokibep in HS, topline data in the Phase 2b/3 trial of izokibep in PsA, and topline data in the Phase 2b/3 trial of izokibep in uveitis are each anticipated in mid-2024.

May 3, 2023 Prospectus at 3. (Emphasis added.)

92. The statements in ¶ 91 were materially incomplete and therefore misleading because, while they disclosed the timeline for "expected" "Part B topline data," they omitted material contemporaneous information that would have informed investors' assessment of the likelihood that such results would be favorable. Specifically, Acelyrin failed to disclose that: (1) by the time of the IPO, Acelyrin was observing elevated discontinuation rates in the ongoing Part B trial that materially heightened the risk that the expected topline data would cause the Part B trial to miss its primary endpoint; (2) under the NRI methodology agreed upon with the FDA for Part B analysis, these observed discontinuation rates would count against the efficacy results regardless of whether the discontinuing patients had been responding to treatment; and (3) a reasonable investor would have considered this information significant in assessing both the risk profile of the investment and the probability that the anticipated Part B results would support continued development of izokibep for HS.

93. In the Offering Documents, Acelyrin also states:

> *Izokibep for the Treatment of Moderate-to-Severe HS*
>
> ***

> ***The double-blind, placebo-controlled Part B of this Phase 2b/3 trial is still actively ongoing and based on the Part A results, we also plan to begin a second Phase 3 trial in HS.***

May 3, 2023 Prospectus at 4-5. (Emphasis added.)

94. The statements in ¶ 93 were materially incomplete and therefore misleading because, while they disclosed Part B was "still actively ongoing," they omitted material contemporaneous information that would have informed investors' assessment of the likelihood that such results would be favorable. Specifically, Acelyrin failed to disclose that: (1) by the time of the IPO, Acelyrin was observing elevated discontinuation rates in the ongoing Part B trial that materially heightened the risk that the expected topline data would cause the Part B trial to miss its primary endpoint; (2) under the NRI methodology agreed upon with the FDA for Part B analysis, these observed discontinuation rates would count against the efficacy results regardless of whether the discontinuing patients had been responding to treatment; and (3) a reasonable investor would have considered this information significant in assessing both the risk profile of the investment and the probability that the anticipated Part B results would support continued development of izokibep for HS.

95. In the Offering Documents, Acelyrin describes its Phase 2b/3 clinical trial of izokibep for the treatment of HS:

> ***Our Ongoing Phase 2b/3 Trial of Izokibep in HS***
>
> ***
>
> ***We are currently conducting a randomized, placebo-controlled double-blind dose-finding Part B of this trial and expect to enroll approximately 150 participants.*** Moderate to severe HS is characterized by the presence of HS lesions in more than two distinct anatomic areas (groin, gluteal cleft, under the breasts, across the upper back and neck), with one of these areas having Hurley Stage II or III, which includes tunnelling or scarring. ***After consultation with the FDA, the trial is expected to enroll participants with moderate-to-severe HS, diagnosed over a year before the expected first dose in the trial, with a total abscess and inflammatory nodule (AN) count of greater than five at screening and prior to enrollment and randomization. Participants will be randomized into four cohorts: two cohorts will receive placebo***

> ***as either a QW or Q2W dosing. Two other cohorts will receive 160 mg izokibep as either QW or Q2W dosing. The primary endpoint is HiSCR75 at Week 16. Secondary endpoints include the reduction in participants assessment of skin pain, reduction in flares, and percentage of participants with reduced counts of abscesses and inflammatory nodules. After Week 16, participants that previously received placebo will be dosed with 160 mg izokibep on their previous dosing schedule until the end of the treatment period at Week 32.***

May 3, 2023 Prospectus at 136-38. (Emphasis added.)

96. The statements in ¶ 95 were materially incomplete and therefore misleading because, while they disclosed the timeline for expected Part B topline data, they omitted material contemporaneous information that would have informed investors' assessment of the likelihood that such results would be favorable. Specifically, Acelyrin failed to disclose that: (1) by the time of the IPO, Acelyrin was observing elevated discontinuation rates in the ongoing Part B trial that materially heightened the risk that the expected topline data would cause the Part B trial to miss its primary endpoint; (2) under the NRI methodology agreed upon with the FDA for Part B analysis, these observed discontinuation rates would count against the efficacy results regardless of whether the discontinuing patients had been responding to treatment; and (3) a reasonable investor would have considered this information significant in assessing both the risk profile of the investment and the probability that the anticipated Part B results would support continued development of izokibep for HS."

97. In the Offering Documents' "Management Discussion and Analysis of Financial Condition and Results of Operations" section, Acelyrin disclosed that: "***Our future research and development costs may vary significantly based on factors such as: … patient drop-out or discontinuation rates…***" *Id.* at 111. (Emphasis added.)

98. The statements in ¶ 97 were materially incomplete and therefore misleading because, while they cautioned that the Company's future research and

development costs may vary based on patient drop-out or discontinuation rates, they omitted to disclose the high dropout rate in Part B was an existing phenomenon with immediate financial implications. Specifically, Acelyrin failed to disclose that: (1) by the time of the IPO, Acelyrin was observing elevated discontinuation rates in the ongoing Part B trial that materially heightened the risk that the expected topline data would cause the Part B trial to miss its primary endpoint; (2) under the NRI methodology agreed upon with the FDA for Part B analysis, these observed discontinuation rates would count against the efficacy results regardless of whether the discontinuing patients had been responding to treatment; and (3) a reasonable investor would have considered this information significant in assessing both the risk profile of the investment and the probability that the anticipated Part B results would support continued development of izokibep for HS.

99. The "Risk Factors" section of the Offering Documents states, "***[Acelyrin] or our collaborators may experience delays in initiating or completing clinical trials due to unforeseen events or otherwise, that could delay or prevent our ability to receive marketing approval or commercialize our current and any future product candidates, including: … participants may drop out or fail to return for post-treatment follow-up at a higher rate than we anticipate***." *Id.* at 23. (Emphasis added.) It goes on to say, "[p]articipant enrollment, a significant factor in the timing of clinical trials, is affected by many conditions including the size and nature of the patient population, the number and location of clinical sites we enroll, the proximity of participants to clinical sites, the eligibility and exclusion criteria for the trial, the design of the clinical trial, the inability to obtain and maintain participant consents, [and] ***the risk that enrolled participants will drop out before completion***…" *Id.* (Emphasis added.)

100. The statements in ¶ 99 were materially incomplete and therefore misleading because, while they warned of the risk that participants "may" drop out

at a higher rate than anticipated, that risk had already materialized, Specifically, Acelyrin failed to disclose that: (1) by the time of the IPO, Acelyrin was observing elevated discontinuation rates in the ongoing Part B trial that materially heightened the risk that the expected topline data would cause the Part B trial to miss its primary endpoint; (2) under the NRI methodology agreed upon with the FDA for Part B analysis, these observed discontinuation rates would count against the efficacy results regardless of whether the discontinuing patients had been responding to treatment; and (3) a reasonable investor would have considered this information significant in assessing both the risk profile of the investment and the probability that the anticipated Part B results would support continued development of izokibep for HS.

101. The risk factors went on to say that Acelyrin "***ha[s] in the past and may in the future experience participant withdrawals or discontinuations from our trials***" and such "***[w]ithdrawal of participants from our clinical trials may compromise the quality of our data.***" *Id.* (Emphasis added.) Further, "[i]f additional adverse events, SAEs or other side effects are observed in any of our clinical trials that are atypical of, or more severe than, the known side effects of the respective class of agents that each of our product candidates are a part of, we may have difficulty recruiting participants to our clinical trials, ***participants may drop out of our trials***, or we may be required to abandon those trials or our development efforts of one or more product candidates altogether." *Id.* at 25. (Emphasis added.)

102. The statements in ¶ 101 were materially incomplete and therefore misleading because, while they cautioned that Acelyrin "may" in the future experience participant withdrawals and that such withdrawals "may compromise the quality of our data," the risks being described were not merely a possibility, but had already materialized. Specifically, Acelyrin failed to disclose that: (1) by the time of the IPO, Acelyrin was observing elevated discontinuation rates in the ongoing Part B trial that materially heightened the risk that the expected topline data would cause

the Part B trial to miss its primary endpoint; (2) under the NRI methodology agreed upon with the FDA for Part B analysis, these observed discontinuation rates would count against the efficacy results regardless of whether the discontinuing patients had been responding to treatment; and (3) a reasonable investor would have considered this information significant in assessing both the risk profile of the investment and the probability that the anticipated Part B results would support continued development of izokibep for HS.

### A. The Registration Statement Failed to Comply with SEC Rules and Regulations and Applicable Accounting Principles

103. The Registration Statement failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were then having and were reasonably likely to have a material effect on Acelyrin's operating performance.

104. Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(2)(ii) ("Item 303"), required the Defendants to "[d]escribe any known trends or uncertainties" that would have "a material favorable or unfavorable impact" on the Company's financial condition. By the time of the IPO, Acelyrin had access to data showing that discontinuation rates in Part B were trending at elevated levels. This constituted a "known trend" within the meaning of Item 303 because: (a) the data was available to Acelyrin's management on an ongoing basis; (b) the trend of elevated discontinuations was objectively observable from the data; and (c) under the NRI methodology, this trend was reasonably likely to increase a risk of an unfavorable impact on Part B's ability to achieve statistical significance, which would in turn have an unfavorable impact on Acelyrin's development timeline, regulatory pathway, and commercial prospects for izokibep in HS—its lead product candidate representing 'multi-billion-dollar' market opportunities. Significantly, Acelyrin's own post-IPO disclosures confirm that discontinuation trends were material. In its Q3 2023 Form 10-Q, after the Part B results were announced, Acelyrin for the first time added risk

factor language specifically addressing "patient responder discontinuations unrelated to adverse events, such as we observed in our Phase 2b/3 trial of izokibep in HS." The fact that Acelyrin deemed this information sufficiently material to warrant specific risk factor disclosure after the fact confirms that the underlying trend data—which Acelyrin possessed before the IPO—was material and should have been disclosed.

105. Similarly, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required in the "Risk Factors" section of registration statements and prospectuses "adequately describe" the most significant risks making the offering speculative. The risk of clinical trial discontinuations compromising trial results was among the "most significant factors" facing Acelyrin because the Company's entire value proposition depended on successful clinical development of izokibep. The Registration Statement failed to adequately describe this risk because it presented discontinuation risk in general, hypothetical terms when Acelyrin possessed specific, contemporaneous information indicating the risk was materializing. An "adequate" description of the discontinuation risk, under these circumstances, required disclosure of: (a) the discontinuation rates actually being observed in Part B; (b) how those rates compared to Part A and to historical industry norms; and (c) the potential impact of those rates on the trial's ability to achieve statistical significance under the NRI methodology. The Registration Statement disclosed none of this information.

106. The Registration Statement failed to disclose the following material facts set forth herein: the high participant discontinuation rates from the ongoing Phase 2b/3 Part B trial of izokibep in treating HS, and the attendant negative consequences and risks stemming from this information, had already presented by the time of the IPO. These omitted material facts violated Item 303 because these undisclosed facts, trends, and uncertainties were known and would (and did) have an unfavorable impact on the Company's financial performance. The fact of high

discontinuations in the Part B trial indicated the clinical trial was less likely to succeed, a material fact that, when later revealed in the Part B topline results, did result in a significant stock price drop.

107. The Registration Statement's failure to disclose these omitted material facts also violated Item 105 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Acelyrin stock speculative or risky. Indeed, as alleged above, the purported risk factors regarding the potential for and impact of clinical trial participant discontinuation provided in the Registration Statement were themselves materially incomplete and therefore misleading when made and omitted the most significant risks facing the Company at the time of the IPO because they identified the risk generally but failed to disclose that such risk had in fact already presented. The fact of high discontinuations in the Part B trial indicated the clinical trial was less likely to succeed.

108. In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part:

> Required disclosure is based on ***currently known trends, events, and uncertainties that are reasonably expected to have material effects***, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> * * *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

109. The 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

110. Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F." In particular, the SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release as support and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – *i.e.*, reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

111. Accordingly, Acelyrin had an affirmative obligation to disclose in the Registration Statement information required by Items 303. The Registration Statement, however, omitted material facts required to be stated therein because it failed to disclose information regarding the following known trends, events, or uncertainties in existence at the time of the IPO, specifically, that the high participant discontinuation rates from the Part B trial of izokibep in treating HS, and the attendant negative consequences and risks stemming from this information, had already presented by the time of the IPO.

112. The Registration Statement similarly omitted material facts required to be stated therein because it failed to disclose information on some of the most material risks facing Acelyrin at the time of the IPO in violation of Item 303 and Item 105. As set forth above, the Registration Statement omitted material facts required to be stated therein because it failed to disclose the risks associated with the undisclosed trends, events, or uncertainties identified above. The foregoing rendered the IPO significantly riskier than portrayed. The absence of this information was materially misleading because it omitted facts necessary to make the statements therein not misleading about the prospects and drawbacks of investing in Acelyrin, as well as the true risk profile of investing in Acelyrin Class A common stock.

## VI. EVENTS AND DISCLOSURES FOLLOWING THE OFFERING.

113. On September 11, 2023, after the markets closed, Acelyrin issued a press release entitled "ACELYRIN, INC. Announces Top-Line Results from Placebo-Controlled Clinical Trial of Izokibep for Moderate-to-Severe Hidradenitis Suppurativa."

114. In that press release, Acelyrin "announced top-line results from Part B of a Phase 2b/3 trial evaluating izokibep for the treatment of moderate-to-severe Hidradenitis Suppurativa (HS)" revealing that "[t]he primary endpoint of HiSCR75 at week 16 did not meet statistical significance."

115. High discontinuation rates, occurring "as early as week four" were a primary reason for this failure:

> The randomized double-blind, placebo-controlled, multi-center trial evaluated the safety and efficacy of izokibep dosed 160 mg weekly (QW) and every two weeks (Q2W), versus placebo, in 175 patients with moderate-to-severe HS (Hurley Stage II and III). The trial was conducted at 50 sites globally and assessed various efficacy endpoints, including the primary endpoint of HiSCR75 (Hidradenitis Suppurativa Clinical Response) at 16 weeks utilizing a non-responder imputation (NRI) analysis method.
>
> ***In the primary NRI analysis of Part B, statistical significance was impacted by patients with HiSCR75-100 discontinuing as early as***

> ***week 4 unrelated to adverse events***. …. Applying a Last Observation Carried Forward (LOCF) sensitivity analysis of the full dataset highlighted the ***impact of responder discontinuations on the primary analysis and showed statistical significance of HiSCR75 at week 16***….
>
> ***Also, given the number of responders who discontinued in the QW arm – the majority unrelated to an adverse event – a modified-NRI (mNRI) approach showed a high level of statistical significance and highlighted the impact of discontinuations on magnitude and significance of response***. This analysis demonstrates the performance of izokibep at this juncture in the study – in isolation from the placebo rate increases observed later in the trial – and provides an exploratory approach to analyzing responder discontinuations. (Emphasis added.)

116. On September 11, 2023, Acelyrin held a call with investors to discuss these "extremely disappointing" results. For the HS Part B top line results, "the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in the primary non-responder imputation analysis" which Acelyrin stated was caused by "two" "***surprising***" "factors," the main one being "***discontinuation*** of HiSCR75 to HiSCR100 responders in the Q week arm due to reasons unrelated to adverse events."[6] (Acelyrin Results Call, Sept. 11, 2023) (Emphasis added.)

117. As Acelyrin explained, these "***discontinuations mattered and affected the outcome of the study***." *Id.* While "[t]he study was over enrolled to account for potential discontinuations, … ***there were both more discontinuations and importantly more responder discontinuations, including even HiSCR75 and HiSCR100 responders than we would expect***. ***Ordinarily, discontinuations tend to occur due to lack of response or for safety and tolerability issues. We did not see***

[6] The other was a "marked increase in placebo rates during the course of the study." *Id.* "[O]ur placebo rates that are markedly higher than historical precedent." *Id.* "Statistical significance was further impacted by the unexplained and marked increase in placebo range during the course of the study to unprecedented levels." *Id.* Although admittedly this "had doubled relative to historical precedents," Acelyrin would only say "[w]e really don't have a good explanation for why that should be happening." *Id.* Acelyrin would only provide that "to be honest, this is the first time in my career that I've seen responders discontinuing without adverse event like this, and also placebo responses sort of increasing in rates during the course of the study to these unprecedented high levels." *Id.*

***that in this study***." "***Discontinuation rates for this study were higher than expected,*** and we tried to understand the potential drivers." Yet "[w]e ***have not identified a clear pattern for reasons for dropout***." *Id.* (Emphasis added.)

118. During the question-and-answer segment, investors struggled "to wrap [their] head around the data," asking again for Acelyrin to explain "the reasons for the discontinuation specifically for the patients who are not discontinuing due to treatment or a side effect" and "what were the major reasons for discontinuations in the placebo? And how do we think about the high – the discontinuations in the placebo along with that high placebo response that you're seeing?" *Id.*

119. Acelyrin, however, only reiterated it was "***really not seeing a pattern at all that we can speak to***." *Id.* (Emphasis added.) Acelyrin noted, however, that these discontinuations occurred "***early***." *Id.* (Emphasis added.)

120. Acelyrin discussed trial modifications to avoid these surprising and "unexplained" results: "There are modifications we are considering to address discontinuations … such as sample size, baseline characteristics, time point and subject to further discussion with health authorities, endpoint and statistical approaches in our continued efforts to bring izokibep to patients with HS." *Id.*

121. On this news, Acelyrin's stock price fell $17.19 per share, or 61.61%, over the following two trading sessions, to close at $10.71 per share on September 13, 2023.

122. These surprising results—and the lack of plausible explanation—left analysts scratching their heads. As one September 12, 2023, report noted "***it's difficult to glean much from the data given how poorly the trial was run [due to] one of the highest … d/c [discontinuation] rates we've seen in HS***." (Jeffries, Sept. 12, 2023) (Emphasis added.)

123. As this report went on, given the "painfully disappointing HS data" from "***high dropouts***" the prior, expected "base case scenario of a 25-30% HiSCR75 delta

at week 16 … was clearly wrong." (Jeffries, 9/12/23) (Emphasis added.) "The most problematic part of the SLRN HS data is that the only dose that looks competitive vs next-gen IL-17's = the 160mg QW dose (if you give SLRN the benefit of the doubt)" but ***"[u]nfortunately that dose also showed a ~25% D/C [discontinuation] rate (approx double the Q2W dose)—which isn't commercially viable***." *Id.* (Emphasis added.)

124. Regarding the "high rates of study discontinuation reported in the izo 160 mg QW arm," analysts noted that:

> ***The dropouts occurred among responders as early as week 4, which SLRN indicated may have impacted the significance of HiSCR responses***…Izo 160mg QW arm had the highest total d/c rates ~25%, almost double vs the Izo Q2W and pbo arms. The d/c rates due to AE were low 2-5% in the Izo dose groups, suggesting most of the d/c [discontinuations] were not related to safety/tolerability. Interestingly, there were seemingly high discontinuations in Part B in the pbo arm as well (~17%). Additionally, it's unclear how SLRN defines d/c unrelated to AE (vs non-tx related AE's) & what types of pts they censored in their KM curve as we're seeing some discrepancies in #'s reported in the slides…
>
> The reason for the non-treatment related d/c's [discontinuations] in izo's Part B trial is still being assessed. When we caught up with SLRN mgmt, they told us the reason for d/c [discontinuations] were labeled all kinds of different ways, but not labeled as related to AE. SLRN has looked at each of the d/c [discontinuations] cases on a subject level to dig for whether there is a safety/tolerability issue since it's unlikely due to lack of efficacy response. ***SLRN told us they found no pattern to why these d/c chose to drop out of the study***, other than in the weekly QW arm the majority of the dropouts were responders (8/14 responders, 7 of the HiSCR75-100, 2 of HiSCR100) and 11 of the 14 QW dropouts were not treatment-related.
>
> Based on our analysis, historical studies showed most of the IL-17 agents had <10% total d/c [discontinuations] rates, and the majority of the dropouts were safety-related. Despite Humira (adalimumab) showing relatively high d/c [discontinuations] rates ~18% in one Ph2 HS study, it had d/c of 2-3% in other trials. ***Given this, we think different trial designs or conduct could potentially play a role.*** Compared to other IL-17 studies, Izo in general had higher total d/c [discontinuations] rates of 12-25% in HS and 14-23% in PsO, but

> relatively low rate 2-5% in PsA. In HS Ph2/3 part A and Ph2 PsO, more d/c [discontinuations] were related to AE (5-17%) vs 2-5% in HS PartB. *Id.* (Emphasis added.)

125. Moving forward, analysts will "need more clarity on the regulatory path forward is (eg, ***trial design/stat modification) … [and] until mgmt provides a good explanation about what is causing the non-tx related dropouts***, izo's potential in HS remains a 'show me' story." *Id.* (Emphasis added.) Until then, investors will remain "skeptical of [Acelyrin's] data" given "***how poorly the trial was run***." *Id.* (Emphasis added.)

126. In a series of talks at analyst-hosted conferences following this news, Acelyrin would not provide any new information to explain the "surprising" dropout rates.

127. At a September 13, 2023, conference hosted by Morgan Stanley, Acelyrin reiterated:

> ***The discontinuations are happening early***. ***They're happening early in the treatment groups, as early as week four in dose treatment groups***….
>
> We asked ourselves the number of discontinuations … that changed during the course of the study or actually sort of ***reached levels that we frankly haven't seen in historical studies*** … And when we dug down to understand what was happening, we found that, especially in the weekly arm, that there were more discontinuations and the majority of those discontinuations were actually responder discontinuations, ***which is very unusual***….
>
> ***We looked across our discontinuations to understand whether or not there was a pattern…. So, it was very confusing to us. We looked both at what was reported to us as the reason of the discontinuation as well as we looked through the full database of everything we had on – had captured on these patients to ask ourselves, was there a tolerability pattern that we could see? And we have not seen that at this point***. (Morgan Stanley, "Surprise Negative Outcome for Izokibep in HS," Sept. 13, 2023) (Emphasis added.)

128. In the question-and-answer portion, investors again pressed for any "hypothesis" to explain these dropouts and the data. In response, Acelyrin would only say it would not "speculate" as to a reason (*id.*):

> We went to the studies—study coordinators to then ask, hey, is there anything that you will have captured on any of these subjects from a discontinuation perspective that are in your database that is not necessarily in the electronic database so that we can continue to hunt for whether or not there's a pattern here. So we'll continue to assess these sorts of things. But at least at this juncture, there really isn't, you know, sort of anything that we can we can understand and we understand that that's unusual. *Id.*

129. Months later, Acelyrin continued to face the same questions. For instance, on Acelyrin's November 7, 2023 earnings call, in response to the question "in regards to HS, I was wondering, have you been able to further analyze the result to better understand the placebo response and discontinuation rate observed?" and if this would impact a PsA trial, Acelyrin responded:

> Obviously, given our HS readout that we shared in September, we've been ***extraordinarily hyper-vigilant with regards to putting in any measures such that we understand real time or continue to understand and make sure that we are understanding in real time any discontinuations …*** We don't anticipate any read-through to our PsA and we think that our sort of blinded continued analysis haven't suggested to us any issues in that regard. We have continued further deep dives with regards to the HS dataset … [and] we anticipate having more information with regards to that program by end of year, early next year to share when we have sort of relevantly compiled both our conversations with the health authorities as well as the deep dives that continue to be ongoing. (Acelyrin Earning Call, Nov. 7, 2023) (Emphasis added.)

130. In response to the question "on HS, can you go over precisely what your HS protocol deemed to be drug related or not?" for dropouts, Acelyrin would only say:

> We actually went back through and didn't just take at face value whether or not it was reported to us, whether there was a lot to follow

> up … We went back through the entire electronic dataset and evaluated for whether or not there was a pattern, including looking for ISRs that weren't necessarily reported as an AE. *Id.*

131. On November 7, 2023, Acelyrin issued a press release announcing the Company's Q3 2023 financial results and recent highlights while omitting mention of the week 16 failures in Part B of the HS clinical trial, stating only, "[w]e believe in izokibep's potential in hidradenitis suppurativa, with ~25% of patients achieving HiSCR100 responses within 12 weeks, which means they rapidly achieved resolution of all abscesses and nodules without new draining tunnels" and "[a]s we previously shared, discussions with the FDA will help inform next steps to advance our registrational program" and "expect to have an update by the end of this year or early next year."

132. A few days later, on November 9, 2023, Acelyrin filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended September 30, 2023 (the "Q3 2023 10-Q").

133. The Q3 2023 10-Q contained substantively similar statements as referenced in Section II.E., *supra*, regarding the design and execution of the Company's izokibep clinical trials, as well as the drug's purported mechanism of action in treating HS, except now the Company acknowledged the disastrous outcome of the Part B portion of its Phase 2b/3 trial in HS, "which significantly harmed [its] stock price."

134. In that Q3 10-Q, Acelyrin finally started disclosing the discontinuation issue from Part B.

135. For instance, in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section, Acelyrin disclosed that: "Our future research and development costs may vary significantly based on factors such as … patient drop-out or discontinuation rates…"

136. This time, however, the section elaborated on the discontinuation issues in Part B:

> A change in the outcome of any of these variables with respect to the development of any of our product candidates could significantly change the costs and timing associated with the development of that product candidate. ***For example, in September 2023, we announced that the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in Part B of the Phase 2b/3 trial of izokibep in HS. The factors we believe contributed to the Part B results, including subject discontinuations unrelated to adverse events*** and a marked increase in placebo response rates during the course of the trial, ***could negatively impact the results of ongoing and future clinical trials of izokibep, including the ongoing Phase 3 trial of izokibep in HS, our ongoing Phase 2b/3 trial in PsA or trials in other indications. In any event, the negative results in Part B of the Phase 2b/3 trial may significantly extend our development timeline and significantly increase our development costs for HS.*** In this regard, we had previously planned for the inclusion of the Part B results from our Phase 2b/3 trial of izokibep in HS as part of the planned registrational package for HS. Subject to receiving feedback from the FDA regarding next steps for development of izokibep in HS, we may need to conduct and successfully complete both our ongoing Phase 3 trial in HS, as well as an additional Phase 3 trial in HS. (Q3 2023 10-Q at 34.) (Emphasis added.)

137. In the "Risk Factors" section of its Q3 10-Q, Acelyrin also for the first time highlighted the discontinuation plaguing Part B of the HS trials:

> Clinical testing can take many years to complete, and its outcome is inherently uncertain. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later-stage clinical trials. ***For example, despite encouraging results from the open-label Part A of our Phase 2b/3 trial of izokibep in HS, the primary endpoint of HiSCR75 at week 16 did not meet statistical significance in the Part B portion of such trial. This result significantly harmed our stock price and investor perceptions of the prospects for izokibep in HS, and may significantly extend our development timeline for such indication. The factors we believe contributed to the Part B results were primarily subject discontinuations unrelated to adverse events*** and a marked increase in placebo response rates during the course of the trial that led to overall placebo response rates that were markedly higher than historical rates in the HS indication. Our clinical trials are subject to significant risk factors that can have a material and negative impact on outcomes, many of which are beyond our control. ***Such factors include unexpectedly high*** placebo response rates and ***patient responder discontinuations unrelated to adverse events, such as we observed in our Phase 2b/3 trial of izokibep in HS…*** (*Id.* at 48.) (Emphasis added.)

> We or our collaborators may experience delays in initiating or completing clinical trials due to unforeseen events or otherwise, that

could delay or prevent our ability to receive marketing approval or commercialize our current and any future product candidates, including: … the number of participants required for clinical trials may be larger, enrollment in clinical trials may be slower, ***or participants may drop out or fail to return for post-treatment follow-up, in each case at a higher rate than we anticipate (as we experienced with respect to participant discontinuations in the Part B portion of our Phase 2b/3 trial of izokibep in HS)…***" (*Id.* at 48-49.) (Emphasis added.)

Participant enrollment, a significant factor in the timing of clinical trials, is affected by many conditions including the size and nature of the patient population, the number and location of clinical sites we enroll, the proximity of participants to clinical sites, the eligibility and exclusion criteria and overall design of the clinical trial, the inability to obtain and maintain participant consents, the ongoing risk that enrolled participants will drop out before completion, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the product candidate being studied in relation to other available therapies. Risks related to patient enrollment are heightened in longer clinical trials. In addition, our clinical trials will compete with other clinical trials for product candidates that are in the same areas as our product candidates, and this competition may reduce the number and types of participants available to us. Participants, including in any control groups, may withdraw from the clinical trial if they are not experiencing improvement in their underlying disease or condition or if they experience other difficulties or issues. Participants may also withdraw from the clinical trial if they experience improvement in their underlying manifestations of disease, and determine that further treatment is not necessary or unduly burdensome relative to their experienced improvement. Additionally, we could encounter delays if treating clinicians encounter unresolved ethical issues associated with enrolling participants in clinical trials of our product candidates in lieu of prescribing existing treatments that have established safety and efficacy profiles. Even if we are able to enroll a sufficient number of participants in our clinical trials, delays in enrollment or small population size may result in increased costs or may affect the timing or outcome of our clinical trials. ***We have in the past and may in the future experience participant withdrawals or discontinuations from our trials. Such withdrawals may compromise the quality of our data or contribute to negative or inconclusive results from trials, as we experienced in the week 16 Part B results of our Phase 2b/3 trial of izokibep in HS.*** Any of these conditions may negatively impact our ability to successfully complete such trials and/or include results from such trials in regulatory submissions, which could adversely affect our ability to advance the development of our product candidates in a timely and cost-efficient manner, or at all. ***For example in light of our week 16 Part B results in our Phase 2b/3 trial of izokibep in HS, subject to FDA feedback, the timeline for any potential related BLA submission for such indication may be significantly extended (or ultimately may not occur)…*** (*Id.* at 49-50.) (Emphasis added.)

> Our clinical trial results may also not support approval. In addition, our product candidates could fail to receive regulatory approval for many reasons, including the following:… the results of clinical trials may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval, including due to the heterogeneity of patient populations, ***participant discontinuation rates, or apparent improvement in trial participants receiving placebo such as those observed in week 16 results of Part B of the Phase 2b/3 trial of izokibep in HS…*** (*Id.* at 58.) (Emphasis added.)

138. That Acelyrin finally disclosed these risks to the market confirm they are material.

139. On November 27, 2023, Acelyrin issued a press release blaming its CRO Fortrea—the entity responsible for executing Acelyrin's HS and PsA clinical trials—for the errors uncovered in these trials, and resulting, at least in part, in a statistically insignificant outcome at primary endpoint week 16 in Part B of the Phase 2b/3 HS trial, stating:

> In September 2023, ACELYRIN disclosed top-line results from Part B of its Phase 2b/3 trial evaluating izokibep for the treatment of moderate-to-severe Hidradenitis Suppurativa ("HS trial"). ***Given certain confounding factors observed in the trial, including responder discontinuations without adverse events and a marked increase in placebo rates arising in the latter half of the study, the Company implemented quality control measures above and beyond standard protocol*** for the ongoing open-label extension of the HS trial, the ongoing Phase 3 trial in HS, and the ongoing PsA trial. These trials are being conducted by the same Contract Research Organization (CRO). The CRO does not conduct any trials on behalf of ACELYRIN beyond the izokibep clinical program…
>
> **Next Steps.** ACELYRIN's wide-ranging review of the ongoing izokibep trials, including operational execution by the CRO, is continuing. ACELYRIN will contract with a third-party to conduct an independent audit of the trials being conducted by the CRO for ACELYRIN, including the HS trial and the PsA trial. ACELYRIN will not use this CRO for any new trials that it conducts. Based on the outcome of its ongoing evaluation and the planned audit, the Company will determine the best path forward for the development of izokibep on behalf of patients. This will include a determination of whether to transition its ongoing trials to a new CRO or complete the trials with the current CRO…
>
> "We are disappointed by these developments, especially for the patients who need better treatment options for psoriatic arthritis and hidradenitis suppurativa," said Shao-Lee Lin, MD, PhD, founder and CEO of ACELYRIN. "However, we are a company founded on truth and

> transparency, and we are grateful that through the tenacity of our internal team we were able to identify these errors. We are committed to delivering the best possible outcome for patients, physicians and shareholders as we continue to pursue development of izokibep as a potentially differentiated treatment for multiple immunologic conditions." (Emphasis added.)

140. In response, the same day, Fortrea filed its own 8-K, "disput[ing] the accuracy of statements that ACELYRIN has made and the characterization of those statements in subsequent media reports." Specifically, "ACELYRIN implied, and media reported that the trial evaluating the product in the treatment of Hidradenitis Suppurativa (HS) was not conducted properly by Fortrea and that this may have impacted the outcome of the trial," but "Fortrea objects to the implications that Fortrea's study conduct impacted the trial outcomes" and "stands behind its conduct of the HS clinical trial in accordance with the protocol and applicable regulatory requirements." "Fortrea has successfully conducted thousands of clinical trials for more than 30 years, all while upholding the highest standards of integrity for all our customers. We have an unwavering commitment to the safety and well-being of patients and clinical trial participants, to data integrity, and to the ethical conduct of clinical trials."

141. This finger-pointing further confirms serious errors pervaded the Part B results.

142. Acelyrin's share price continued to decline, falling as low as $5.90 per share on January 19, 2024, and as of March 26, 2024 (the date the First Amended Complaint was filed) trading at $6.65 per share, more than 60% below the Offering price of $18.00.

## VII. CLASS ACTION ALLEGATIONS FOR THE SECURITIES ACT CLAIMS

143. Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all individuals

who purchased or otherwise acquired Acelyrin Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO (the "Class"). Excluded from the Class are the Defendants, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

144. The members of the Class are so numerous that joinder of all members is impracticable. Acelyrin Class A common stock is actively traded on the NASDAQ, and 30 million shares were sold in the IPO. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Acelyrin or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

145. Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by the Defendants' wrongful conduct in violation of the federal securities laws as complained of herein.

146. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

147. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Defendants violated the Securities Act;

(b) whether the Registration Statement issued by the Defendants to the investing public in connection with the IPO was prepared without the exercise

of reasonable care and due diligence required by the Securities Act and contained inaccurate statements of material fact or omitted material information required to be stated therein; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

148. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. CAUSES OF ACTION

## COUNT I

## FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS

149. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, by Lead Plaintiffs on behalf of the Class, against all Defendants.

150. The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

151. Acelyrin is the registrant for the IPO. As the issuer of its common stock, Acelyrin is strictly liable to Lead Plaintiffs and the Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required to be disclosed therein pursuant to the regulations governing the Registration Statement's preparation.

152. The Individual Defendants signed the Registration Statement either personally or through an attorney-in-fact and caused its issuance. Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants had a duty to ensure that such statements were true and accurate, and that there were no omissions of material facts that would make the statements in the Registration Statement inaccurate. By virtue of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained inaccurate misrepresentations and/or omissions of material facts. As such, the Individual Defendants are liable to Plaintiff and the Class under Section 11 of the Securities Act.

153. The Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not inaccurate. By reasons of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

154. At the time of their purchases of Acelyrin Class A common shares pursuant and/or traceable to the to the Registration Statement issued in connection with the IPO, Lead Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that the action commenced. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action commenced.

155. Lead Plaintiffs and the Class have sustained damages. The value of Acelyrin securities has declined substantially subsequent and due to the Defendants' violations.

**COUNT II**

**FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST ALL DEFENDANTS**

156. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of Lead Plaintiff and the Class against the Individual Defendants for their control of Acelyrin, and against Acelyrin for its control of the Individual Defendants and all its employees and subsidiaries in connection with the controlled persons' violations of Section 11 of the Securities Act relating to the IPO.

157. The Individual Defendants possessed the power to control, and did control, directly and/or indirectly, the actions of Acelyrin at all relevant times. By virtue of their positions as directors and/or senior officers of Acelyrin, the Individual Defendants possessed the power and authority to control the contents of Acelyrin's Registration Statement and had the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Acelyrin.

158. This claim is brought within the applicable statute of limitations.

159. As control persons of Acelyrin, the Defendants are liable jointly and severally and to the same extent as Acelyrin for its violations of Section 11 of the Securities Act. By reason of such conduct and participation, the Defendants are liable pursuant to Section 15 of the Securities Act.

**PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs demand judgment against Defendants as follows:

A. Determining this action to be properly maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as Class Representatives and Hagens Berman Sobol Shapiro LLP and Pomerantz LLP as co-Lead Class Counsel;

B. Awarding damages in favor of Lead Plaintiffs and the Class against Defendants, jointly and severally, by reason of the acts and transactions alleged herein in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C. Awarding Lead Plaintiffs and the Classes their reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D. Awarding Lead Plaintiffs and the Classes such other and further relief, including any injunctive or other equitable relief, as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiffs hereby demand a trial by jury.

DATED: February 5, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ *Lucas E. Gilmore*
LUCAS E. GILMORE

Reed R. Kathrein (139304)
Lucas E. Gilmore (250893)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Lead Plaintiff Kamel Boukadoum and Co-Lead Counsel for the Class*

DATED: February 5, 2026

POMERANTZ LLP

By: /s/ *Jennifer Pafiti*
JENNIFER PAFITI
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff Estate of Fred Bergman and Co-Lead Counsel for the Class*

**Attestation**

I, attest that all other signatories listed, and on whose behalf this document is submitted, concur in the filing's content and have authorized the filing.

Dated: February 5, 2026

*<u>/s/ Lucas E. Gilmore</u>*
Lucas E. Gilmore